```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA
 2

 3   UNITED STATES OF AMERICA,      •    Docket No. 8:23CR215
                                    •
 4           Plaintiff,             •
                                    •
 5       vs.                        •    Omaha, Nebraska
                                    •    January 14, 2025
 6   JADEN D. REIMAN,               •    9:34 a.m.
                                    •
 7           Defendant.             •
     • • • • • • • • • • • • • • • •

 8

 9

10         TRANSCRIPT OF MOTION TO SUPPRESS PROCEEDINGS
           BEFORE THE HONORABLE MICHAEL D. NELSON
11              UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16   APPEARANCES:

17   For the Plaintiff:        MR. THOMAS J. KANGIOR, ESQ.
                               Assist. United States Attorney
18                             1620 Dodge Street, Suite 1400
                               Omaha, NE  68102-1506
19

20   For the Defendant:        MR. MICHAEL J. WILSON, ESQ.
                               Berry Law Firm
21                             1414 Harney Street, Suite 400
                               Omaha, NE  68102
22

23

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription via mechanical stenography.
25
```

```
 1                    I N D E X

 2                        Direct Cross Redirect Recross

 3   WITNESSES FOR THE GOVERNMENT:

 4   1.    Inv. Daniel Eads............. 14    36    55

 5   2.    Sgt. Jarrod Wineinger........ 58    82    99    105

 6   3.    Off. Brian Gerrity...........108   116   123

 7         By the Court.................123

 8   WITNESSES FOR THE DEFENSE:

 9   None

10   EXHIBITS:                          Offered Received

11   1.    Body-worn camera footage.................. 8         8

12   2.    Body-worn camera footage.................. 8         8

13   3.    Body-worn camera footage.................. 8         8

14   4.    Body-worn camera footage.................. 8         8

15   5.    Signed Miranda form....................... 8         8

16   101. Screenshot photograph..................... 11        11

17   102. Screenshot photograph..................... 11        11

18   103. Screenshot photograph..................... 11        11

19   104. Screenshot photograph..................... 11        11

20   105. Screenshot photograph..................... 11        11

21   MOTIONS AND STIPULATIONS:             Made Ruled On

22   Motion to Sequester............................ 12        12

23   CLOSING ARGUMENT:  Mr. Wilson...................... 132

24   RESPONSE:  Mr. Kangior............................. 136

25   CERTIFICATE OF REPORTER............................ 147
```

```
 1              (At 9:34 a.m. on January 14, 2025, with counsel for the

 2     plaintiff present, counsel for the defendant present, and the

 3     defendant present, the following proceedings were had:)

 4              THE COURT:  ...United States of America vs. Jaden

 5     Reiman.  The case number is 8:23CR215.

 6              Counsel for the government?

 7              MR. KANGIOR:  Good morning, Your Honor.

 8     Thomas J. Kangior appearing on behalf of the United States.

 9     Also seated at counsel table is the case representative,

10     Daniel Eads.

11              THE COURT:  Okay.  Good morning to each of you.

12              On behalf of the defendant?

13              MR. WILSON:  Good morning, Your Honor.

14     Michael J. Wilson on behalf of Jaden Reiman.  He's present

15     here with me.

16              THE COURT:  Okay.  Good morning.

17              Good morning, Mr. Reiman.

18              THE DEFENDANT:  Good morning.

19              THE COURT:  How are you feeling today, sir?

20              THE DEFENDANT:  Nervous, but okay.

21              THE COURT:  Okay.  Well, nervous is usual.

22              We are scheduled for an evidentiary hearing on the

23     motion to suppress that was filed in this case on your

24     behalf.  Your attorney did file that motion.  It's at Filing

25     Number 231, supported by a brief at Filing Number 232.  The
```

 1    government filed its response at Filing Number 261.

 2         Essentially, the government -- or, essentially, the

 3    defendant argues that the stop on this case was unlawful; the

 4    detention of the defendant was without reasonable suspicion,

 5    that there wasn't probable cause for a search of the vehicle.

 6         Defendant also contests the dog's crossing the

 7    plane of the vehicle, and the defendant alleges that that

 8    constitutes unlawful search.  Defendant also alleges that

 9    there was coercion with regard to certain statements that

10    were made to law enforcement in this case.

11         The government contests all those matters and also

12    raises a good-faith exclusion in the -- in the event that

13    there was any unlawful activity on behalf of the officers.

14         Mr. Wilson, with regard to the statements, you are

15    contesting the statements made by your client on coercion

16    grounds but not on the grounds that he wasn't properly

17    advised of his Miranda rights?

18         MR. WILSON:  I did not raise the Miranda advisement

19    in the brief, Your Honor, but I believe that...

20         THE COURT:  Well, there is going to be an

21    exhibit --

22         MR. WILSON:  Right.  I did argue...

23         THE COURT:  -- for a Miranda waiver...

24         MR. WILSON:  Right.  And I -- but I did arg- -- and

25    I -- and I see why the government included it because in my

1   motion to suppress I did write, "none of which was cured by

2   Miranda advisements."

3            So I think that encompasses an improper or

4   ineffective Miranda advisement.

5            THE COURT:  Okay.  So from the court's perspective

6   you are not contesting whether Miranda was given or properly

7   given.  What you are contesting is is that any statements

8   were coerced or unlawfully given notwithstanding the fact

9   that Miranda warnings were properly given?

10           MR. WILSON:  Yes.  I arg- -- yeah.  I don't believe

11   we have an argument based on the evidence that I think we'll

12   hear here today that the Miranda warnings weren't given at

13   one point during this -- during the interrogation.

14           THE COURT:  They were not given?

15           MR. WILSON:  That they -- we don't have good

16   evidence that they were not given.

17           THE COURT:  Okay.

18           MR. WILSON:  That's a double negative.  I am sorry.

19           THE COURT:  Sure.  I understand.  I just want to

20   make sure.  The grounds are that they were coerced or there

21   was --

22           MR. WILSON:  Uh-huh.

23           THE COURT:  -- undue pressure given on the

24   defendant so that his will was overborn despite the fact that

25   he was given Miranda warnings.

1          MR. WILSON:  That's...

2          THE COURT:  Do I have that correct?

3          MR. WILSON:  That's correct, Your Honor.

4          THE COURT:  Okay.  And then, in addition, your

5    client takes issues with statements that were made by someone

6    else, namely his wife?

7          MR. WILSON:  Right.  I would suggest that all

8    statements that were made were the -- essentially fruit of

9    the poisonous tree given the coercive nature of the

10   interrogations.

11         THE COURT:  Right.  But your client doesn't have

12   standing to contest any statements that were made by someone

13   else.  That may be an issue that could be raised in advance

14   of trial in a motion in limine, but you don't claim standing

15   with regard to statements made by another person, do you?

16         MR. WILSON:  I did not claim standing in my motion

17   or my brief, no.

18         THE COURT:  Okay.  So, Mr. Kangior, did I properly

19   set forth the government's position, namely that the stop was

20   permitted because there was a following too closely traffic

21   infraction, that the detention -- that the prolonged

22   detention from the traffic stop was lawful because there was

23   reasonable suspicion to believe that the occupants of the

24   vehicle may have been engaged in criminal behavior, that the

25   dog -- taking the dog around for a sniff of the vehicle was

*Motion to Suppress*

1  lawful, and if the dog, in fact, put its head or nose into
2  the open window that that was not unlawful activity, that
3  there was no coercion for any statements obtained from the
4  defendant, and to the extent that there was any unlawful
5  activity it would be protected by the good -- by the Leon
6  good-faith exclusion to the exclusionary rule -- or exception
7  to the exclusionary rule?
8          Is there anything else to add to that?
9          MR. KANGIOR:  That is, Your Honor.  I would just
10  also add that the reason for the stop was also supported by
11  the officers' observations prior to them seeing the traffic
12  infraction.
13          THE COURT:  There was surveillance going on?
14          MR. KANGIOR:  Correct.
15          THE COURT:  Based on information that had been
16  obtained concerning potential drug activities?
17          MR. KANGIOR:  That's correct.
18          THE COURT:  So will the government -- okay.
19  Mr. Kangior, you did file at Filing Number 267 your list of
20  exhibits and at Filing Number 268 your witness list.
21          Mr. Wilson, have you had a chance to review five
22  exhibits that were listed?
23          MR. WILSON:  Yes, Your Honor.
24          THE COURT:  Will the defendant be having any
25  objection to the court's receipt of those exhibits for

1    purposes of this motion and today's hearing?

2         MR. WILSON:  Not for purposes of this motion and

3    hearing.

4         THE COURT:  Okay.  And, Mr. Kangior, are you then

5    offering them on behalf of the government?

6         MR. KANGIOR:  I will offer them at this time.

7    Government offers Exhibits 1 through 5.

8         THE COURT:  Okay.  So Exhibit -- the first four

9    exhibits are body-worn camera footage of the traffic stop

10   from various cameras or operators and then Exhibit Number 5

11   is the signed Miranda form by Defendant in this case.  So the

12   court will receive Exhibits 1 through 5 without objection.

13        Will the government be offering any additional

14   exhibits?

15        MR. KANGIOR:  Not at this time.

16        THE COURT:  Will the defendant be offering any

17   exhibits today?

18        MR. WILSON:  Yes, Your Honor.

19        THE COURT:  And are you -- what exhibits are you

20   planning on offering?

21        MR. WILSON:  Your Honor, we have -- we have -- I

22   have a thumb drive here that has five, what we would call,

23   screen grabs.  And these come from Government's Exhibit

24   Number 4 --

25        THE COURT:  Okay.

1    MR. WILSON:  -- which is the body-worn camera

2    footage of the traffic stop and the drug dog sniff, if the

3    government -- I believe that that's correct.

4    MR. KANGIOR:  That should be identical to

5    Government's Exhibit 2.  That would be the...

6    MR. WILSON:  Okay.

7    MR. KANGIOR:  No.  I am sorry.  That would be...

8    THE COURT:  Well, he says that he's got five still

9    photos taking from -- taken from...

10    MR. KANGIOR:  That should be taken from

11    Government's Exhibit 4, which is the body camera worn by the

12    K-9 handler, Jarrod Wineinger.

13    THE COURT:  Okay.  So there is five of those

14    photos?

15    MR. WILSON:  There are five in total, Your Honor.

16    I guess I am not sure what naming convention the court would

17    be using, but these would be Defense Exhibits 1 through 5.

18    THE COURT:  Right.  So you -- have you printed

19    those, or are those the same ones that you provided to the

20    court earlier?

21    MR. WILSON:  These are the same ones that have

22    already been provided to the court.  I do have those on a

23    thumb drive, Your Honor, for the -- for purposes...

24    THE COURT:  But you don't have them printed out?

25    MR. WILSON:  I didn't print them out, Your Honor.

 1  I put them on a thumb drive for the court.  I thought that
 2  would be easier for the court.
 3          THE COURT:  Well, I think -- I wonder if -- so we
 4  properly have the record made for the court, I think it might
 5  be best to, first of all, mark these individually as
 6  exhibits.
 7          MR. WILSON:  Uh-huh.
 8          THE COURT:  And if we are going to do so to
 9  properly mark them as Exhibits 1 -- 101 through 105 --
10          MR. WILSON:  All right.
11          THE COURT:  -- pursuant to our local court rules
12  and to mark them as exhibits.
13          MR. WILSON:  Uh-huh.
14          THE COURT:  I have the five printouts that you
15  provided to the court.  Is that how you want to proceed?
16          MR. WILSON:  That would be great, Your Honor.  And
17  I apologize.  I should have printed them.  Thank you for
18  providing those.
19          THE COURT:  That's fine.  I am going to give them
20  to the courtroom deputy.  If you could retrieve them, make
21  sure you put them in order the way you want them to be
22  received, and then we'll put exhibit stamps on them.
23          MR. WILSON:  Thank you, Your Honor.
24          Yes, Your Honor.  The way these are ordered right
25  now from top to bottom, the exhibits -- Defense Exhibits 1

1   through 5.

2       THE COURT:  Okay.  So it would be Defense

3   Exhibits 101 through 105.

4       MR. WILSON:  Okay.

5       THE COURT:  Is the government going to object to

6   any of those exhibits being received by the court for

7   purposes of the motion, the pending motion and today's

8   hearing?

9       MR. KANGIOR:  No, Your Honor.

10      THE COURT:  Okay.  Defendant's Exhibits 101 through

11  105 will be received by the court.

12      And then, Mr. Wilson, will you be having any

13  additional exhibits?

14      MR. WILSON:  No, Your Honor.

15      THE COURT:  Are you planning on calling any

16  witnesses today?

17      MR. WILSON:  No, Your Honor.

18      THE COURT:  And the government is going to have

19  four -- or three witnesses?

20      MR. KANGIOR:  Correct.

21      THE COURT:  And are you -- and are you confident

22  that you are going to be calling all three witnesses?

23      MR. KANGIOR:  Two for sure.  Possibly the third.

24      THE COURT:  Okay.  And how much time do you

25  anticipate -- and I know you can't necessarily predict

*Motion to Suppress*

1    cross-examination, but how long do you think the first two

2    witnesses will take?

3          MR. KANGIOR:  Less than an hour.

4          THE COURT:  Okay.  So I would think then that

5    probably after the first two witnesses, depending on how long

6    cross-examination is, we'll take a break to make sure

7    everyone has a moment to be prepared to move forward, and

8    then we can decide on how we are going to go from there.

9          So with regard to witnesses then, is the defendant

10   wishing to make a motion to sequester witnesses?

11         MR. WILSON:  Your Honor, I would request that.

12         THE COURT:  Okay.

13         MR. WILSON:  Thank you.

14         THE COURT:  That will be granted.

15         Who are you planning on calling first, Mr. Kangior?

16         MR. KANGIOR:  Daniel Eads, the case representative,

17   who I would request be present throughout the proceedings

18   this morning.

19         THE COURT:  Okay.  And the defendant is -- doesn't

20   object to that, I take it?

21         MR. WILSON:  No, Your Honor.

22         THE COURT:  Okay.  So any other witnesses, so that

23   would be Officer and Deputy, Gerrity and Wineinger, I will

24   have you step out.  You are sequestered.  Don't discuss the

25   case or your testimony with anyone else, and we'll retrieve

1    you when it's time for your testimony.  Thank you.

2              Again, the motion for sequestration is granted.

3              I don't think that we need to have opening

4    statements.  I have already, I think, explained to counsel

5    that I have reviewed all the briefs.  I think I have an idea

6    of what the issues are.  I will allow closing arguments at

7    the conclusion of today's testimony.

8              Is that acceptable to the government?

9              MR. KANGIOR:  It is, Your Honor.

10             THE COURT:  To the defendant?

11             MR. WILSON:  Yes, Your Honor.

12             THE COURT:  Okay.  Well, with that said, then, the

13    government may call its first witness.

14             MR. KANGIOR:  Thank you, Your Honor.  The

15    government calls Daniel Eads.

16             THE COURT:  Sir, will you please approach the

17    witness stand, remain standing, and raise your right hand?

18             THE COURTROOM CLERK:  Please state your full name

19    for the record and spell your last name.

20             THE WITNESS:  Daniel Eads, E-a-d-s.

21        INVESTIGATOR DANIEL EADS, GOVERNMENT WITNESS, SWORN

22             THE WITNESS:  Yes.

23             THE COURTROOM CLERK:  You can be seated.

24             THE COURT:  Okay.  Mr. Kangior, you may proceed.

25             MR. KANGIOR:  Thank you, Your Honor.

EADS - Direct

| | |
|---|---|
| 1 | <u>DIRECT EXAMINATION</u> |
| 2 | BY MR. KANGIOR: |
| 3 | Q.   Sir, how are you employed? |
| 4 | A.   With the Douglas County Sheriff's Office. |
| 5 | Q.   And how long have you been so employed? |
| 6 | A.   Almost eight years. |
| 7 | Q.   And in what capacity are you employed with Douglas |
| 8 | County Sheriff's Office? |
| 9 | A.   I am an investigator with the special operations group |
| 10 | and a TFO with the FBI TOC West Task Force. |
| 11 | Q.   And give the judge an overview of some of the |
| 12 | investigations that you become involved with. |
| 13 | A.   I primarily investigate narcotics crimes, long-term |
| 14 | narcotics crimes. |
| 15 | Q.   That occur here in Douglas County? |
| 16 | A.   In Douglas County and all over Nebraska. |
| 17 | Q.   Were you employed in your current capacity on |
| 18 | August 23rd, 2023? |
| 19 | A.   Yes. |
| 20 | Q.   August 23rd, 2023? |
| 21 | A.   Yes. |
| 22 | Q.   Were you working that day? |
| 23 | A.   Yes. |
| 24 | Q.   What -- were you involved in an investigation? |
| 25 | A.   Yes. |

*EADS - Direct*

1    Q.    Describe the investigation to the court.

2    A.    It's a OCDETF investigation.

3    Q.    Let me stop you there.  What's OCDETF?

4    A.    Organized crime drug-trafficking investigation.

5    Q.    And does that involve federal agencies?

6    A.    Yes.

7    Q.    Such as?

8    A.    The FBI and DEA.

9    Q.    And do you also -- in that OCDETF investigation do you

10    work with other agencies in Nebraska?

11    A.    Yes.  Other task force officers.

12    Q.    And then describe how this OCDETF investigation began.

13    A.    It began with an investigation into a Mexican

14    drug-trafficking organization operating in the Omaha metro

15    area.

16    Q.    Give an overview of how this organization was operating.

17    A.    It ships large quantities of methamphetamine to the

18    Omaha area and has couriers distribute the methamphetamine.

19    Q.    And then specifically who or what were you investigating

20    on August 23rd, 2023?

21    A.    We were conducting surveillance on Jonathan Solis

22    Ovalle, who is a Mexican drug courier.

23    Q.    Why was it that you were investigating him?

24    A.    We have two previous undercover buys buying one pound of

25    meth each time from him.

*EADS - Direct*

1    Q.    From him?

2    A.    From him.

3    Q.    And then did those transactions occur here in Douglas

4    County?

5    A.    Yes.

6    Q.    And then as a result of those two...

7            THE COURT:  Mr. Kangior, if I could interrupt.

8    Sir, could you spell this individual's name that you were

9    surveilling?

10            THE WITNESS:  Uh...

11            THE COURT:  To the best of your ability.

12            THE WITNESS:  Yeah.  Jonathan, J-o-n-a-t-h-a-n,

13    middle name, Ovalle, O-v-a-l-l-e, last name, Solis,

14    S-o-l-i-s.

15            THE COURT:  Thank you.

16    BY MR. KANGIOR:

17    Q.    Was he eventually arrested as part of this

18    investigation?

19    A.    Yes.  And indicted.

20    Q.    And is a co-defendant of Mr. Reiman's?

21    A.    Yes.

22    Q.    Named in the same indictment?

23    A.    Yes.

24    Q.    So you had two previous buys from this Mr. Ovalle?

25    A.    Yes.

*EADS - Direct*

1  Q.  Of methamphetamine?

2  A.  Yes.

3  Q.  As a result of those buys, what investigative techniques

4  did you utilize?

5  A.  We obtained a tracker warrant and put a tracker on the

6  vehicle that he was using.

7  Q.  What type of vehicle was it?

8  A.  A Malibu, Chevy Malibu.

9  Q.  And on August 23rd, 2023, was the tracker on the Malibu

10  at that time?

11  A.  Yes.

12  Q.  Is that the reason that you were following the Malibu

13  that day?

14  A.  Yes.

15  Q.  And what were you trying to discover?

16  A.  We were discovering if he was distributing

17  methamphetamine.

18  Q.  So did you see Mr. Ovalle driving this Malibu on

19  August 23rd, 2023?

20  A.  Yes.  Surveillance officers observed him.

21  Q.  Where was this?

22  A.  At 24th and L at the Walgreens parking lot.

23  Q.  And what was he doing there?

24  A.  He was meeting with a white Buick Enclave.

25  Q.  Did he arrive separately from the Conclave [sic]?

*EADS - Direct*

1   A.   Yes.

2   Q.   And then did he park in the parking lot?

3   A.   Yes.

4   Q.   Describe what happens after he parks.

5   A.   A white Buick Enclave arrives, and a white male gets out

6   of the vehicle and meets with him.

7   Q.   And how was it they met?

8   A.   They met in the parking lot, and we recorded the entire

9   thing.

10  Q.   The white male, was that Mr. Reiman?

11  A.   Yes.

12  Q.   Who is sitting in here next to defense counsel?

13  A.   Yes.

14  Q.   When they -- when they met, did Mr. Reiman get into

15  Ovalle's vehicle?

16  A.   I don't recall if he got in or met at the window.

17  Q.   Okay.  And then what happens after they meet?

18  A.   He gets back in the -- his vehicle.

19  Q.   Who's "he"?  Who's "he"?

20  A.   Reiman gets back into his vehicle, and then they leave

21  the area.

22  Q.   And Reiman's vehicle was the Enclave?

23  A.   I believe it was a white Buick Enclave.

24  Q.   Was he driving?

25  A.   He was a passenger.

*EADS - Direct*

1    Q.    Did you -- at the time that you observed Reiman meet

2    with Ovalle, did you see who was driving --

3    A.    I did not.

4    Q.    -- Reiman's vehicle?

5    A.    I did not observe that.

6    Q.    This -- when Mr. Reiman approached the Malibu, did he

7    have anything in his hands?

8    A.    Yes.  He had a black drawstring bag.

9    Q.    When he approached the Malibu?

10   A.    When he approached the Malibu.

11   Q.    And then when he left the Mali- -- well, how long was he

12   at the Malibu?

13   A.    Less than a minute.

14   Q.    Okay.  And then he returned to his Enclave to the

15   passenger's side door?

16   A.    Yes.

17   Q.    And did he have the black bag with him at that time?

18   A.    Yes.

19   Q.    How long did this transaction take, about?

20   A.    Less than a minute or two.

21   Q.    And did you see the Malibu meet with any other parties

22   in the Walgreens parking lot?

23   A.    No.  They both left the parking lot at approximately the

24   same time.

25   Q.    And have you observed similar type of transactions

*EADS - Direct*

1    before?

2    A.    I have.

3    Q.    And what did you believe occurred?

4    A.    A narcotics transaction.

5    Q.    And based on your belief, what did you do?

6    A.    We started beginning surveillance on the white Buick

7    Enclave.

8    Q.    Why?

9    A.    Because we believed he just purchased a large quantity

10    of methamphetamine.

11    Q.    And did you know who Reiman was at the time?

12    A.    I did not, no.

13    Q.    Did you run the plates?

14    A.    We ran the plates.

15    Q.    And what information did you receive after running the

16    plates?

17    A.    The registered owner.  And I don't recall who the

18    registered owner was on that.

19    Q.    Did anybody follow -- well, how many officers or agents

20    were involved in this surveillance at the Walgreens parking

21    lot?

22    A.    Approximately 20.

23    Q.    Several undercover vehicles involved?

24    A.    Yes.  Many.

25    Q.    And what were you driving that day?

*EADS - Direct*

1   A.   I was driving a undercover Toyota Tundra.

2   Q.   And when you say undercover, it doesn't have any

3   identifying law enforcement decals on it?

4   A.   No.  It just has emergency lights.

5   Q.   Were you in communication with the other agents and

6   officers involved in this surveillance?

7   A.   Yes.  We were on the radio with each other during the

8   entire thing.

9   Q.   And everybody is communicating with one another about

10   their observations?

11   A.   Yes.

12   Q.   Do you -- does anybody follow the Malibu after it left

13   the Walgreens parking lot?

14   A.   I don't believe so.

15   Q.   Because you had...

16   A.   We had it on tracker.

17   Q.   No need to follow it?

18   A.   Correct.

19   Q.   So describe what you observed when you follow the Buick

20   Concave [sic] with Mr. Reiman riding as a passenger?

21   A.   We observed them go westbound on I-80 and then

22   approximately at 108th and I-80 observed the vehicle

23   following too close to a semi.

24   Q.   What's your description of following too close?

25   A.   Following too close was when the semi was braking, they

*EADS - Direct*

1  had to brake so that they could avoid a collision.  And then

2  rule of thumb is approximately two to three seconds so that

3  you are far enough back that the semi driver can see you in

4  the mirrors.

5  Q.   And was this Concave [sic] following this semi within

6  two sec- -- two to three seconds?

7  A.   It was following too close.

8  Q.   Well within two seconds?

9  A.   Yes.

10  Q.   As a result of your observations, what do you do?

11  A.   I initiate a traffic stop, attempt to initiate a traffic

12  stop at I-80 westbound and Q Street.

13  Q.   How do you go about initiating your traffic stop?

14  A.   I call out on the radio advising dispatch I am

15  attempting a traffic stop and activate my emergency lights.

16  Q.   Did the Buick Concave [sic] pull over immediately?

17  A.   No.  And I began honking my horn attempting to get their

18  attention to pull over.

19  Q.   You say her attention.  At that point when you activated

20  your lights could you see who was driving?

21  A.   I could not see who was driving.

22  Q.   Okay.  Eventually you found out it was a female that was

23  the driver?

24  A.   Correct.

25  Q.   Does the Concave pull over?

*EADS - Direct*

1    A.    No.   The Enclave --

2    Q.    Enclave.

3    A.    -- continues to drive.   And then Sergeant Wineinger

4    pulls next to me and activates his lights and sirens.   And

5    then they eventually pull over approximately a mile and a

6    half, two miles later.

7    Q.    Did you honk your horn numerous times prior to -- or

8    after activating your lights and prior to the Enclave pulling

9    over?

10   A.    Yes.

11   Q.    How long do you think the Enclave traveled after you

12   activated your lights prior to pulling over?

13   A.    Approximately a mile and a half, two miles.

14   Q.    And how fast were you going at the time?

15   A.    Fifty-five, sixty.   There was -- there was traffic.   It

16   was rush hour.

17   Q.    So a minute or two minutes?   Minute and a half, two

18   minutes?

19   A.    Approximately that.   Maybe a little longer.

20   Q.    Have you pulled over vehicles before?

21   A.    Many times.

22   Q.    Do parties that you pull over typically travel a mile

23   and a half to two miles prior to pulling over?

24              MR. WILSON:   Objection.   Form and foundation.

25              THE COURT:   Object -- objection is overruled.   You

1    may answer.

2    A.    Could you repeat that?

3    BY MR. KANGIOR:

4    Q.    Do parties that you pull over typically travel a mile

5    and a half to two miles prior to pulling over?

6    A.    No.

7    Q.    Did that cause you concerns?

8    A.    Yes.

9    Q.    What concerns did it cause you?

10   A.    Obviously raised our suspicion that they could be

11   obtaining a weapon.  They could be hiding evidence,

12   destroying evidence.  I mean, there is a whole bunch of

13   things that go through your head at that point.

14   Q.    And were your suspicions heightened because you believed

15   that this vehicle was just involved in a drug transaction?

16          MR. WILSON:  Objection.  Leading.

17          THE COURT:  Overruled.  You may answer.

18   A.    Yes.

19   BY MR. KANGIOR:

20   Q.    Okay.  Where did the Enclave eventually pull over at,

21   approximately?

22   A.    Past the Harrison/Giles exit on the outside shoulder of

23   the interstate.

24   Q.    And you mentioned another agent or deputy traveling with

25   you involved in this traffic stop?

EADS - Direct

1    A.    Yes.  Sergeant Wineinger.

2    Q.    What was he driving?

3    A.    He was driving an unmarked Ford F-150.

4    Q.    And did that -- does that vehicle have emergency lights

5    as well?

6    A.    And sirens, yes.

7    Q.    Were they activated?

8    A.    Yes.

9    Q.    For the same time period that your emergency lights were

10    activated?

11    A.    He came out and helped after he had -- the person

12    driving was initially not pulling over.  He pulled next to

13    me, and we both had our lights on the vehicle.

14    Q.    The two vehicles, yours and Officer or Deputy Wineinger,

15    did they have in-car cameras?

16    A.    No.

17    Q.    Why is that?

18    A.    Undercover vehicles don't have in-car cameras.

19    Q.    Okay.  But you were wearing body cameras?

20    A.    Yes.

21    Q.    Both you and Wineinger?

22    A.    Yes.

23    Q.    And have you reviewed those recently?

24    A.    Yes.

25    Q.    After the vehicle, the Enclave, pulls over, how do you

1    proceed with the investigation?

2    A.    We go up.  I made contact with Reiman.

3    Sergeant Wineinger makes contact with the driver.  I asked

4    Reiman to step out of the vehicle.  He said no.  And then

5    Deputy Wineinger has the female driver step out of the

6    vehicle.

7    Q.    And what were your intentions at that time?

8    A.    To get Reiman and the driver out of the vehicle.  We

9    weren't sure what they were doing in that time it took to

10   pull over, and just as an officer safety concern.

11   Q.    How were you and Wineinger dressed that day?

12   A.    We were wearing external carriers that say "Sheriff" and

13   police belts and badges.

14   Q.    Who was the driver eventually identified as?

15   A.    I believe it's Jessica Reiman.  It's Reiman's wife.

16   Q.    And then were you eventually able to get Mr. Reiman out

17   of the passenger's seat?

18   A.    Yes.  He was brought out of the vehicle at the time of

19   the K-9 sniff was being conducted.

20   Q.    And so it's clear, Wineinger is a K-9 officer?

21   A.    Yes.

22   Q.    And did you observe him deploy his K-9 that day?

23   A.    Yes.

24   Q.    What were you doing while Wineinger was employing his

25   K-9?

*EADS - Direct*

1    A.    I was attempting to slow down or block traffic so that

2    we didn't get hit by a vehicle.

3    Q.    And then eventually do you seat the driver in your

4    vehicle?

5    A.    What's that?

6    Q.    In your -- in your -- do you take the driver and seat

7    her in your vehicle?

8    A.    Yes.

9    Q.    And what did -- why did you do that?

10    A.    To get her out and be able to interview her.

11    Q.    What did you talk to her about when she was in your

12    cruiser or undercover vehicle?

13    A.    We discussed the traffic infraction, ran a records

14    check, and then conducted an interview with her over what was

15    going on at the time.  And then ex- -- before she got into my

16    vehicle, when she was first exiting the vehicle, Reiman was

17    yelling at her, "Don't say fuckin' anything."

18            THE COURT:  Excuse me.  Could you repeat your

19    testimony?

20            THE WITNESS:  Yeah.  When she was exiting the

21    vehicle initially, Reiman was screaming at her, "Don't say

22    fucking anything."

23    BY MR. KANGIOR:

24    Q.    Did that cause you a concern?

25    A.    Yes.

1    Q.    Why?

2    A.    Normal people don't do that.

3    Q.    Unless they have got something to hide?

4    A.    Correct.

5    Q.    Do you discuss with Ms. Reiman the reason that you

6    pulled her over?

7    A.    Yes.

8    Q.    Is that captured on your body-worn camera?

9    A.    Yes.

10    Q.    Can you give a summary of the discussion you had with

11    her and her response?

12    A.    Yep.  I explained to her what the traffic infraction

13    was, following too closely, explained the general rule of

14    thumb, two to three seconds behind.  I said he wasn't able --

15    the semi driver wouldn't be able to see you.

16        Then she explained to me that she was trying for the

17    aerodynamics of the -- of the truck for better gas mileage

18    following behind the vehicle.  So...

19            THE COURT:  Mr. Kangior, could you identify what

20    exhibit this interview would be on?

21    BY MR. KANGIOR:

22    Q.    Your body-worn camera would have been identified as BWC

23    footage of traffic stop under your name, D. Eads?

24    A.    Yes.

25    Q.    You have reviewed copies of that?

*EADS - Direct*

1    A.    Yes.

2    Q.    And that consists of two different videos?

3    A.    Yes.

4    Q.    And are you aware of the [indiscernible] in Government's

5    Exhibits 1 and 2?

6    A.    Yes.

7    Q.    And then Government's Exhibit 3 would have been the

8    body-worn camera footage of the traffic stop from the camera

9    worn by S. Anton?

10    A.    Yes.

11    Q.    And then the Government's Exhibit 4 would have been the

12    body worn footage of the traffic stop from the camera worn by

13    Jarrod Wineinger?

14    A.    Yes.

15          THE COURT:  So Exhibit Number 2 is the one that has

16    the interview or Exhibit 1?

17    BY MR. KANGIOR:

18    Q.    It's -- I believe it's a two-part video?

19    A.    Yeah.  It's -- it was -- it was a long video, so it's

20    broken up into two disks.

21    Q.    Do you recall your discussions with Ms. Reiman being on

22    the first portion or the second?

23    A.    The first portion.

24    Q.    Towards the end, obviously?

25    A.    Towards the end.

1          THE COURT:  Okay.  Thank you.

2    BY MR. KANGIOR:

3    Q.   Did you have any discussions with Mr. Reiman during the

4    traffic stop?

5    A.   Not till the very end.  My initial contact with him was

6    when I asked him to get out of the vehicle and he said no.

7    Q.   And then what happened towards the end of the traffic

8    stop?  What discussions are you having with him?

9    A.   Towards the end he mentioned that he wanted to speak

10   with law enforcement, and then he was transported to the

11   Douglas County Sheriff's Office.

12   Q.   Was he interviewed at the scene?

13   A.   No.  He was interviewed at the Douglas County Sheriff's

14   Office.

15   Q.   Did you make any threats to him at the scene?

16   A.   No.

17   Q.   Was he told his wife was going to jail?

18   A.   No.

19   Q.   Was he told his kid was going to jail?

20   A.   No.

21   Q.   Did he have a kid in the back seat?

22   A.   There was a four-year-old in the back seat.

23   Q.   In fact, was his wife placed under arrest?

24   A.   No.

25   Q.   Was she released from the scene?

1    A.    She was released with the child.

2    Q.    And were -- was she released along with the child in

3    Mr. Reiman's presence?

4    A.    Yes.  He was still there when she was released.

5    Q.    And she was released in the vehicle that they were

6    pulled over in?

7    A.    Yes.

8    Q.    After it was searched?

9    A.    Yes.

10   Q.    What was the reason for the search?

11   A.    The K-9 indicated to the odor of narcotics.

12   Q.    And so it's clear, when was this K-9 deployed?

13   A.    After the business of the stop was completed, I returned

14   the documents.  I asked if there was anything illegal in the

15   vehicle; marijuana, methamphetamine, cocaine, heroin, stolen

16   property, guns.  And then I asked for consent, and she denied

17   consent.

18   Q.    And did you instruct her what you were intending to do

19   thereafter?

20   A.    Yes.  I told her that we were going to run a K-9 around

21   the vehicle.

22   Q.    Okay.  And at that time you mentioned that the stop had

23   concluded?

24   A.    Yes.

25   Q.    Therefore, you needed reasonable suspicion to deploy the

*EADS - Direct*

1    K-9?

2    A.    Yes.

3    Q.    Did you believe you had reasonable suspicion?

4    A.    Yes.

5    Q.    Based on all your -- well, tell the court why.

6    A.    Based on our observations of the narcotics deal at 24th

7    and L, based on how long it took them to pull over, based on

8    the statements made by Reiman to don't say fuckin' anything,

9    all those clustered into what we believed...

10    Q.    Led you to reasonably believe that vehicle contained

11    narcotics?

12    A.    Yes.

13    Q.    Were you involved in the deployment of the K-9?

14    A.    I blocked traffic for the deployment of the K-9.

15           MR. KANGIOR:   Okay.  If I may have just a moment,

16    Your Honor.

17           THE COURT:   Sure.

18    BY MR. KANGIOR:

19    Q.    Where was Mr. Reiman taken after this traffic stop?

20    A.    He was taken to the Douglas County Sheriff's Office

21    special operations group interview room.

22    Q.    Does that interview room -- did it have a recording

23    device?

24    A.    It did not.

25    Q.    Why is that?

1    A.   Because it's broken.

2    Q.   Okay.  Did you conduct the interview?

3    A.   Myself and Deputy Jesse Ronk did.

4    Q.   How did you begin the interview?

5    A.   We uncuffed him.  We placed him into the interview room.

6    And he was seated in the corner.  Ronk was seated against the

7    wall, and I was seated at the desk.

8    Q.   And how did you begin the interview?

9    A.   We advised him of his rights and read aloud a rights

10   advisory form.

11   Q.   Have you reviewed Government's Exhibit 5?

12   A.   I have.

13   Q.   Is that a copy of the Douglas County Sheriff's rights

14   advisory form you filled out with Mr. Reiman?

15   A.   Yes.

16   Q.   Describe how you -- describe how you filled this out.

17   A.   We fill in his information on the top, and then we read

18   each question, and he gives an answer.  Then we write his

19   answer for each question going down the list, and then at the

20   conclusion he reviews his answers.  He signs that those are

21   his answers, and then I write on the bottom that I was the

22   one that did it.

23   Q.   Describe Mr. Reiman's demeanor at the time of the

24   interview.

25   A.   He was upset at the time of the interview, but he wanted

1    to cooperate.

2    Q.    Had you found any narcotics in the vehicle prior to the

3    interview?

4    A.    Yes.

5    Q.    Was Mr. Reiman aware of this?

6    A.    I believe so.

7    Q.    At any point prior or during the interview did anyone

8    make him any promises?

9    A.    No.

10    Q.    Did Officer or Deputy Ronk make him any promises?

11    A.    No.

12    Q.    Did you threaten him?

13    A.    No.

14    Q.    Did Ronk threaten him?

15    A.    No.

16    Q.    Did anybody say, We are going to arrest your wife and

17    child?

18    A.    No.

19    Q.    Did he ask about his wife being arrested?

20    A.    I don't recall if he asked about his wife.

21    Q.    Did he ask if his child was going to be taken into

22    custody?

23    A.    I don't recall if he did.

24    Q.    But they were released at the scene prior to this

25    interview?

1    A.   Yes.

2    Q.   Did Mr. Reiman answer your questions?

3    A.   Yes.

4    Q.   Was he coherent?

5    A.   Yes.

6    Q.   Did he appear under the influence?

7    A.   No.

8    Q.   Did he ask questions of you?

9    A.   I don't recall if he asked questions of us.

10   Q.   Did he ask for any assurances or any promises from

11   authorities?

12   A.   I don't recall.

13   Q.   If he did, would -- did you give him any?

14   A.   No.

15   Q.   Have you ever promised anybody anything during your

16   interview with them?

17   A.   No.

18   Q.   How long did this interview last, about?

19   A.   Approximately an hour.

20   Q.   And then give the court a summary of the information he

21   relayed to you during this interview.

22   A.   He identified who gave him the number to the Mexican

23   drug-trafficking organization, identified that as Clarinda

24   Blair.  Do you want me to spell her name?

25            THE COURT:  If you would.

 1             THE WITNESS:  C-l-a-r-i-n-d-a.  Last name is Blair,

 2    B-l-a-i-r.

 3    A.    She was the one who introduced him to the Mexican

 4    drug-trafficking organization.  That's who he had been in

 5    contact with and that he -- I don't recall how much he

 6    purchased that day.

 7             MR. KANGIOR:  I have nothing further, Your Honor.

 8             THE COURT:  Okay.  Cross-examination?

 9             MR. WILSON:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11    BY MR. WILSON:

12    Q.    Good morning, Investigator Eads.

13    A.    Good morning.

14    Q.    Where were you located during the meeting with the -- I

15    guess you described his last name as Solis?

16    A.    Yes.

17    Q.    S-o-l-i-s?

18    A.    I believe so.

19    Q.    Okay.  Where were you located during the interaction

20    that you witnessed with my client?

21    A.    I don't recall my exact position.  I was in the area of

22    24th and L.

23    Q.    Were you watching this on a live-streaming camera?  Were

24    you watching this with your own eyes?  How were you

25    observing?

EADS - Cross

1  A.   No.  I was able to see the vehicles with my own eyes;

2  however, we had an investigator that was filming the whole

3  thing, and that's Brian Gerrity.

4  Q.   I am sorry.  What was that?  24th and?

5  A.   L, at the Walgreens on the southeast corner.

6  Q.   Did Mr. Reiman go into the Walgreens?

7  A.   I don't recall if he did or not.

8  Q.   Did you see him emerge from the Walgreens?

9  A.   I don't recall.  I would have to review the -- we have

10  footage from Walgreens as well.

11  Q.   But as you sit here, you can't dispute that he went into

12  the Walgreens?

13  A.   I don't know.

14  Q.   And the -- and specifically I am referring to before the

15  meeting you didn't see him go into the Walgreens?

16  A.   I personally did not.

17  Q.   Where did you see Mr. Reiman come from when he got --

18  went to -- into the -- what was it?  The Malibu? -- the

19  Malibu vehicle.

20  A.   Can you -- can you repeat that?

21  Q.   Yeah.  Where did you see Mr. Reiman come from when he

22  went to the Malibu?

23  A.   The Buick Enclave is the vehicle he arrived in.

24  Q.   Okay.  Could you see anything happening in the Malibu?

25  A.   I could not.

1  Q.   And other than the fact that Mr. Reiman had a black bag

2  when he went into the Malibu and he had a black bag when he

3  left the Malibu, there is nothing of note as it relates to

4  the black bag; is that right?

5  A.   No.  It just observes that he still retained that black

6  bag.

7  Q.   And you followed the Enclave from that parking lot; is

8  that right?

9  A.   Yes.

10  Q.   Were you the first vehicle on its tail, or were there --

11  how many vehicles were behind you?

12  A.   I don't recall.  There was at least 15 to 20 cars

13  following it.

14  Q.   Did anybody follow the -- Solis in the Malibu?

15  A.   I don't recall.  I know we had it on tracker.  I don't

16  know if they continued following him.  He left the parking

17  lot at the same time.

18  Q.   Do you know whether there was a traffic stop conducted

19  on the vehicle?

20  A.   No.

21  Q.   And Mr. Solis is not coop- -- was not cooperating with

22  the -- with law enforcement at that time?

23  A.   No.

24  Q.   Had he ever been arrested at that point?

25  A.   No.  He wasn't arrested until later.

*EADS - Cross*

1   Q.   Was he arrested that day?

2   A.   I don't remember if it was that day or what it -- what

3   day it was.

4   Q.   As you are following this vehicle you said that you --

5   you were observing -- and by vehicle, I mean the Enclave.

6   A.   Yes.

7   Q.   You were observing the Enclave as it was traveling

8   eastbound on I-80; is that right?

9   A.   Yes.  I became the lead vehicle on the western part of

10  I-80 around 96th Street.

11  Q.   Is that roughly where the cloverleaf with 680 would be?

12  A.   It's just before that.

13  Q.   All right.  And then as you are proceeding in that

14  direction, did you notice when the truck that -- it -- well,

15  actually, I will withdraw that question.

16       Could you describe the truck that you said that the

17  Enclave was following too closely?

18  A.   Yeah.  It was a semitruck.

19  Q.   Okay.  Did it have a typical tractor-trailer on it?  Did

20  it...

21  A.   Yeah.

22  Q.   Yeah?

23  A.   Yes.

24  Q.   Okay.  And you noticed in -- what brought your attention

25  to this traffic violation?  You said you saw brake lights on

```
 1   the Enclave; is that right?

 2   A.    Correct.

 3   Q.    All right.  Your definition of following too close, does

 4   it simply mean that braking when the vehicle in front of the

 5   vehicle -- that braking in rear position, that that means you

 6   are following too close if you have to brake?

 7   A.    No.  If you -- if it appears that you have to brake to

 8   avoid a collision, then you are following too close.

 9   Q.    Well, I mean, to be fair, anybody has to brake to avoid

10   a collision when the vehicle in front of them brakes; right?

11   A.    Generally.

12   Q.    Okay.  So really does this come down to a question of

13   following distance and following time?

14   A.    No.  I am -- it comes down to just following too closely

15   to the vehicle in front of you.  The -- if that vehicle

16   slammed on its brakes, you would be colliding with that

17   vehicle.  You wouldn't -- it has to do with reaction time.

18   Q.    Okay.  So it does come down to reaction time?

19   A.    Right.

20   Q.    Okay.  And you said two to three seconds, roughly, is

21   enough time to react?

22   A.    Correct.

23   Q.    Is that fair?

24   A.    Yes.

25   Q.    Okay.  You have testified that this Enclave was, you
```

1    believe, less than two seconds behind the truck; right?

2    A.    Yes.  Two -- yeah, less than two seconds.

3    Q.    All right.  Did you use your phone to time that?

4    A.    No.

5    Q.    And...

6    A.    From my training and experience.

7    Q.    Okay.  You don't have a stopwatch in your vehicle;

8    right?

9    A.    No.

10    Q.    You didn't mention on direct that you used any sort of

11    technique in measuring that following distance or time, did

12    you?

13    A.    No.

14    Q.    Okay.

15    A.    It's my observations.

16    Q.    So you are estimating --

17    A.    Yes.

18    Q.    -- that the vehicle was less than two seconds behind the

19    truck?

20    A.    Yes.

21    Q.    But you can't say with any certainty whether it was, for

22    instance, less than one second behind the truck; right?

23    A.    I can't.

24    Q.    The vehicle you were driving did not have sirens;

25    correct?

*EADS - Cross*

1    A.    Correct.

2    Q.    You said it had emergency lights?

3    A.    Yes.

4    Q.    And you said you activated those lights; right?

5    A.    Yes.

6    Q.    There wasn't another vehicle with sirens at the time

7    you -- that were on at the time you activated your lights;

8    correct?

9    A.    Not at my initial time that I activated.

10   Q.    All right.  So a time passed before any vehicles turned

11   on any sort of sirens; right?

12   A.    A very short time passed.

13   Q.    Okay.  Do you know whether the radio was on in the car

14   prior to you pulling the vehicle over?

15   A.    Which radio?

16   Q.    A radio, any sort of noise.

17   A.    In my car?

18   Q.    In the Enclave.

19   A.    Oh, I -- I don't recall.  No, I have no idea.

20   Q.    Right.  You don't...

21   A.    I...

22   Q.    Right.

23   A.    Right.

24   Q.    You don't know what the sound conditions were in the

25   Enclave before you pulled it over, do you?

1    A.    No.

2    Q.    You mentioned honking your horn; right?

3    A.    Yep.

4    Q.    Is there something different about your car's horn that

5    would signify you are a police officer?

6    A.    No.  Horns are meant to get people's attention.

7    Q.    Right.  But it's a standard car horn; right?

8    A.    Right.

9    Q.    Okay.  The same one that any other car out on an

10    interstate would be using if they were honking at someone;

11    right?

12    A.    Yep.

13    Q.    Correct me if I am wrong, but I believe you said you are

14    the one who approached the -- you know what?  I will actually

15    withdraw that.

16        The 55 to 70 -- well, let's say 60 miles an hour, how

17    far can a car travel in that time period?  Do you know?

18    A.    I don't know.

19    Q.    All right.  Safe to say it could be a couple hundred

20    feet in a matter of seconds; right?

21    A.    I don't know.

22    Q.    Well, you have done a lot...

23    A.    I think there -- there is a math equation for it, but I

24    don't know.

25    Q.    Right.  You have done -- you have mentioned your

*EADS - Cross*

1    training and experience; right?

2    A.    Right.

3    Q.    You have -- you have been involved in many car --

4    vehicle stops; right?

5    A.    Yes.

6    Q.    Cars can travel significant distances at highway speeds

7    over a period of a second or two; right?

8    A.    Yes.

9    Q.    Okay.  And where did you pull the vehicle over?

10   A.    We pulled the vehicle over on the west side of the

11   Harrison/Giles exit.

12   Q.    Okay.  So do you know how far that is in miles between

13   when you first started --

14   A.    Activated...

15   Q.    -- yeah, activated your lights and when the car...

16   A.    I don't know the exact distance.  I estimate between a

17   mile and a half, two miles.

18   Q.    You approached the driver's side of the vehicle;

19   correct?

20   A.    I approached the passenger's side.

21   Q.    You approached the passenger's side.  Were you able to

22   overhear anything going on on the driver's side of the

23   vehicle?

24   A.    I had Deputy Wineinger ask the wife to get out of the

25   vehicle, and then he -- after -- before that I was asking

1    Reiman to get out of the vehicle.  He told me no.

2    Q.    Uh-huh.

3    A.    And then when Wineinger asked her to get out, he was

4    arguing with Wineinger.

5    Q.    "He" meaning my client --

6    A.    Yes.

7    Q.    -- Mr. Reiman?

8          Yes?

9    A.    Yes.

10   Q.    Did Mr. Wineinger -- or, excuse me, Investigator,

11   Officer Wineinger, did he give Ms. Reiman, Jessica Reiman, an

12   option as to whether she could remain in the car?

13   A.    No.

14   Q.    So she gave -- he gave her instructions, get out of the

15   car and go to -- to go to my vehicle; right?

16   A.    Yes.  Yes.

17   Q.    He didn't suggest to her that she roll up her window;

18   right?

19   A.    What's that?

20   Q.    Well, let's -- I will withdraw that question.

21         Was her window down at some point?

22   A.    She had rolled her window down, yep.  Both windows were

23   down.

24   Q.    Okay.

25   A.    The passenger and driver's side.

1    Q.    All right.  And that was -- and that -- and she rolled

2    her window down to have communication with Officer --

3    Officer Wineinger; right?

4    A.    Yes.

5    Q.    Okay.  He didn't suggest to her, roll your window up, or

6    anything to that effect, did he?

7    A.    No.

8    Q.    Okay.  He told her, get out, go back to my vehicle;

9    right?

10    A.    Yes.

11    Q.    And did she do it immediately?

12    A.    No.

13    Q.    Okay.  It took some convincing; right?  But she

14    eventually did it; is that correct?

15    A.    Yes.  He explained to Jaden Reiman that if he didn't,

16    then she would be arrested.

17    Q.    And what was the purpose of having Ms. Reiman -- well, I

18    will withdraw that.

19        You mentioned that you asked Officer Wineinger to have

20    her -- to remove her from the car; right?

21    A.    Yes.

22    Q.    What was the purpose of that?

23    A.    To remove her from the driver's seat of the vehicle for

24    officer safety.

25    Q.    All right.  Were there any other purposes of having her

*EADS - Cross*

1    separated from her husband?

2    A.    Yes.  To describe the traffic stop to her.  It's loud to

3    hear out there.  And then to be able to talk to her after he

4    yelled at her, "Don't say fuckin' anything."

5    Q.    Uh-huh.  Well, he didn't say that until after you had

6    instructed the officer to take her out of the driver's seat;

7    right?

8    A.    That was as she was getting out of the vehicle.

9    Q.    Okay.

10    A.    Yeah.

11    Q.    And if the purpose of the stop was simply a following

12    too closely investigation or citation, you could have left

13    her in the car; right?

14    A.    No.  Generally on the interstate we bring everyone back

15    to our car.

16    Q.    Including the average person pulled over for following

17    too closely if -- even if that's the only offense that you

18    are looking at?

19    A.    Yes.

20    Q.    Did you interview Jessica Reiman in the vehicle?

21    A.    Yes.

22    Q.    The police vehicle?

23    A.    In which vehicle?

24    Q.    Did you interview Jessica Reiman in the police vehicle?

25    A.    Yes.

1   Q.   Did you ask her for consent to search?

2   A.   Yes.

3   Q.   And what did -- what was her response?

4   A.   She did not consent to search.

5   Q.   And at some point what -- and then after she denied

6   consent to search, what did you do with Ms. Reiman after you

7   were done speaking to her in the veh- -- in the police

8   vehicle?

9   A.   I told her she was being detained and to sit tight.  And

10  I went and requested Deputy Wineinger to conduct a sniff of

11  the vehicle with the K-9.

12  Q.   All right.  And I believe you testified that that was

13  based on reasonable suspicion --

14  A.   Yes.

15  Q.   -- factors that you have described during your direct

16  examination; right?

17  A.   Yes.

18  Q.   Did you have -- when you were speaking with Ms. Reiman,

19  at any point during your conversations with her did you ever

20  suggest to her that she might go to jail or be in custody?

21  A.   At one time I told her she was detained.

22  Q.   Right.

23  A.   Right.

24  Q.   Did you ever suggest to her at any time during any of

25  your conversations with her that she might -- that her child

1    might not be able to go home with her that day?

2    A.    Before we conducted an interview following the K-9

3    sniff, I told her what -- I laid everything out for her of

4    what we were doing.

5    Q.    Uh-huh.

6    A.    The consequences for everything, and that's -- I told

7    her, I said, he could go to jail.  You could go to jail.  And

8    so we need to figure this out.

9    Q.    Okay.  So going to jail was among the consequences that

10   you described to her?

11   A.    Yes.

12   Q.    And what was -- and that was the consequence of what?

13   A.    Consequence of drugs in the car.

14   Q.    Okay.

15   A.    Yeah.

16   Q.    Was that also a consequence of her failing to answer

17   your questions?

18   A.    No.

19   Q.    Did you have anything to do with interviewing Mr. Reiman

20   at any time when the vehicle was on the side of the highway?

21   A.    I don't recall on the side of the highway other than

22   right before we went back to the office when he indicated he

23   wanted to talk to law enforcement.

24   Q.    Okay.  So he did inter- -- indicate he would talk to law

25   enforcement while he was in the vehicle on the side of the

EADS - Cross

1   highway?

2   A.    Yeah.

3   Q.    All right.  Did he want to do that at first?

4   A.    He was very rude at first, so I don't think so.

5   Q.    So the answer is no, he didn't want to do that at first?

6   A.    Yeah.  The answer is I -- I don't know.  I don't know

7   what his intentions were.

8   Q.    All right.  But he didn't cooperate at first in terms of

9   answering your questions regarding drug trafficking; is that

10  right?

11  A.    I didn't ask him any questions about drug trafficking on

12  the side of the road.

13  Q.    Okay.  Who did?

14  A.    I don't recall if anyone did.

15  Q.    All right.  Do you recall or do you know whether anybody

16  interviewed Reiman in the vehicle about drug trafficking?

17  A.    I don't know.  In his vehicle?

18  Q.    Uh-huh.

19  A.    I don't -- I don't know.

20  Q.    No, not just in his vehicle.  I will -- I will ask you

21  again.  Do you know whether anybody with -- from law

22  enforcement interviewed Mr. Reiman at any time during his --

23  when he was sitting on the side of the interstate in any

24  vehicle?

25  A.    I don't recall.

EADS - Cross

1    Q.    All right.  So you didn't have anything to do with any

2    interviews of Mr. Reiman while on...

3    A.    Not that I can remember, no.

4    Q.    Okay.  You...

5    A.    Other than when we got back to the office.  But on the

6    side of the road, I don't recall.

7    Q.    Okay.  Do you know who he was talking to on the side of

8    the road when he was in -- well, I will withdraw that.

9          Do you know whether he was eventually in a police

10   vehicle on the side of the road?

11   A.    Eventually I -- I don't know whose vehicle or what

12   vehicle --

13   Q.    Uh-huh.

14   A.    -- but he got transported to the office, so he had to

15   have been.

16   Q.    Okay.  Yeah.  So he ended up in a police vehicle; right?

17   A.    Yes.  I don't know whose, though.

18   Q.    Okay.  You did not take Jessica Reiman into custody that

19   day; right?  You testified to that.

20   A.    Correct.  We released her.

21   Q.    Okay.  Why did you do that?

22   A.    We didn't believe that she was a hundred percent

23   involved.  We were still unclear, until we got the phone

24   search warrants back, her true involvement.

25   Q.    All right.  Did you have any information from Mr. Reiman

EADS - Cross

1   at that point, you or any of the other officers that you are

2   aware of, did you have any information from Mr. Reiman about

3   that point as to her involvement or lack thereof?

4   A.   I don't recall.

5   Q.   All right.  Did any officers tell you that Mr. Reiman

6   cooperated or began answering questions about drug

7   trafficking while in a police vehicle on the side of the

8   road?

9   A.   No.  I don't recall.

10  Q.   Okay.  You don't recall or that did not happen?

11  A.   I don't know.

12  Q.   You don't know if that happened?

13  A.   I don't know if that happened.

14  Q.   All right.  And just to reiterate, you don't know the

15  identity of any officers that were talking to Mr. Reiman

16  while that vehicle was on the side of the road?

17  A.   I am not sure which officers were there.  There was

18  probably seven, eight officers there.  I don't know who was

19  with him.

20  Q.   Okay.  Well, was Officer Wineinger talking to him in the

21  back of a vehicle, to your knowledge?

22  A.   I don't know.

23  Q.   Was Sergeant Anton talking to him?  I say -- I am sorry.

24  He's not necessarily a sergeant.  Was the officer by the name

25  of Anton speaking to him?

*EADS - Cross*

1    A.   I don't know.

2    Q.   All right.  And then there is another officer, Eads --

3    or Brian; right?

4    A.   Gerrity.

5    Q.   Brian Gerrity?

6    A.   Yeah.

7    Q.   Was he speaking to him in the --

8    A.   I don't know.

9    Q.   -- rear of the vehicle?

10       Did you observe the K-9 deployment and sniff?

11   A.   No.  I was blocking traffic.

12   Q.   I believe I am correct.  You said you saw the K-9

13   deploy; right?

14   A.   Yeah.  I saw the K-9 get out, and then I advised him

15   that I would block traffic so he didn't get hit by a car.

16   Q.   Uh-huh.  So do you know whether -- K-9 Riggs is his

17   name; right?

18   A.   Yes.

19   Q.   Do you know whether K-9 Riggs entered the car at any

20   point?

21   A.   No.

22            MR. WILSON:  Just one second, Your Honor.

23            THE COURT:  Sure.

24   BY MR. WILSON:

25   Q.   I did specifically ask about conversations with

1   Mr. Reiman in the vehicles; right?

2   A.   Yes.

3   Q.   Just to -- just to broaden that question, make sure I

4   am -- I am giving you every opportunity, did you hear

5   conversations with Mr. Reiman that would have occurred when

6   he was standing outside of the vehicles on the side of the

7   highway?

8   A.   I did not.

9   Q.   All right.  You didn't have any part in any

10  conversations with him?

11  A.   No.

12  Q.   Do you know when officers did, if...

13  A.   Could have been Gerrity.  I believe Ginnetti [phonetic]

14  was there, and then Wineinger.  I don't recall who else was

15  there.

16        MR. WILSON:  We are about done, Your Honor.  Thank

17  you for your patience.

18        THE COURT:  Take your time.

19  BY MR. WILSON:

20  Q.   Okay.  Just based on your training and experience, if

21  you do not have some statement, inculpatory statement as to

22  the source of drugs or the -- or the ownership of drugs in a

23  vehicle, if those are discovered during a search, is it

24  typical to allow the driver of the vehicle to leave the

25  scene?

1    A.    We observed him make the transaction, so it is typical

2    for that, yes.

3    Q.    All right.  And based on your memory, there is -- at no

4    point did anyone threaten Mr. Reiman while on the side of the

5    road?  At no point did anyone threaten Mr. Reiman with his

6    wife or his child being prevented from getting in the vehicle

7    and driving away?

8    A.    No.  I did not talk to him, and I did not threaten him.

9    Q.    All right.  But you don't know of anybody that said

10    anything to that effect?

11    A.    I don't know of any -- what anybody else said to him.

12            MR. WILSON:  Okay.  Nothing further, Your Honor.

13            THE COURT:  Any redirect?

14            MR. KANGIOR:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16    BY MR. KANGIOR:

17    Q.    During a drug investigation if someone asks you the

18    consequences of finding drugs, are you going to tell them

19    what the possible consequences are?

20    A.    Yes.

21    Q.    Such as you may go to jail?

22    A.    Yes.

23    Q.    People you are with may go to jail?

24    A.    Yes.

25    Q.    Is that a threat?

1    A.    No.

2    Q.    When you were asked about following too close, less than

3    two seconds, how do you articulate that span of time when you

4    are traveling 65 miles an hour?

5    A.    I count, 1,001, 1,002, 1,003.

6    Q.    Did you do so in this case?

7    A.    Yes.

8    Q.    And would you say that a tractor-trailer length is a

9    one-second distance at -- traveling 65 miles an hour?

10    A.    I don't know.

11    Q.    But based on your time count you are sure that this

12    Enclave was following the semi tractor-trailer within two

13    seconds?

14    A.    Yes.

15    Q.    And then prior to the Enclave stopping after you

16    activated your emergency lights, did you make any eye contact

17    with the driver of the Enclave?

18    A.    I did not.  I did not.

19    Q.    Do you know if Wineinger may have?

20    A.    I am not sure.

21    Q.    Okay.  Do you know if the driver of the Enclave was

22    aware of your presence when you were trying to get them to

23    pull over?

24    A.    Following the -- once the vehicle stopped and we talked

25    with her, she said, yes, we saw the lights; we weren't sure

*EADS - Redirect*

1   what those lights were, and then pulled over.

2   Q.   So -- and this was prior to -- after you activated your

3   lights prior to them stopping?

4   A.   Yes.

5           MR. KANGIOR:  Nothing further, Your Honor.

6           THE COURT:  Okay.  You have been designated as the

7   case representative or agent, so you can remain in the

8   courtroom.  Thank you for your testimony.  You may step down.

9           MR. KANGIOR:  Would you like me to call my next

10  witness?

11          THE COURT:  Yes, you may.

12          MR. KANGIOR:  I will go ahead and call Jarrod

13  Wineinger.  May I be excused?

14          THE COURT:  Yes.

15          THE COURTROOM CLERK:  Go ahead and come up here.

16          THE WITNESS:  Oh.

17          THE COURTROOM CLERK:  [Indiscernible] for a minute.

18          THE WITNESS:  Jarrod Wineinger, W-i-n-e-i-n-g-e-r.

19          THE COURTROOM CLERK:  And is Jarrod spelled

20  J-a-r-r-o-d?

21          THE WITNESS:  Correct.

22          THE COURTROOM CLERK:  Okay.  Please raise your

23  right hand.

24      SERGEANT JARROD WINEINGER, GOVERNMENT WITNESS, SWORN

25          THE WITNESS:  Yes.

 1                    THE COURTROOM CLERK:  You can be seated.

 2                    THE WITNESS:  Thank you.

 3                    THE COURTROOM CLERK:  And if you need to adjust the

 4    mic so...

 5                    THE WITNESS:  Okay.  Thank you.

 6                    THE COURT:  Okay.  Mr. Kangior, you may proceed.

 7                    MR. KANGIOR:  Thank you.

 8                           DIRECT EXAMINATION

 9    BY MR. KANGIOR:

10    Q.   Sir, how are you employed?

11    A.   I am a deputy sheriff with the Douglas County Sheriff's

12    Department.

13    Q.   How long have you been so employed?

14    A.   Almost 24 years, this March.

15    Q.   And then which unit are you currently assigned with?

16    A.   To our K-9 division.

17    Q.   And as a K-9 officer or deputy, give an overview of some

18    of the -- your job description.

19    A.   I came into the unit in 2008.  Part of our

20    responsibilities in the K-9 unit is assisting other Douglas

21    County units with patrol or narcotics deployments for the K-9

22    ranging from narcotic sniffs of vehicles, storage units,

23    luggage, things of that nature, to patrol deployments looking

24    for suspects who ran from vehicle stops, ran from other

25    encounters, things of that nature.  Also helping with the

1    apprehension of those suspects.

2    Q.   And can you give an overview of some of the training you

3    have received in order to fulfill your duties?

4    A.   When I got into the unit in 2008 I went through a

5    five-week basic narcotics handler course with my first K-9

6    and then a six- to seven-week patrol K-9 course.  I was then

7    certified in both narcotics and patrol at that time.

8         The State of Nebraska requires an annual recertification

9    for handler teams.  I have been certified annually with the

10   K-9 I was assigned to since that point.  I have also been

11   certified as a K-9 trainer in both patrol and narcotics, a

12   K-9 evaluator, which an evaluator is someone that has the

13   authority to certify K-9 handler teams.

14        Been certified as an evaluator in both patrol and

15   narcotics, and I have been certified as a K-9 judge in patrol

16   and narcotics.  A judge has the ability to certify evaluators

17   throughout the state.

18   Q.   And as a judge, what does it take to become certified or

19   what is -- what do you look for to certify someone?

20   A.   It -- are you -- what did I need to do to be cert- --

21   become certified as a judge, or how do I grade evaluators?

22   Q.   How do you grade evaluators to become certified?

23   A.   The typical process to become an evaluator is you have

24   to be a handler for over five years, I believe.  Then

25   potential evaluators will job shadow judges.  I am one of

1    three in the state.

2        So the potential evaluators will follow judges when they

3    do certifications.  They will grade dogs alongside of the

4    judge.  We will talk about our answers, things that the

5    potential evaluators may have noticed or may have missed and

6    kind of a teaching process along the line.

7        Once the evaluators reach -- I think it's 25

8    evaluations, the judge they have been with the most will run

9    them maybe through another final certification.

10       At that time if their answers are in line with the

11   training, theory, and teaching practices, they will take a

12   written test.  And if they pass the written test along with

13   their required number of certifications, they can be

14   certified as an evaluator.

15   Q.   Are you currently assigned a K-9?

16   A.   Yes, I am.

17   Q.   What's the K-9's name?

18   A.   My K-9 currently is K-9 Riggs.

19   Q.   How long have you been assigned K-9 Riggs?

20   A.   I have been with Riggs since 2019.

21   Q.   And what -- has Riggs been certified every year since?

22   A.   Yes, he has.

23   Q.   Prior to August 23rd, 2023, when was Riggs's most recent

24   certification?

25   A.   I would have to refer to my reports, but I believe he

WINEINGER - Direct

```
 1   was certified in July of '23.
 2   Q.   Within a -- certainly within a year of August 23rd of
 3   2023?
 4   A.   Yes.
 5   Q.   And that certification process involves what?
 6   A.   It is a -- ten scenarios with 14 finds.  It's supposed
 7   to simulate real-world deployments, vehicle deployments,
 8   lockers, just the various scenarios you will see in the real
 9   world, home environments, bathroom environments, storage
10   environments.
11        Fourteen finds over the ten scenarios.  So they are
12   single finds in some scenarios, and there are two finds in
13   others.  The locations of the find are unknown to the team
14   going through certification.  They are only known to the
15   evaluator that's putting the certification on.
16   Q.   And has Riggs been certified every year since he's been
17   assigned to you?
18   A.   Yes.
19   Q.   Have you been certified every year since you have been
20   assigned Riggs?
21   A.   Yes.  We certify as a team.
22   Q.   What is Riggs trained to detect?
23   A.   He is trained for narcotics detection.  He's trained to
24   detect the odors of marijuana, methamphetamine, cocaine, and
25   heroin.
```

WINEINGER - Direct

1   Q.   And how do you go about deploying K-9 Riggs?

2   A.   It depends on what we are being asked to sniff, but

3   typ-...

4   Q.   Say a -- say a road traffic stop.

5   A.   Traffic stop, depending on the environment, the traffic,

6   I try and start from some point on the vehicle.  There is --

7   I -- when we are on a roadway where we are going with

8   traffic, I try and deploy where I can see traffic coming at

9   us for the beginning of the sniff just so we don't both get

10  hit by a car, and then work my way typically counterclockwise

11  around the vehicle.

12  Q.   And then do you direct K-9 Riggs on where to sniff?

13  A.   I initially let him start sniffing on his own.

14  Typically he'll move at head level in a vehicle.  In the case

15  of a vehicle he'll typically move at head level around the

16  vehicle.

17       If he catches any odors on that initial, I will let -- I

18  will let the line play out, let him follow it.  If we don't

19  get anything on first pass, I will start to direct him where

20  maybe I -- I don't think he got his nose into a particular

21  seam or area.  I will typically direct him high and low as we

22  are going along on the next passes.

23  Q.   And then you mentioned a leash.  When you are doing

24  deploy -- when you deploy Riggs, he's always on a leash?

25  A.   Typically, yes.

1    Q.    And then sometimes you give him more leash to go where

2    he wants to?

3    A.    Yes.  I deploy with a leash that's a lot longer than a

4    five- to six-foot waist lead.  If he wants to -- as we are

5    moving along if all of a sudden he head snaps and wants to go

6    work an area on his own, I can play out the leash.  My

7    motion, my tension on the leash will hopefully not interfere

8    with him or influence, and it allows him to work an odor

9    source on his own.

10    Q.    And then what behaviors will Riggs indicate to you that

11    he might be sensing in the odors of narcotics?

12    A.    There is a range of alert behaviors the -- with every

13    dog, and some dogs show the same behaviors all the time.

14    Some show different behaviors in different situations.  With

15    K-9 Riggs typically as we are working, when he goes from

16    open-mouth sniffing to completely closed mouth, nasal, that's

17    one of the alert behaviors that his -- through training with

18    him that leads me to believe he's in one of the four target

19    odors he's been trained on.

20         He works very well coming with me at my direction.  When

21    he wants to break away from my movement and go back to a

22    location without any prompting from me, that's another

23    alerting behavior.  A head snap behavior where we are -- we

24    are going along, then all of a sudden he wants to break off

25    and go back.

1    There is also what I call kind of the radar sweep

2    behavior.  He'll get in an area.  We'll see maybe a

3    closed-mouth alert.  He'll start working there, get nasally.

4    Then he'll move past it a little bit, stop, move past that

5    area again, and almost like he's trying to close in a box on

6    where he's getting the strongest odor.

7    Q.    And then does Riggs indicate a different behavior when

8    he's indicating to you that he's found the source of the odor

9    of narcotics?

10   A.    So his trained indication behavior after alert, which

11   the -- a true indication can only follow after the alert

12   behavior, his indication will be to stop and focus on the

13   strongest source of the odor that he can detect.

14        Typically if the source odor is at head level, within a

15   range of a foot or two at head level, he'll sit and focus on

16   it.  If it's lower, he'll lay down and focus on it.  If it's

17   higher, he may go up and put his paws on something and stand

18   and focus on it.

19        But he will stop all his movement.  He won't move any

20   further from that point.

21   Q.    And to you that indicates that Riggs is demonstrating to

22   you where he believes the strongest source of the odor of

23   narcotics is coming from?

24   A.    Correct.

25   Q.    Will Riggs sometimes do alerting behavior and not come

WINEINGER - Direct

1    to a final indication?

2    A.   I have seen that on occasion in training.

3    Q.   And does that tell you that he is picking up the odor of

4    narcotics?

5    A.   Yes.  Where -- what I typically interpret that as is

6    he's getting the odor, but he just can't figure out where the

7    strongest source of the odor may be coming from.

8    Q.   Were you and Riggs involved in a traffic stop on

9    August 23rd of 2023?

10   A.   Yes.

11   Q.   Who were you assisting that day?

12   A.   I was assigned to our special operations group.  I had

13   been contacted by one of the members of the group that they

14   were conducting surveillance.  I am not sure exactly, but

15   east of -- around the area of 20th Street and I think just

16   north of the interstate.

17        They were looking to possibly conduct traffic stops.  I

18   was headed to that area.  They had observed a -- what they

19   believed was a drug transaction.  The suspect vehicle from

20   the transaction got onto the interstate at that point.

21        They started following it.  And I got around on the

22   interstate to get caught up to them at some point after that.

23   Q.   So you weren't involved in the initial observations of

24   their surveillance of this alleged drug transaction?

25   A.   No.

1  Q.   But you were made aware through radio contact that

2  officers were involved in a suspected drug deal?

3  A.   Correct.

4  Q.   When did you actually come into or observe the suspect

5  vehicle?

6  A.   I believe Deputy Eads initially turned on his emergency

7  lights and tried to stop the vehicle somewhere around I-80

8  and Q street.  I think I was about a minute or two behind

9  when he initially activated his lights.

10      The vehicle kept proceeding westbound on I-80.  I got

11  caught up to Deputy Eads.  The vehicle wasn't pulling over.

12  I pulled to his driver's side into the middle lane, activated

13  my emergency lights and sirens, and I also activated my air

14  horn several times trying to get the attention of the driver

15  to pull over.

16      At one point I saw the driver look in her rearview

17  mirror at me, and I tried to motion her to pull over, and she

18  still proceeded westbound on I-80.

19  Q.   And then what were you driving that day?

20  A.   I was driving an F-150 silver unmarked vehicle, but it

21  had visor lights and grille lights, and it also had a siren

22  package.

23  Q.   And the siren is a loud siren?

24  A.   Yes.

25  Q.   Like a fire truck?

WINEINGER - Direct

1    A.    Typ- -- your typical police siren, along with an air

2    horn that I was using intermittently with the sirens.

3    Q.    And then your lights, what do those consist of?

4    A.    They are -- there is a set of lights in the visor, and

5    then there is lights in the grille of the vehicle.  And also

6    it will cause the front headlights to flash intermittently

7    between the two.

8    Q.    And then when you activated your lights, where were you

9    in relation to the suspect vehicle?

10   A.    I was basically even with Deputy Eads's vehicle.  We

11   were approximately 30, 40 feet behind the suspect vehicle.

12   Q.    And you -- were you directly behind it or off to one

13   lane?

14   A.    I was off a lane.

15   Q.    Okay.  And you have mentioned the driver -- well, what

16   did -- what observations did you make of the driver while you

17   were trying to pull the vehicle over?

18   A.    I believe I could see it was a female driver who looked

19   in her side rearview mirror right -- right back at me, but

20   that's -- I thought there was initially three occupants in

21   the vehicle.  It turned out there were two, and I -- and a

22   child safety seat was creating a -- in my mind what I thought

23   was a third person in the back seat.

24   Q.    And then how long did this suspect vehicle travel before

25   pulling over once you were behind it?

1    A.   We traveled west of the Harrison Street overpass from --

2    so from Q street to where we initially finally stopped I

3    would say is a mile and a half to two miles.

4    Q.   And the suspect vehicle, what -- describe it.

5    A.   It was a sedan, four-door sedan.  I think pretty dark

6    tint on at least the rear passenger windows.  I don't recall

7    what her front passenger windows were.

8    Q.   And then where did it pull over?

9    A.   It pulled over to the right side of the road.

10   Q.   About approximately where?

11   A.   It -- west of the Harrison Street overpass on I-80.  So

12   between Harrison Street and what would be the exit to get off

13   at what's 144th Street.

14   Q.   Where did you park in relation to the suspect vehicle?

15   A.   Deputy Eads gave me enough room to get mostly onto the

16   shoulder, so I -- by the end of when they finally came to a

17   stop, I would be basically directly behind the suspect

18   vehicle on the shoulder.

19   Q.   How were you dressed that day?

20   A.   I was dressed in my outer body cam -- or body armor

21   carrier with sheriff's insignia armed with, you know, duty --

22   typical duty belt.

23   Q.   Were you wearing a body camera?

24   A.   Yes, I was.

25   Q.   Was it activated?

WINEINGER - Direct

1    A.    Yes, it was.

2    Q.    And was your undercover vehicle equipped with any

3    recording devices?

4    A.    No, it was not.

5    Q.    How did you approach the vehicle after it pulled over?

6    A.    Once it finally got stopped, Deputy Eads approached the

7    passenger's side.  I approached the driver's side.

8    Q.    What did you do upon approaching the passenger's side?

9    A.    I made con-...

10   Q.    Or, I am sorry, driver's side.

11   A.    Oh.  I made contact with the female driver at that

12   point.  I told her that Deputy Eads had observed her with a

13   traffic violation and he would basically fill her in on

14   everything with that, and I asked her if she could locate her

15   vehicle paperwork.

16   Q.    Did it take her some time to produce the paperwork?

17   A.    Yes.

18   Q.    Did she eventually produce it?

19   A.    She -- I believe she found the registration and her

20   license at some point.

21   Q.    And did she eventually exit the driver's side door?

22   A.    Yes.

23   Q.    Upon whose request?

24   A.    Upon my request.

25   Q.    For what purpose?

1    A.    Number one, it's very hard to hear roadside on the

2    interstate.  It's easier to conduct a follow-up with a driver

3    back at your vehicle inside the vehicle.  It's safer that

4    way.

5        Number two, based on what we had known from the previous

6    observations of surveillance, I don't know if there were any

7    weapons in the vehicle she might have access to.  I don't

8    know if there is any evidence in the vehicle she might be

9    able to destroy.  We typically want to get people away from

10   things that could be a potential danger to us or a loss of

11   evidence.

12   Q.    And then prior to this traffic -- the traffic stop, the

13   suspect vehicle being pulled over, did you observe any

14   traffic infractions?

15   A.    I did not.

16   Q.    Did anyone relay to you that they had observed a traffic

17   infraction?

18   A.    Deputy Eads had.

19   Q.    At some point did someone or some fellow agent request

20   that you deploy Riggs?

21   A.    Deputy Eads spoke with the female driver of the vehicle.

22   When he was done with speaking with her, he asked me to

23   deploy K-9 Riggs.

24   Q.    And you had Riggs with you in your undercover vehicle

25   that day; correct?

WINEINGER - Direct

1    A.    Yes.

2    Q.    Did you deploy Riggs?

3    A.    I did.

4    Q.    How did you go about doing that?

5    A.    I got his leash on him.  I brought him up to the front

6    driver's side fender, front door area.  I gave him his sniff

7    command, and we started from there in a counterclockwise

8    motion around the car.

9    Q.    Prior to deploying Riggs, did you ask anyone to roll up

10   windows or roll down windows?

11   A.    No, I did not.

12   Q.    When you approached the driver initially, did you ask

13   her to roll down the window so you could speak with her?

14   A.    I believe she already had it down.

15   Q.    Prior to deploying Riggs, did you shut any doors that

16   were left open?

17   A.    Yeah.  When we had the passenger exit the vehicle for

18   the sniff, the passenger left the door open.  I did shut that

19   door.

20   Q.    Why did you do that?

21   A.    Just because of the inherent risk of if the dog were to

22   follow his natural instincts and jump into a vehicle, it's an

23   unsearched vehicle.  I don't know if there is anything in the

24   vehicle that could be a physical danger to the dog, needles,

25   knives, weapons.

WINEINGER - Direct

1       And in this day and age, fentanyl being a pretty

2  prevalent drug nowadays, fentanyl will kill dogs.  I don't

3  want him -- if he gets into a vehicle and finds fentanyl or

4  comes across sniffing fentanyl, I don't want him to die.

5  It's a danger to him, so I don't want him going physically

6  inside of a vehicle.

7  Q.   And do you routinely conduct your searches to prevent

8  Riggs from entering vehicles?

9  A.   Yes.

10  Q.   Is it part of your practice to ever indicate or

11  encourage Riggs to stick his head inside of a vehicle?

12  A.   The sticking the head inside of the vehicle to get into

13  an odor cone, if that's what -- if I need him to direct into

14  that odor cone, yes.  That -- that's part of training is to

15  get where the most likely source of odor could be coming

16  from.

17       An open window is most likely going to be a strong

18  source of odor for anything in the vehicle, but we do not

19  train to have them follow up and jump into a vehicle, whether

20  we give them a command to do it or whether they want to do it

21  on their own.

22       That's something we try and teach them to don't just

23  jump into vehicles.  If you -- if you get your odor source

24  there and you fe- -- if you feel that's the source, you know,

25  go to indication at that point.

WINEINGER - Direct

1   Q.   And that's the reason you have them on a leash, to

2   prevent them from entering into vehicles?

3   A.   Correct.

4   Q.   How did you deploy Riggs in this case on August 23rd,

5   2023?

6   A.   Like I said, I put him on his long line.  I initially

7   start giving him three to four feet.  We start at a point on

8   the vehicle.  I started about the front driver's fender,

9   front driver's side door.  We worked our way around the

10  vehicle.

11        Initially, the first pass was head level.  We worked

12  counterclockwise around the vehicle.  On the first complete

13  pass I started trying to detail him high to get him up into

14  window seams and, you know, they -- the -- where the seams

15  are a little less protected than door seams, where you have

16  several folds that can affect odor where -- versus just a

17  single seam of a rubber seal on a window.

18        I directed him high from the driver's side window to the

19  dri- -- or passenger's side doors.  Got back to the driver's

20  side window.  He went up high, went nasal up in the window,

21  came down, worked on the door seam.  Giving a little -- he

22  gave me a little radar.

23        He worked past it again.  Then eventually he came up

24  without any direction from me back into that window, saw him

25  take kind of his final deep breath, and then he went to sit

1    for his -- sit and focus for his indication.

2    Q.    Okay.  And all this is recorded on your body camera?

3    A.    Yes.

4    Q.    So you started the deployment of Riggs on the rear

5    passenger's side of this vehicle?

6    A.    No.  The front driver's side fender, driver's side door

7    area.

8    Q.    Okay.  And when Riggs first approached the window, was

9    he giving you any alerts?

10    A.    We started on the -- that -- when we got from the front

11    of the door to the back of the door, he started going nasal

12    on that.  Right about that time Deputy Eads was trying to

13    block traffic, yelled out something, so I lost my focus on

14    Riggs and looked, hoping that Dan wasn't warning me that a

15    car was about to plow into us.

16         I started to see an alert, but he continued past that.

17    So we worked back around for that first lap.  And after that

18    first lap, I started to see alerting behavior that I could --

19    that I was focused on.

20    Q.    And you mentioned you direct Riggs high and low.  How do

21    you do -- how do you direct him?

22    A.    Typically I just raise my hand above his head if I want

23    him to go high.  I put it down below his head if I want him

24    to go low.  I don't touch the vehicle or touch any surface

25    that we are trying to sniff.  I just want to direct his

1    attention up high.

2    Q.    And was the pass- -- I am sorry -- the driver's side

3    window rolled down when you were deploying Riggs in this

4    case?

5    A.    Yes.

6    Q.    Did you direct Riggs to sniff inside of that open

7    window?

8    A.    No.

9    Q.    Did you put your hand up by -- next to the open window?

10   A.    Yes.

11   Q.    For the purpose of?

12   A.    Sniffing high on that -- on that side of the vehicle.

13   Q.    And as you have mentioned, an open window is going to be

14   more likely a source of -- a stronger source of an odor than,

15   say, a seam?

16   A.    Yes.

17   Q.    And, again, did you put your hand inside the open

18   window?

19   A.    No, I did not.

20   Q.    Give you -- Riggs any indication to enter into that

21   vehicle?

22   A.    No.

23        MR. WILSON:  Your Honor, I have to object to

24   leading here.

25        THE COURT:  Overruled.  I will allow you full

1    cross-examination.

2              MR. WILSON:  Thank you, Your Honor.

3    BY MR. KANGIOR:

4    Q.   And at some point did Riggs stick his nose inside the

5    window?

6    A.   Yes.

7    Q.   Was that upon direction of you?

8    A.   I believe the initial time I presented that window high

9    that could have been considered direction of me, but at --

10   just prior to that final indication, we worked into it.  His

11   head snapped back to that area and started working that area

12   again, and he went high up into the window without any motion

13   or anything from me.  After that instance where he went on

14   his own, that's when he came to his final indication after

15   that.

16   Q.   I guess what I am asking is when you direct him high,

17   you wanted him to get up and sniff the open window?

18   A.   Yes.

19   Q.   Did you direct him to go inside the open window?

20   A.   No, I did not.

21   Q.   He did that on his own?

22   A.   Yes.

23   Q.   Based upon what?

24   A.   Based upon he's trying to get into the strongest source

25   of odor.

1    Q.   And at some point did Riggs give his final or an

2    indication to you alerting to the strongest source of

3    narcotics?

4    A.   Yes, he did.

5    Q.   How did he do that?

6    A.   He went up into that window one last final time, took a

7    deep inhale, came down on the seam between the B-pillar and

8    the -- and that door and then sat and focused for indication.

9    Q.   Indicating what to you?

10   A.   That he had found the strongest source of narcotics

11   odor.

12   Q.   Giving you probable cause to search?

13   A.   Yes.

14   Q.   Was the vehicle searched?

15   A.   Yes.

16   Q.   Who participated in that?

17   A.   I participated, and Deputy Eads participated.

18   Q.   What, if anything, was found?

19   A.   Deputy Eads located a baggie with methamphetamine

20   residue.  I think there was another bag related to a -- like

21   a tote bag.  And then we found a water container later that

22   we -- it factored into the investigation.

23   Q.   Where were these items found?

24   A.   I believe Deputy Eads found them on the passenger's side

25   of the vehicle.  I -- I was on the driver's side of the

1    vehicle.  I did not locate any of those items.

2    Q.    And how did you participate -- excuse me.

3        How did you participate in the investigation after the

4    drugs were found?

5    A.    After the drugs were found, I assisted with trying to

6    determine what the water bottle played into it.  I believe at

7    some point we figured out from either the passenger's

8    statements or our own experience that methamphetamine had

9    been dumped into that water bottle.  So I participated in

10    trying to facilitate a field test of that water so we could

11    go on from there with further testing.

12    Q.    Was anyone in the vehicle when you are deploying Riggs?

13    A.    No.

14    Q.    Was there a child in the back seat?

15    A.    I know there is a child seat, but I can't remember if

16    there is a child or not.

17    Q.    Okay.  But the driver and the passenger was removed

18    prior to deploying Riggs?

19    A.    Yes.

20    Q.    Why is that done?

21    A.    Because, again, it's a safety concern for the dog.  We

22    don't know what they are going to -- it's a safety concern

23    for the officer as, again, it's an unsearched vehicle.  The

24    dog's walking around.  Myself are walking around.  If there

25    is weapons in the vehicle, we could be in potential danger.

WINEINGER - Direct

1   Q.   And what was done with the driver prior to you deploying

2   Riggs?

3   A.   I believe he was secured in another investigator's

4   vehicle.

5   Q.   The female driver?

6   A.   Or -- oh, I am sorry.  The driver was secured in my

7   vehicle at that time, and the passenger was asked out and

8   secured in another vehicle prior to the sniff.

9   Q.   Were you present when the passenger was secured?

10  A.   I was there when he initially exited the vehicle, and he

11  was -- two other investigators secured him, I believe.

12  Q.   And your camera captures him -- when we say the

13  passenger exiting the vehicle, that's the defendant in this

14  case?

15  A.   Yes.

16  Q.   And when he exited the vehicle, did he shut the

17  passenger door?

18  A.   No, he did not.

19  Q.   Your camera captures you shutting it prior to you

20  deploying Riggs?

21  A.   Correct.

22  Q.   And while you are deploying Riggs, where is the

23  defendant?

24  A.   I thought he had been secured in the -- one of the other

25  investigators' vehicles.

1    Q.   Or he was standing on the side of the road?

2    A.   He could have been.

3    Q.   Were you talking to him?

4    A.   No.

5    Q.   Did you have any contact with him on the side of the

6    road?

7    A.   No.

8    Q.   Do you know if anyone else did?

9    A.   I have no idea.

10   Q.   Did you speak to the defendant at any time after your

11   deployment of Riggs?

12   A.   I do not believe so.

13   Q.   You weren't involved in the interview?

14   A.   No.

15   Q.   Did you hear any officers make him any promises or

16   threats?

17   A.   No.

18   Q.   Did you hear any questioning whatsoever of the defendant

19   other than when you were standing outside of the vehicle

20   prior to them getting out?

21   A.   No, I did not.

22             MR. KANGIOR:  I have nothing further, Your Honor.

23             THE COURT:  Mr. Kangior, are you anticipating

24   calling a third witness today?

25             MR. KANGIOR:  Briefly because of one issue that

 1   came up.

 2            THE COURT:  Okay.  Mr. Wilson, how long do you

 3   anticipate your cross-examination will take?

 4            MR. WILSON:  Your Honor, a half hour to 45 minutes.

 5            THE COURT:  Okay.  We'll take a ten-minute break

 6   then.  It's 11:07 a.m., and we'll come back here by 11:20.

 7   And then my thought is that we'll probably be done by

 8   12:30 or so.  Certainly by 12:45.  I know I have a warrant

 9   appointment at that time.

10            Does that present any issues for your witness or

11   yourself, Mr. Kangior?

12            MR. KANGIOR:  No, no issues.

13            THE COURT:  Mr. Wilson?

14            MR. WILSON:  No issues.  Thank you, Your Honor.

15            THE COURT:  Okay.  We'll come back here at 11:20

16   then and start.

17            MR. WILSON:  Thank you.

18        (Recess from 11:08 a.m. to 11:19 a.m.)

19            THE COURT:  ...and, Mr. Kangior, you were done with

20   your direct questioning of this witness?

21            MR. KANGIOR:  I was.

22            THE COURT:  Okay.  We can proceed with

23   cross-examination.

24            MR. WILSON:  Thank you, Your Honor.

25

| | |
|---|---|
| 1 | <u>CROSS-EXAMINATION</u> |
| 2 | BY MR. WILSON: |
| 3 | Q.   Good morning, Deputy Wineinger. |
| 4 | A.   Good morning. |
| 5 | Q.   What was this K-9's name? |
| 6 | A.   Riggs. |
| 7 | Q.   Have you ever seen the movie Lethal Weapon? |
| 8 | A.   Yes, I have. |
| 9 | Q.   All right.  Did you have something to do with that name? |
| 10 | A.   I did not. |
| 11 | Q.   Okay.  Is K-9 Riggs named after Mel Gibson's character? |
| 12 | A.   I have no idea who he is named after. |
| 13 | Q.   That was a pretty self-destructive, reckless, |
| 14 | unpredictable cop in that movie; right? |
| 15 | A.   Yes. |
| 16 | Q.   So you don't know whether K-9 Riggs was named that |
| 17 | because he's unpredictable? |
| 18 | A.   I do not know that. |
| 19 | Q.   Okay. |
| 20 | A.   And he's not unpredictable. |
| 21 | Q.   Fair enough.  When you pulled over the vehicle, you |
| 22 | directed Ms. Reiman to get out of the car and proceed |
| 23 | directly to your vehicle; right? |
| 24 | A.   The driver? |
| 25 | Q.   Yes. |

WINEINGER - Cross

1    A.    Ye- -- not immediately, but at some point I did direct
2    her, yes.
3    Q.    Okay.  Why did that change?  Why didn't you do it
4    immediately?
5    A.    Because Deputy Eads was speaking at the passenger's side
6    window with both occupants.  I could not hear the entire
7    content of what he was saying at that point.
8    Q.    Did he direct you to have Ms. Reiman get out of the
9    vehicle then?
10   A.    No.  At some point I could -- I could tell that the
11   conversation was over and we needed to proceed with our
12   traffic stop stuff.
13   Q.    Okay.  And you never observed -- personally observed a
14   traffic violation prior to the stop; correct?
15   A.    Correct.
16   Q.    You detailed all the training that you have gone through
17   over your career as a K-9 officer; correct?
18   A.    Some portion of it, yes.
19   Q.    All right.  And I am just referring you back to that
20   because I wanted to ask you a few things about K-9 Riggs's
21   training.
22   A.    Okay.
23   Q.    Have you been present for all of K-9 Riggs's training,
24   or most of it or part of it?  Can you characterize that for
25   us?

WINEINGER - Cross

1    A.    I would say part of it.

2    Q.    Okay.  How would...

3    A.    Before he was -- I -- so since I have had him, I have

4    been a part of all of his training, but he was with another

5    handler for at least two years prior that I assisted with his

6    initial training, but there are other training times I was

7    not there.

8    Q.    Understood.  Does K-9 Riggs essentially live with you?

9    A.    Yes.

10    Q.    Okay.  So you take him home at the end of the day with

11    you to your home, and he's your dog outside of work purposes

12    too?

13    A.    Correct.

14    Q.    Okay.  So you are intimately familiar with K-9 Riggs and

15    how he reacts in given situations; right?

16    A.    Yes.

17    Q.    Does Riggs receive -- I will say K-9 just to make this

18    clear each time.

19         Does K-9 Riggs receive a reward when he successfully

20    indicates during his search for narcotics?

21    A.    In training.

22    Q.    Okay.  What's that reward?

23    A.    It's a toy.

24    Q.    And so at least during training he has an incentive to

25    give a positive indication; right?

1    A.    Correct.

2    Q.    If he -- is he trained -- well, I will rephrase.

3         Does he receive a reward in -- during training when he

4    successfully refrains from indicating, when there is no

5    source of narcotics odor?

6    A.    Yes.

7    Q.    In this real-world situation on August 23rd of 2023, did

8    he receive any sort of a reward or praise after positively

9    indicating on the Enclave?

10    A.    I may have verbally praised him, which is kind of our

11    standard thing to do.  I -- it's what's allowed during

12    certification.  There is no rewarding in the certification

13    scenarios, but you can verbally praise the dog, and that's

14    generally what I do on the street.

15    Q.    And dogs react positively to being verbally praised;

16    right?

17    A.    Generally.

18    Q.    It's an incentive in its way, isn't it?

19    A.    It's just a confirmation that he did his required

20    training.

21    Q.    Uh-huh.

22    A.    It's a release to go back, and we are going to do other

23    things now.

24    Q.    K-9 Riggs sniffs where you direct him to sniff; right?

25    A.    Yes, generally.

WINEINGER - Cross

1    Q.    And could you explain again how you -- how you direct

2    Riggs where to sniff?

3    A.    Well, if we are talking about a vehicle sniff, I will

4    typically start, let him sniff the vehicle head level.  If on

5    the initial pass he doesn't do anything on his own, go low,

6    go high or -- on his own account, I will start directing him

7    to areas that we didn't get on that first pass.

8         So I may direct him high; I may direct him low just

9    trying to watch what kind of reaction he's giving me.

10   Q.    And you did that in this case; right?

11   A.    Correct.

12   Q.    You directed high around the car for the most part;

13   right?

14   A.    Yes.

15   Q.    And that was at various points around the vehicle;

16   right?

17   A.    Yes.

18   Q.    You actually did touch the vehicle at least once during

19   those passes, didn't you?

20   A.    I don't recall that I did, but I try not to.  I try to

21   make the -- my standard not to actually touch things.

22   Q.    Uh-huh.  But it's possible you did?

23   A.    Without watching the video, I can't tell you.

24   Q.    Uh-huh.  Do you know how many times you put your hand on

25   or near the vehicle directing K-9 Riggs during this drug dog

1   sniff?

2   A.    I don't have any specific number.

3   Q.    All right.  If I said more than three, would you agree

4   with that?

5   A.    I -- yeah, I guess I could agree with that.

6   Q.    Uh-huh.  And do you remember how many times you put your

7   hand on or near the driver's side window, front driver's side

8   window?

9   A.    I don't know.

10   Q.    You testified that window was open; correct?

11   A.    Yes.

12   Q.    All right.  You also testified that the passenger's side

13   door was open; right?

14   A.    It was open at one point prior to the sniff.

15   Q.    Prior to the sniff it was open, but you closed it;

16   right?

17   A.    Correct.

18   Q.    Okay.  And correct me if I am wrong.  The primary reason

19   you closed that door is that concern for K-9 Riggs's safety;

20   right?

21   A.    Correct.

22   Q.    And that's because if you are not careful, he'll just

23   jump right into that car; right?

24   A.    Not necessarily, but it's a possibility.

25   Q.    All right.  You didn't close the window, though?

WINEINGER - Cross

1   A.   No.

2   Q.   And, in fact, I think you testified that -- well,

3   actually, I will pull that -- I will withdraw that question.

4        You don't train K-9s, including Riggs, to jump into

5   vehicles; correct?

6   A.   Correct.

7   Q.   But you don't train them to refrain from doing so

8   either, do you?

9   A.   I do.

10  Q.   You do?

11  A.   Yes.

12  Q.   Okay.  You don't train them to refrain from putting

13  their snout in the vehicle, though?

14  A.   No.

15  Q.   And, in fact, the dogs generally are going to go where

16  you are directing them to with your hand; right?

17  A.   Depends on the dog.  Some do not take well to direction

18  from a handler.

19  Q.   Well, I don't believe you said K-9 Riggs is

20  unpredictable.  He's not like Riggs in Lethal Weapon; right?

21  A.   Correct.

22  Q.   Okay.  So he's pretty predictable, and he follows the

23  directions you are giving; right?

24  A.   Yes.

25  Q.   All right.  Has -- I am sorry.  You have answered this

WINEINGER - Cross

1   question, but I just want to refresh everyone's memory.  How

2   long have you been working with K-9 Riggs?

3   A.   Since 2019.

4   Q.   All right.  So at this point it would have been about

5   four years ago?

6   A.   Or I -- I would have to look at my notes.  Since 2021.

7   I am sorry.

8   Q.   Okay.  So at this point in August of '23 you had been

9   working with him about two years?

10  A.   Yes.

11  Q.   How many -- just estimate, how many drug or narcotics

12  sniffs on the sides of the -- of the roads do you think he

13  had conducted by that point with you?

14  A.   Fifteen-plus.

15  Q.   Okay.  Have you ever seen him put his face or snout or

16  head or any other part of his body through an open window on

17  a vehicle?

18  A.   Yes.

19  Q.   And you don't correct him when he does that, do you?

20  A.   Not if it's -- not if he's just putting his nose into

21  the window.  If he gives me any indication that he's going to

22  try and climb in or jump in, I will correct him on that.

23  Q.   Okay.  Because from your perspective as his officer, as

24  his training officer, him putting his snout through the open

25  window of a vehicle is fine; right?

1   A.   Yes.

2   Q.   When he's putting his snout into the open window of a

3   vehicle, what's he doing?

4   A.   Well, he should be sniffing if he's given the sniff

5   command.

6   Q.   Okay.  So he's collecting information about what's in

7   that vehicle; right?

8   A.   Yes.

9   Q.   He's collecting -- well, I will ask you this about the

10  training and experience that you have.  What are the dogs

11  essentially trained on in detecting narcotics odors?  Is

12  there a specific smell?  When they are trained, do they --

13  are they trained on real narcotics?

14  A.   Yes.  We train with real narcotics and what we call

15  unid- -- unidentifiable amounts of narcotics, which are

16  cloth, rubber hoses, things that are soaked in/with actual

17  narcotics so we can remove those for training aids without

18  using actual narcotics.

19  Q.   Uh-huh.

20  A.   And we can place those in areas.  They will maintain the

21  odor of those narcotics, but they don't actually have the

22  narcotics presence -- present because the odor can maintain

23  in an area without that actual item being present.

24       If you have ever -- if anyone has ever ordered a pizza

25  in your household and they ate it before you got home and you

1    got home and you knew there had been a pizza there, the pizza

2    is gone, but that odor is still there.

3        So as far as our UA training aids, it's that same

4    concept.  They are -- they are trained on both live dope and

5    the UAs.

6    Q.    So there are essentially odors that diffuse into the air

7    in that cabin of that vehicle; right?

8    A.    Yes.

9    Q.    And you, I believe, testified that that is -- eventually

10   contributes to what is called the cone of smell; right?

11   A.    A scent cone.

12   Q.    Scent cone.  And the scent cone is stronger in an area

13   where an open window might be?

14   A.    Typically.

15   Q.    Okay.  You directed him near that to -- to sniff near

16   the open window of this vehicle because that was a good place

17   to get a scent cone; right?

18   A.    Yes.

19   Q.    I am sorry.  You may have called it a smell cone?

20   A.    I -- if I said smell cone, then I was wrong.  It -- it's

21   a scent cone.

22   Q.    Okay.  Thank you for clarifying.

23       K-9 Riggs, in this situation his -- his snout at least,

24   right, his snout at least broke that plane of that window on

25   more than one occasion during this search; right?

1    A.    Yes.

2    Q.    Okay.  And you mentioned at one point during your

3    testimony a head snap; right?

4    A.    Mm-hmm.  Yes.

5    Q.    All right.  Did that occur before or after the first

6    time that K-9 Riggs stuck his snout into that vehicle?

7    A.    I believe there was at least one, if not two that

8    occurred after he had been up in the window with nasal

9    sniffing, came down, started to move past the window, head

10   snapped back to it.  From his training from when I have

11   watched, that means he's just left a scent area and he --

12   Q.    Uh-huh.

13   A.    -- and now he's going to try and work back into the

14   scent area.

15   Q.    All right.  So something about him putting his snout in

16   that vehicle at least may have led to them -- him snapping

17   back on the way back to that spot; right?

18   A.    If that's where he was picking up his source of odor,

19   yes.

20   Q.    Okay.  And then is it after the head snap that you had

21   what you would call a positive indication?

22   A.    Eventually, yes.

23   Q.    Okay.  Why would it be eventually?  Did he do that --

24   did he do some additional sniffing after he did his head

25   snap?

1   A.   Yeah.   He -- I saw what I call kind of a radar sweep

2   behavior where he left --

3   Q.   Uh-huh.

4   A.   -- a scent area, worked back past the window, felt that

5   he was to the end of the sniff area and then started working

6   back into the window on his own again.

7   Q.   And is that the second time he stuck his head and snout

8   or at least some part of his face into the window?

9   A.   Without seeing the exact video again, to my memory, yes,

10   it's about the second time.

11         MR. WILSON:   Okay.   I am sorry, Your Honor.   I am

12   just checking my questions here.   I think I am close to done

13   already.

14         THE COURT:   Sure.   Take your time.

15         MR. WILSON:   Thank you.

16   BY MR. WILSON:

17   Q.   So during your certification and training process, I --

18   you testified you specifically try to keep dogs from jumping

19   into vehicles; right?   You train them not to do that; right?

20   A.   During training, yes.

21   Q.   Okay.   You don't -- you do that for the dog's safety;

22   right?

23   A.   Yes.

24   Q.   You don't do that due to Fourth Amendment concerns, do

25   you?

1    A.    I -- with the latest case law, we -- I have never

2    worried about it from Fourth Amendment concerns because I

3    don't train our dogs to jump into vehicles.

4    Q.    Right.  But you do train them to go where you direct;

5    right?

6    A.    Correct.

7    Q.    And you will direct them toward open windows; right?

8    A.    Yes.

9    Q.    And that would result in the dog following your

10    direction and putting -- and put its face or head into an

11    open window; right?

12    A.    Yes.

13    Q.    Okay.  Your dog alerted -- or, I am sorry, your dog gave

14    a positive indication, I believe you said, by -- did it sit?

15    A.    He came to almost a seated position.  It was -- it would

16    be what I call kind of almost a crouch.  The temperature was

17    around a hundred degrees that day.  The asphalt where we were

18    actually walking on on that driver's side that day is going

19    to be very hot.

20        I have seen it time and time again.  A condition like

21    that, you are not going to have a lot of dogs that want to

22    sit fully just because of the positioning of their anatomy at

23    the lower end of their body.

24    Q.    They don't want to get burned; right?

25    A.    Yes.

1    Q.    Have you ever seen him do that before?

2    A.    Yes.

3    Q.    On hot days?

4    A.    I -- it depends on the surface.  We have done sniffs on

5    other environments off of asphalt and grass -- or off of

6    asphalt and concrete where it was much cooler, and he was

7    much more comfortable to do it.

8    Q.    Following the positive indication by K-9 Riggs, is that

9    when you and the other officers determined that you had

10    probable cause to search the vehicle?

11    A.    I believe prior to the stop, with the observations made

12    during the initial surveillance, which I wasn't a part of,

13    that I believe they felt they had probable cause without the

14    K-9 sniff at that point.

15    Q.    All right.  Did -- but at that point the search was

16    conducted because...

17    A.    After the positive indication?

18    Q.    Yeah.  After the positive indi- -- so, in other words,

19    there was no search of this vehicle conducted until after the

20    positive indication; correct?

21    A.    Correct.

22    Q.    Okay.  And once that positive indication occurred, what

23    happened to Mr. Reiman, if you know?

24    A.    He was -- I imagine he was secured in one of the

25    investigators' vehicles at that point.  If he -- if he was

WINEINGER - Cross

1    roadside at that point and wasn't already secured, I imagine

2    he was secured at that point.

3    Q.   All right.  Did you observe him secured at some point

4    following the positive indication?

5    A.   No.

6    Q.   You never saw him in the back of a police vehicle after

7    the positive indication?

8    A.   I may have, but I assisted with searching the vehicle

9    after that.

10    Q.   So you don't know whether he was allowed to leave the

11    scene on -- in his own vehicle?

12    A.   I don't believe he was allowed to leave the scene in his

13    own vehicle.

14    Q.   All right.  So at some point he was secured in the back

15    of a police vehicle; right?

16    A.   Yes.  I believe the driver was the only person allowed

17    to leave the scene in the vehicle.

18    Q.   All right.  And then there was a young girl in the car

19    too; right?

20    A.   Yeah.  What I am starting to remember now, yes, I do

21    believe there was a kid in the car.

22    Q.   Okay.  And at some point there was an officer in that

23    vehicle with Mr. Reiman, right, in the police vehicle?

24    A.   I imagine there was, but I can't say if there was one

25    the whole time or not.

WINEINGER - Cross

1    Q.    All right.  Were you the last one to leave the scene?

2    A.    I don't recall.

3    Q.    Okay.  You certainly don't recall, though, Mr. Reiman

4    being left on the side of the road; right?

5    A.    No.  I am pretty sure he was transported for

6    questioning.

7    Q.    All right.  Do you know whether he was handcuffed?

8    A.    I don't know for certain.  I would assume, per our

9    policy and procedure, he would have been.

10   Q.    Okay.  Okay.  So there would be a policy and procedure

11   at that point he'd be handcuffed; right?

12   A.    Yes.

13   Q.    And do you know who he was with at that point?

14   A.    I do not know.

15   Q.    All right.  Do you know what officer -- can you name the

16   officers that you were there with that were in charge of

17   Mr. Reiman during the search?

18   A.    I believe Deputy Eads and Deputy Ronk were the leads on

19   this case, but I am not a hundred percent certain on it.

20             MR. WILSON:  One second, Your Honor.

21             Thank you for this moment, Your Honor.  I am just

22   looking at some things with my client.

23             THE COURT:  Take your time.

24             MR. WILSON:  Thank you.

25

1    BY MR. WILSON:

2    Q.    Did you testify that you were one of the officers that

3    actually searched the Enclave?

4    A.    Yes.

5    Q.    All right.  Did you personally find any narcotics?

6    A.    No.

7    Q.    All right.  You are aware -- are you aware of whether

8    another officer found something that tested positive for

9    meth -- for narcotics?

10   A.    I believe Deputy Eads found the baggie with the residue

11   and another tote bag maybe involved with it, and then I am

12   not sure which of the investigators found the water bottle

13   that eventually contained the methamphetamine.

14   Q.    Do you know where in the vehicle the water bottle was

15   found?

16   A.    I believe it was passenger's side because I had -- I

17   searched the driver's side.

18   Q.    All right.  And you didn't find anything on the driver's

19   side?

20   A.    No.

21   Q.    Okay.  And, again, to be clear, K-9 Riggs's indication

22   was -- you observed that after he stuck his head in the

23   window on the driver's side; right?

24   A.    Correct.

25         MR. WILSON:  I don't have anything further, Your

WINEINGER - Redirect

1    Honor.  Thank you.

2              THE COURT:  Redirect?

3                     REDIRECT EXAMINATION

4    BY MR. KANGIOR:

5    Q.    You testified that Riggs is not unpredictable?

6    A.    Correct.

7    Q.    You believe he's predictable then?

8    A.    I believe so.

9    Q.    Why?

10   A.    Because I have been training with him for two years.

11   That's one of the things that the, I guess, professional

12   handler needs to be in tune with is the dog's reactions to

13   certain situations.

14        That's why we go through training is to expose them to

15   as many situations in a training environment before you get

16   to the real world.  Now, the real world does present surprise

17   factor every now and then that you haven't trained for, and

18   it might create an unpredictable behavior, but that's why

19   training is important.

20        And you try and -- try and do every training scenario

21   you can imagine and cover every base you can imagine so you

22   get a baseline behavior that as you deploy that dog you can

23   measure that baseline behavior from training to what's going

24   on in that actual real-world deployment.

25   Q.    And based on all your training with Riggs do you believe

WINEINGER - Redirect

1  he's reliable?

2  A.    Yes.

3  Q.    Would you consider Riggs to be a reliable drug-detecting

4  K-9?

5  A.    Yes.

6  Q.    And was he certified at the time of the search on

7  August 23rd of 2023?

8  A.    Yes, he was.

9  Q.    Or I should say at the time he was deployed on that

10  date?

11  A.    He -- yes, he was.

12  Q.    And he had been certified previous to that on at least

13  two occasions?

14  A.    Yep.  More than that.  If we got him in 2019, he's

15  probably been certified every year since that point.

16  Q.    Did you ever direct -- during the deployment on

17  August 23rd, 2023, did you ever direct Riggs to -- his snout

18  to enter inside the open passenger -- open driver's window?

19  A.    No.

20  Q.    You did direct him to go up to the window?

21  A.    Yes.

22  Q.    But not inside it?

23  A.    Correct.

24  Q.    Based on your training?

25  A.    Yes.

WINEINGER - Redirect

1  Q.   And you mentioned your understanding of the law in

2  conducting your training in certain ways.  What is your

3  understanding of the law?

4  A.   Well, U.S. vs. Pla- -- or, excuse -- excuse me, <u>U.S. vs.</u>

5  <u>Stone</u> says that a K-9 who on his own instinct, with no --

6  with no prompt from a handler, is allowed to enter a vehicle

7  to continue the K-9's sniff and pinpoint of the narcotics.

8       While that's the initial case law I was initially

9  trained with in 2008, most of the trainers that I have

10  trained under in the state of Nebraska and outside of the

11  state of Nebraska, it allows the dog to do something, but

12  that doesn't necessarily mean you should allow the dog to go

13  into a vehicle you haven't searched.

14       So the training philosophy I was trained with is do not

15  let the dog enter a vehicle even if it's not on your prompt

16  and not on your command because of the unknown dangers in

17  that vehicle that are presented.

18       So you train to get that dog if -- if there is an open

19  door, you train it to work the odor source into that door

20  without going completely into the vehicle and to try and get

21  it to get to its final indication, to train it to a point

22  where it doesn't have to go into the interior of the vehicle,

23  where it can get into that strong source of odor and come to

24  its final indication at that point.

25  Q.   So in the deployment in question on August 23rd of 2023

WINEINGER - Redirect

1   you directed Riggs up high and low several times during this

2   deployment?

3   A.   Correct.

4   Q.   And you directed him high near the open window?

5   A.   Yes.

6   Q.   You did not direct his snout to go inside the open

7   window?

8   A.   Correct.

9   Q.   But you knew full well if he gets the odor, detects the

10  odor of narcotics, his instinct is going to take him to

11  follow that odor?

12  A.   Yeah.  I -- the -- I don't think his head would go any

13  further into the vehicle than the distance it would take me

14  to gather the license, registration, insurance card from

15  inside that vehicle on initial contact.

16  Q.   But if you are directing Riggs to sniff near an open

17  window, you have no belief that he would go inside the window

18  if he's not detecting the odor?

19  A.   Correct.

20  Q.   Any odor of narcotics, I should say?

21  A.   Yes.

22  Q.   So in this case Riggs's snout entered the si- -- entered

23  the open window on his own instinct?

24  A.   Yes.

25  Q.   Following the -- trying to find the source of the odor

WINEINGER - Redirect

1   of narcotics?

2   A.   Yes.

3   Q.   Prior to Riggs first coming upon this open window during

4   this deployment, was he indicating any alerting behavior?

5   A.   On that -- when we first started just ahead of the open

6   window, when we got to the driver's side door, passenger's

7   side door seam, or the rear passenger driver's side door, he

8   stopped and started going nasal on that seam instant -- for

9   an instant.

10       Again, that's when I heard Deputy Eads yell something

11  out, and I took my attention away from Riggs at that point to

12  make sure a car wasn't barreling down on us.  He didn't stop

13  and stick with it, so we continued on around the vehicle with

14  the sniff.

15  Q.   What alerting behavior did he indicate prior to coming

16  upon the open driver's window?

17  A.   He went nasal when he went up in the window, sniffing

18  the seam.  I...

19  Q.   Let me stop you there.  What -- when you say "nasal," is

20  that when he closes his mouth and he's only breathing or

21  sniffing through his nose?

22  A.   Yes.  Typically he'll start the sniff open mouthed

23  trying to get as much air into his nasal cavity as possible

24  through his -- through his mouth and his nose.  When he

25  starts to get into one of his target odors, he'll typically

1    close his mouth and focus more air or all the air coming

2    through his nasal cavity.  I will typically see that

3    behavior.

4         If we don't necessarily pinpoint a find right away in

5    training, he'll go nasal when you come by the find.  If he

6    doesn't go to pinpoint an indication right there, but he's

7    not quite sure, we'll move on, and his -- the mouth will

8    slowly open up again.  And then as we get back to it, it will

9    start to close again.  That's a typical behavior I see when

10   he's in one of his target odors.

11   Q.   So Riggs alerted to you that he was on to the odor of

12   narcotics before even getting to that open driver's window?

13   A.   Correct.

14   Q.   And then other than the open window and the area where

15   he alerted prior to coming upon the open window, were there

16   other areas on this vehicle that Riggs was giving alerting

17   behavior?

18   A.   He went nasal on the window seams of the passenger door

19   I believe at least once or twice.  I know one specific was

20   right around the passenger's side door.  The seams by the

21   mirror, the rearview mirror on the passenger's side he went

22   really nasal, was working on the seams there and then

23   continued on around that.

24        MR. KANGIOR:  I have nothing further.

25        THE COURT:  Okay.  Mr. Wilson, I normally don't

1    allow any recross.  Is there any additional questions that

2    you feel necessary to ask?

3             MR. WILSON:  If I may, Your Honor.

4             THE COURT:  You may.

5             MR. WILSON:  Thank you.

6             THE COURT:  Briefly.

7             MR. WILSON:  Yes.  Very briefly.

8                      <u>RECROSS-EXAMINATION</u>

9    BY MR. WILSON:

10   Q.   Deputy -- I am sorry.  It's deputy; right?

11   A.   Technically, it's sergeant now.  I am not used to it

12   yet.  So...

13   Q.   All right.  Sergeant Wineinger, he -- the K-9 Riggs, you

14   are aware of the behavior -- you were aware of the behavior

15   of him putting his head through windows before this traffic

16   stop; right?

17   A.   Yes.

18   Q.   Okay.  Yet you directed K-9 Riggs to put his snout,

19   face, part of his body to that open window on that vehicle,

20   did you not?

21   A.   I directed him to start sniffing high on the vehicle.

22   Whether he wants to stick his head in or not -- stick it in

23   there is dependent on him and to whether he has a -- any

24   narcotics odor he's detecting.

25        We have done training where we have had open window on

1    the vehicles but nothing placed.  Typically you might see

2    them put their head in once, and after that you -- he'll go

3    around the vehicle, and he won't do it again at the open

4    window.

5         So when he does it a couple different times, to me

6    that's one of his alerting behaviors that he is, indeed, in a

7    source odor that he's been trained on.

8    Q.   All right.  So even during training, dogs put their

9    noses and faces into open car windows; right?

10   A.   I think it's their natural instinct to try and get as

11   much of the smell of the environment as possible.  And by

12   putting their nose in a little further, that helps them,

13   versus from an outside barrier of having air movement across

14   their face versus getting in and having that air movement

15   actually direct from the vehicle.

16   Q.   So he's gaining information about what's in that vehicle

17   from putting his snout into that vehicle; right?

18   A.   He's gaining information if there is an odor in the

19   vehicle.

20   Q.   And that's the goal of the search; right?  That's your

21   goal, isn't it?

22   A.   The goal to sniff the -- yes.  Is there an odor present

23   or is there not an odor present.

24        MR. WILSON:  Nothing further, Your Honor.

25        THE COURT:  With that said, is there any

WINEINGER - Recross

 1  re-redirect?

 2          MR. KANGIOR:  No, Your Honor.

 3          THE COURT:  Okay.  Any reason this witness cannot

 4  be excused on behalf of the government?

 5          MR. KANGIOR:  No, Your Honor.

 6          THE COURT:  On behalf of the defendant?

 7          MR. WILSON:  No, Your Honor.

 8          THE COURT:  Okay.  Thank you for your testimony,

 9  sir.  You may --

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  -- step down.  And you are still

12  sequestered, so that you understand.

13          THE WITNESS:  What was that?  I am sorry?

14          THE COURT:  You are still under a sequestration

15  order.  Thank you.

16          THE WITNESS:  Yes, Your Honor.

17          MR. KANGIOR:  If you would send in Brian.

18          THE WITNESS:  Yeah.  Do you need me to stand by?

19          MR. KANGIOR:  Yeah.  If you would --

20          THE WITNESS:  Okay.

21          MR. KANGIOR:  -- just stand by just in case.

22          Government would call Officer Brian Gerrity.

23          THE COURT:  Okay.  Thank you.  You may ob- -- you

24  may have -- you can obtain your witness.

25          Sir, if you would approach the witness stand,

*GERRITY - Direct*

1    remain standing and raise your right hand.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURTROOM CLERK:  Please state your full name

4    for the record and spell your last name.

5              THE WITNESS:  Brian Gerrity.  The last name is

6    G-e-r-r-i-t-y.

7          OFFICER BRIAN GERRITY, GOVERNMENT WITNESS, SWORN

8              THE WITNESS:  I do.

9              THE COURTROOM CLERK:  You can be seated.

10             THE WITNESS:  Thank you.

11             THE COURTROOM CLERK:  And you can adjust the mic if

12   you need to.

13             THE WITNESS:  Okay.

14             THE COURT:  Okay.  You may proceed, Mr. Kangior.

15             MR. KANGIOR:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17   BY MR. KANGIOR:

18   Q.   Sir, how are you employed?

19   A.   With the City of Omaha Police Department.

20   Q.   How long have you been so employed?

21   A.   Twenty-one years.

22   Q.   Which unit are you currently assigned to?

23   A.   Currently assigned to the FBI TOC West Task Force.

24   Q.   And can you give a brief description of some of the

25   investigations you become involved with?

1  A.   Our responsibilities are to investigate drugs that come

2  from Mexico.  So we are usually involved in long-term

3  investigations.

4  Q.   And do you assist other agencies in the course of your

5  job duties?

6  A.   Yes, we do.

7  Q.   Were you employed in your current capacity on

8  August 23rd of 2023?

9  A.   Yes, I was.

10 Q.   Were you involved in a surveillance operation that day?

11 A.   Yes, I was.

12 Q.   Give an overview of that operation.

13 A.   Myself and another officer were in Council Bluffs, and

14 we were conducting surveillance on a known drug dealer that

15 was living -- living in Council Bluffs, and we also had a

16 tracker on the suspect's car.

17 Q.   And prior to installing that tracker, was the suspect

18 involved in the delivery of narcotics?

19 A.   Yeah.  To my knowledge I believe he delivered drugs to

20 an undercover a couple of times.

21 Q.   And that was the reason for the tracker?

22 A.   That is correct.

23 Q.   Did you follow or observe the suspect leave his

24 residence on that day?

25 A.   Yes, we did.

GERRITY - Direct

1   Q.   Were other agents and officers involved in this

2   surveillance?

3   A.   Yeah.   I believe initially it was just two of us, but we

4   were following the suspect back into Omaha using surveillance

5   but also utilizing the tracker.

6   Q.   And where did you follow the suspect to?

7   A.   We followed him to the Walgreens located at 24th and

8   L Street.

9   Q.   Describe the vehicle that the suspect was driving that

10  you had the tracker on.

11  A.   It was a brown Malibu, I believe.

12  Q.   And was this suspect -- did he utilize this vehicle in

13  the prior drug transactions?

14  A.   Yes, he did.   That's why we had that vehicle under

15  surveillance.

16  Q.   Did you observe the two drug transactions involved --

17  involving the suspect?

18  A.   On previous dates?

19  Q.   Yeah.

20  A.   I don't recall if I was there for both the buys or not,

21  but it sounds familiar.

22  Q.   Were you in contact with the other agents and officers

23  in the course of this surveillance?

24  A.   Yes, I was.

25  Q.   Detailing them of what your observations are?

GERRITY - Direct

1   A.    I guess I -- can you repeat the question?  My

2   observations leading up to getting to the Walgreens?

3   Q.    Yeah.  Are you telling the other agents, keeping them up

4   to date on what's going on?

5   A.    Right.  The purpose of the surveillance was to follow

6   the drug dealer to see if he was going to meet with anybody

7   else to do other deals and try to get more intel on the

8   person we were looking at.

9         And on that date we started following him into Omaha, so

10  at that point we were contacting other detectives to come out

11  that were available to assist with surveillance, and which is

12  the point where we ended up at the Walgreens at 24th and L.

13  Q.    Did you have eyes or were you able to surveil the

14  suspect all the way from his vehicles [sic] to the Walgreens

15  in Omaha?

16  A.    Yes, we did.

17  Q.    And what do you observe when the suspect got into Omaha?

18  A.    When he got into Omaha, he went straight to the

19  Walgreens at 24th and L Street.  I pulled into the Walgreens

20  parking lot at the same time and parked in a position where I

21  could see his vehicle.

22        At that point I saw the defendant's vehicle.  I believe

23  it was a Buick, a Buick Enclave, but a white SUV.  And I saw

24  the passenger get out of that vehicle, at which point I

25  turned on my camcorder and started recording the incident.

GERRITY - Direct

1          And then I was able to record the defendant getting back
2     out of the brown Malibu carrying a bag and getting back into
3     the vehicle with his wife.
4     Q.    How long was the original suspect drive- -- well, was
5     the original suspect in the Malibu alone?
6     A.    Yes.
7     Q.    And how long was this -- the suspect in the Malibu
8     parked in the Walgreens prior to the defendant showing up?
9     A.    It was almost -- almost the same time.  It was pretty
10    close to immediate.
11    Q.    And when the defendant arrived, he exited the
12    passenger's side of the white SUV?
13    A.    That's correct.
14    Q.    Did he go into the Walgreens?
15    A.    No, he did not.
16    Q.    What did he do immediately after exit -- well, where did
17    he park in relation to the Malibu?
18    A.    They -- right next to each other, within a car length
19    away.
20    Q.    Did you see who was driving the white SUV at the time?
21    A.    It was the suspect's -- which I didn't know at the time,
22    but it was a white female.  It ended up being the suspect's
23    wife.
24    Q.    Did she get out of the vehicle?
25    A.    No.

GERRITY - Direct

1    Q.   Did she go into the Walgreens?

2    A.   No.

3    Q.   Would you observe the defendant get out of the -- what

4    exactly did you observe of -- after the defendant exited the

5    passenger's side of the SUV?

6    A.   He got into the passenger's side of the brown Malibu and

7    then pretty quickly after that exited, got back out, and went

8    back to the vehicle that he came from.

9    Q.   Was he carrying anything?

10   A.   Carrying a bag.

11   Q.   And did he enter the Walgreens after exiting the Malibu?

12   A.   No, he did not.

13   Q.   Were you the closest surveillance officer observing this

14   transaction?

15   A.   I believe I was.

16   Q.   Other surveillance units were outside of the parking

17   lot?

18   A.   Right.  I think they were trying to get into the area,

19   but it happened so fast that nobody else was able to get a

20   position to be able to see.

21   Q.   How long was the defendant inside the Malibu?

22   A.   Less than a minute.

23   Q.   Did you see any hand-to-hands?

24   A.   I couldn't see that.

25   Q.   What did the defendant do upon exiting the Malibu?

1   A.   Carried the bag and walked back into the passenger's

2   side of the vehicle he showed up in, and then they departed.

3   Both vehicles actually left at the same time.

4   Q.   And what did you do upon the vehicles leaving the

5   Walgreens?

6   A.   I turned off the re- -- the video recording and started

7   calling out the direction of travel.  It was at that point

8   that we decided we were going to try to stop the person that

9   our suspect was meeting with, which in this case ended up

10   being the defendant.

11       So we were calling other cars to get to the area.  It

12   was a lot of moving parts trying to get someone with lights

13   and sirens to be able to conduct a traffic stop.

14   Q.   Did your vehicle -- did your vehicle that you were

15   conducting surveillance out of have lights and sirens?

16   A.   Mine does, but I -- I -- we weren't trying to utilize my

17   vehicle.  We wanted somebody that was in uniform, if

18   possible.

19   Q.   And did your undercover vehicle have any recording

20   devices, say, in like -- in the front area?

21   A.   No.  The only recording device I had was a camcorder,

22   and I only utilized that while at Walgreens.

23   Q.   What did you believe that you had observed when the

24   defendant got into the Malibu and exited shortly thereafter?

25   A.   Well, I was certain I observed a drug deal that just

GERRITY - Direct

1   happened.

2   Q.   Why did you believe that?

3   A.   Because I have been doing this for a long time, and I

4   had seen these types of meetings before.  Someone comes,

5   meets a courier.  They come in there in the car, either

6   through the window or in a passenger's seat.  It only lasts

7   less than a minute, and then they leave and go in separate

8   directions.

9   Q.   And is it common during these types of transactions that

10   no one will enter the store of the parking lot that they are

11   in?

12   A.   Yes.  That's correct.

13   Q.   And that's exactly what occurred here?

14   A.   Yes, it is.

15   Q.   And you had prior knowledge of the Malibu being involved

16   in two prior drug transactions?

17   A.   Yes, I was.

18   Q.   Thus, it was your intent to pull over or have another

19   agent pull over the white SUV who had met with the Malibu?

20   A.   That's correct.

21   Q.   And your observations that you are making during the

22   meet between the defendant and the person in the Malibu, were

23   you relaying this information by way of radio to other

24   agents?

25   A.   Yes, I was.

```
1              MR. KANGIOR:  I have nothing further.

2              THE COURT:  Okay.  Cross-examination.

3              MR. WILSON:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5   BY MR. WILSON:

6   Q.   Did you see Mr. Reiman arrive at the Walgreens?

7   A.   I saw them pull in as I was pulling in to try to get to

8   a parking spot.

9   Q.   Okay.  Did you lose sight of Mr. Reiman at all while

10  he -- when he pulled -- after he pulled into the Walgreens or

11  after -- I guess I will rephrase.

12       Did you lose sight of anybody that was in the white

13  Buick Enclave after it pulled into the Walgreens parking lot?

14  A.   No, I didn't.

15  Q.   Okay.  Did you see anybody enter the Walgreens prior to

16  Mr. Reiman entering the Malibu?

17  A.   There was nobody from that vehicle that exited and went

18  into Walgreens.

19  Q.   Have you reviewed all of the footage of this incident?

20  A.   I have reviewed it.

21  Q.   Okay.  Does that include -- did you have aerial footage

22  of the Enclave at the Walgreens?

23  A.   It doesn't sound familiar to me.

24  Q.   Okay.  Okay.  You were present at the time that the

25  Enclave was pulled over then?
```

GERRITY - Cross

1    A.    I was trying to catch up, but, yes.

2    Q.    Okay.  And eventually you caught up; right?

3    A.    That's correct.

4    Q.    All right.  And at some point did you observe Mr. Reiman

5    instructed to leave the Enclave?

6    A.    You are talking about during the traffic stop?

7    Q.    Uh-huh.

8    A.    Yeah.  There was a point where he exited the vehicle.

9    Q.    Uh-huh.  And what happened to him after that?  Did he

10   have to stand on the side of the road for a while?

11   A.    Yeah.  There was me and another officer.  We stood next

12   to him and waited while they were conducting the search of

13   the vehicle.

14   Q.    And did you attempt to question him during that time?

15   A.    No.

16   Q.    At some point -- well, was Mr. Reiman allowed to return

17   to his vehicle after that?

18   A.    I don't remember that.

19   Q.    Okay.  Was he taken into custody after that?

20   A.    I can't tell you for sure.  I remember going up, helping

21   watching him because we had information that he had been

22   violent in the past, so we were -- I was just coming out of a

23   neck surgery, so I was hoping that we weren't going to have

24   to fight with him.  And that was my main concern at the

25   moment.

1    Q.    All right.  You didn't have to fight with him, did you,

2    physically?

3    A.    No, we did not.

4    Q.    And you had conversation with him as part of that

5    process, getting him out of the Enclave; right?

6    A.    We just asked him to come step over here away from the

7    vehicle.  I don't remember any other conversation other than

8    that.  Prior to him getting out of the car...

9    Q.    Well, here, I don't -- I haven't given you a question.

10   A.    Oh.

11   Q.    One second.

12   A.    Okay.

13   Q.    One second.  Sorry.  When did -- when did he leave your

14   pr- -- when did Mr. Reiman leave your presence when you were

15   on the side of the road?

16   A.    So at one point I ended up assisting in the searching

17   after they were having trouble finding the drugs that we

18   figured that were going to be in there.

19   Q.    Uh-huh.

20   A.    So I am not sure at that point if we handed him off to

21   one of the other officers and he put him in a cruiser at that

22   point.  I can't remember the exact -- the de- -- in the order

23   of events that happened.

24   Q.    Okay.  Were you present -- have you ever seen

25   Government's Exhibit 5, a Miranda form --

1    A.    No.

2    Q.    -- signed by Mr. Reiman?

3          No?

4    A.    I was not a part of any of the interviews.

5    Q.    Okay.  There was more than one interview, though; right?

6    A.    I am not privy to any of that information.  I know they

7    had him in a car at the traffic stop.

8    Q.    Uh-huh.

9    A.    And then I know that after that, after they let the wife

10   go, they ended up taking him back.  And he had indicated he

11   wanted to talk.  And after that I wasn't a part of any of it.

12   Q.    Understood.  But he was in the back of the car while

13   they still had Mr. Reiman's wife in custody.  You just said

14   that.  Right?

15   A.    They were both separated in other vehicles at the time

16   is --

17   Q.    Right.  With him...

18   A.    -- what I remember.

19   Q.    And Ms. -- and Jessica Reiman was in cus- -- was at

20   least in a police vehicle while Mr. Reiman was in a separate

21   police vehicle; right?

22   A.    Yes.  That sounds correct.

23          MR. WILSON:  Okay.  One second, Your Honor, if I

24   might.

25          THE COURT:  Take your time.

1         (Indiscernible discussion in low tones.)

2    BY MR. WILSON:

3    Q.    Did you determine you wanted to pull the vehicle over

4    before -- well, I will withdraw that.

5         You were radioed at some point about a traffic

6    violation; is that right?  Did you hear a radio broadcast

7    about any alleged traffic violation?

8    A.    I heard them talking about it on the radio, yeah.

9    Q.    All right.

10   A.    That's correct.

11   Q.    You didn't personally observe any traffic violation;

12   right?

13   A.    I did not.

14   Q.    And, in fact, you -- I believe you testified you

15   determined you wanted to pull this vehicle over before any

16   traffic violation; correct?

17   A.    If it was possible, yes.

18   Q.    Okay.  Why would it not be possible?

19   A.    If they don't conduct -- the purpose of doing a stop

20   like that after something that we witnessed that we believed

21   to be a drug transaction, there is lots of times if we have

22   cruiser available or we have someone that -- and enough

23   surveillance, we will attempt to pull them over, but the

24   purpose of stopping him wasn't to screw up the case on the

25   other person.

1     So if he didn't conduct any infractions or had gone

2   somewhere else and stopped and got out, at that point we

3   wouldn't have done anything with him.  So that's...

4   Q.   Right.  Because you didn't -- because you didn't have

5   probable cause to pull him over or search his vehicle at that

6   point; right?

7   A.   I...

8         MR. KANGIOR:  Objection, Your Honor.  Calls for a

9   legal conclusion.

10         THE COURT:  Yeah.  Objection is sustained.  But you

11   can rephrase the question, and I will allow some latitude

12   with regard to the question.

13   BY MR. WILSON:

14   Q.   You didn't at that point have anything other than

15   Mr. Reiman entering that vehicle, the Malibu, and leaving

16   that vehicle, with the exception to the -- the stuff you knew

17   about the driver of the Malibu.  Is that fair?

18   A.   What I knew about the incident that just happened, I

19   would say there was absolutely probable cause to stop him.

20   It was just whether we wanted to indicate --

21   Q.   Well...

22   A.   -- that we had watched the surveillance...

23         MR. WILSON:  I am going to object, Your Honor.

24   That's nonresponsive, and now he's making the legal

25   conclusion that the government said he shouldn't make.

1    THE COURT:  Okay.  So --

2    MR. WILSON:  So I will ask to strike that.

3    THE COURT:  -- the answer -- okay.  The motion to

4  strike is granted.  The testimony is stricken.  I will have

5  you re-ask the question.

6    THE WITNESS:  I am sorry.  I misunderstood.

7  BY MR. WILSON:

8  Q.    It's okay.

9  A.    Yeah.

10  Q.    The only information you had about Mr. Reiman after he

11  left the Walgreens parking lot, right, was that he got into a

12  vehicle with Mr. Solis for a short period, then left the

13  vehicle, both times holding a black bag, and then he left the

14  area?

15  A.    Yes.  My...

16  Q.    Is that...

17  A.    My observations and my knowledge prior to the incident.

18  Q.    Right.  But that's what you knew about Mr. Reiman at

19  that point; right?

20  A.    Yes.

21  Q.    And you knew Mr. Solis had -- you had some -- you have

22  already testified as to the information you had on Mr. Solis;

23  right?  So you had that information, and then you had what I

24  just described as the information on Mr. Reiman, and that's

25  it; right?

1    A.    Correct.

2              MR. WILSON:  Okay.  Nothing further, Your Honor.

3                              EXAMINATION

4    BY THE COURT:

5    Q.    Okay.  So for clarification, the decision by law

6    enforcement was after you witnessed what you thought was a

7    drug transaction was to effectuate a traffic stop if there

8    was an infraction observed by a law enforcement officer?

9    A.    Correct, Your Honor.  If there was a reason to be able

10   to legally pull him over, then we would pull him over.

11             THE COURT:  Okay.  Any additional questions,

12   Mr. Wilson?

13             MR. WILSON:  No, Your Honor.  Thank you.

14             THE COURT:  Any additional questions on behalf of

15   the government?

16             MR. KANGIOR:  Yes, Your Honor.

17                         REDIRECT EXAMINATION

18   BY MR. KANGIOR:

19   Q.    At the time of the meeting of the defendant with

20   Mr. Solis driving the Malibu, you knew that both of the

21   vehicles arrived about the same time and parked in near

22   proximity to one another at the Walgreens parking lot?

23   A.    That is correct.

24   Q.    You knew that neither party from either vehicle entered

25   the Walgreens?

1    A.    That's correct.

2    Q.    You knew that the two met for a very short period of

3    time?

4    A.    That's correct.

5    Q.    And you knew that both vehicles and all parties left

6    almost immediately after and whatever transaction they

7    conducted in the Walgreens parking lot?

8    A.    That's correct.

9    Q.    You knew or did you believe that the two were involved

10   in a drug transaction?

11   A.    Yes, I did.

12   Q.    And if you know someone is involved in a drug

13   transaction, do you believe you have probable cause to stop

14   them?

15   A.    Yes, I do.

16          MR. WILSON:  I am going to object, Your Honor.

17   That calls for the same legal conclusion.

18          THE COURT:  Overruled.  The answer will stand.

19          MR. KANGIOR:  The answer will stand?

20          THE COURT:  It will.

21   A.    I said yes.

22   BY MR. KANGIOR:

23   Q.    Okay.  And at any time when you are standing on the side

24   of the road during the traffic stop monitoring the defendant,

25   did you threaten him with anything?

1    A.   No, I did not.

2    Q.   Make him any promises?

3    A.   I did not.

4    Q.   Did you ask him any questions?

5    A.   No, I did not.

6    Q.   Other than maybe exit the -- please exit the vehicle?

7    A.   That's correct.

8    Q.   Did you hear anyone else conversing with him?

9    A.   I did not.

10   Q.   Did you hear anyone else promising him anything?

11   A.   No, I did not.

12   Q.   Anyone else making him any threats?

13   A.   I did not.

14   Q.   Were you aware that the defendant's wife was allowed to

15   leave the scene of the traffic stop?

16   A.   Yes, I was.

17   Q.   How were you aware of that?

18   A.   Because they let her out of the car, uncuffed her, and

19   let her get back in the car with her -- I believe it was a

20   daughter maybe.

21   Q.   And you were there and witnessed all that?

22   A.   Correct.  And then they let her drive away.

23   Q.   When that occurred, where was the defendant?

24   A.   He was still in a vehicle that was parked on the side of

25   the road.

GERRITY - Redirect

1   Q.   And as far as you know the vehicle he was sitting in,

2   could you see out -- did it have windows?

3   A.   Yes, it did.

4   Q.   Would he be able to see his wife leaving the scene?

5   A.   Yes, he would have.

6           MR. KANGIOR:  Nothing further.

7           THE COURT:  Okay.  Any reason this witness cannot

8   be excused on behalf of the government?

9           MR. KANGIOR:  No, Your Honor.

10          THE COURT:  On behalf of the defendant?

11          MR. WILSON:  No, Your Honor.

12          THE COURT:  Okay.  Thank you for your testimony,

13  sir.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  You may stand down.

16          Does the government have any additional witnesses?

17          MR. KANGIOR:  No, Your Honor.

18          THE COURT:  Any additional exhibits?

19          MR. KANGIOR:  None.  They have previously been

20  received, but --

21          THE COURT:  They have.

22          MR. KANGIOR:  -- I would submit them to the court

23  at this time, Government's Exhibits 1 through 5.

24          THE COURT:  They are received without objection.

25          Do you rest?

1          MR. KANGIOR:  I...

2          THE COURT:  Does the government rest?

3          MR. KANGIOR:  Yes.

4          THE COURT:  Okay.  Does the defendant have any

5    additional exhibits?

6          MR. WILSON:  Your Honor, I hate to do this because

7    I know it's noon, but the officer's testimony did open up a

8    question for me as to the exhibits that have been submitted

9    and received or will -- I guess are -- we'd asked that our

10   exhibits be received.

11         THE COURT:  That's correct.

12         MR. WILSON:  Yeah.  But it did open up a question

13   as to the contents of one of these government exhibits and

14   whether it covers the time frame between when Mr. Reiman was

15   standing on the side of the highway during the drug dog sniff

16   and when he's placed in the vehicle and then eventually

17   transported, which I think we have enough evidence to

18   indicate he was transported to police headquarters and

19   Mirandized there.

20         THE COURT:  I think that's clear from the

21   testimony.

22         MR. WILSON:  Right.  Right.  And so there is -- I

23   can represent to the court there is body-worn camera --

24   body-worn camera footage that my understanding, based on my

25   conversations with the government, is represented in here.

1          I would like to check that, if the court would

2     grant me a few minutes to check that, but we -- you know,

3     I...

4          THE COURT:  Sure.  That's fine.

5          MR. WILSON:  We have been exchanging exhibit lists

6     up to this point.  I am not saying he didn't give it to me

7     months ago, that particularities, but this list I got last

8     night, and I need to -- I just need to double-check that

9     exhibit.

10         THE COURT:  Other than that -- and what exhibit is

11    that that you are going to check?

12         MR. WILSON:  The body-worn camera footage of --

13    it's Eads, and there is a two-part video, and I believe it's

14    in the second part of that.

15         THE COURT:  Okay.  Well, we'll leave the record

16    open with regard to that.

17         MR. WILSON:  Uh-huh.

18         THE COURT:  When we get done with argument --

19         MR. WILSON:  Uh-huh.

20         THE COURT:  -- we'll have you do that, and then

21    we'll...

22         MR. WILSON:  Okay.

23         THE COURT:  You can -- if you have -- well,

24    we'll -- I guess we'll have to come back on the record to see

25    if there is anything else that you are going to be asking

1    to --

2            MR. WILSON:  Uh-huh.

3            THE COURT:  -- for the court to receive.  But other

4    than leaving the record open for that one particular issue,

5    are you going to have any additional exhibits or any

6    witnesses today?

7            MR. WILSON:  No, Your Honor.

8            THE COURT:  Okay.  Do you rest other than leaving

9    the record open with regard to the information that you have

10   indicated?

11           MR. WILSON:  Yes.  That's correct, Your Honor.

12           THE COURT:  Okay.  So I am going to allow the

13   parties to move on to closing arguments then.

14           I do want to try to narrow the scope of the issues

15   now that we -- the testimony has come in.  The first thing is

16   I garner from your filings that you are contesting the

17   reliability of the K-9 himself, rather with regard to the dog

18   sniff it seemed like the only thing you are contesting is

19   whether or not the officers acted lawfully with regard to the

20   dog either putting his head, snout, or nose into the open

21   window.  Do I have that right?

22           MR. WILSON:  That's right, Your Honor.

23           THE COURT:  So as far as the reliability of the

24   dog's training or not, that's not an issue?

25           MR. WILSON:  Well, Your Honor, I -- to put...

```
1              THE COURT:  Well, let me -- let me back up.
2              MR. WILSON:  Yeah.
3              THE COURT:  You are not claiming that the dog is
4    not reliable or properly trained or certified.  This is more
5    of a question as to whether or not the officer acted lawfully
6    in -- with regard to the dog putting its nose into the open
7    window, whether that's a matter of training or whether --
8              MR. WILSON:  Uh-huh.
9              THE COURT:  -- what happened in the field on
10   August 23rd, 2023; is that correct?
11             MR. WILSON:  That's a fair characterization, Your
12   Honor, yes.
13             THE COURT:  Okay.  Just wanted to make sure we
14   don't have to cover something that might not need to be
15   covered.
16             And then are you -- given the testimony and
17   evidence received by the court, is the defendant still
18   contesting the legality of the traffic stop itself?
19             MR. WILSON:  Your Honor, we are -- we are
20   submitting that to the court, yes.
21             THE COURT:  Okay.  And then as far as reasonable
22   suspicion, between the time that the mission of the traffic
23   stop would have been completed and the time that the dog
24   sniff took place, is the defendant still contesting whether
25   there was reasonable suspicion for that delay, whatever
```

```
 1   period of time it was?

 2              MR. WILSON:  Yes, Your Honor.

 3              THE COURT:  And your -- and then your position

 4   still is that a search was effectuated by the way that the

 5   K-9 was utilized --

 6              MR. WILSON:  Uh-huh.

 7              THE COURT:  -- and that that search was done

 8   without probable cause?

 9              MR. WILSON:  Yes, Your Honor.  That was done -- the

10   Fourth -- there is a Fourth Amendment violation.  We are --

11   we are -- we claim there is a Fourth Amendment violation in

12   how that drug dog sniff took place, and therefore, beyond

13   that, every -- the fruit of that unlawful -- that renders the

14   search unlawful.

15              THE COURT:  Okay.  So your point is that without

16   that the officers did not have probable cause to do -- to

17   effectuate the search of the vehicle?

18              MR. WILSON:  You said it better than me.  Yes, Your

19   Honor.

20              THE COURT:  Okay.  And then with regard to the

21   defendant's statements, is the defendant still contesting

22   whether those statements -- is he still taking the position

23   that those statements were a product of undue influence,

24   whether it's coercion, threats, promises, or the like?

25              MR. WILSON:  So, yes, Your Honor.  And that's part
```

1  of why I need to just double-check with the exhibits that the
2  court has here.
3       THE COURT:  Okay.  Well, then that question we'll
4  want to come back to once you have --
5       MR. WILSON:  I believe so.
6       THE COURT:  -- had a chance to do that.
7       MR. WILSON:  Thank you, Your Honor.
8       THE COURT:  Okay.  So, I mean, I will let you make
9  argument.  And I will -- I guess I will have Defendant make
10  the argument first, and then I will let Mr. Kangior respond
11  to that, understanding that the government has the burden in
12  this case, but I just want to make sure that we understand
13  exactly what you are arguing so that the government can
14  respond to that.
15       MR. WILSON:  Thank you, Your Honor.
16       And actually, in all honesty, Your Honor, this --
17  the questions particularly regarding the dog sniff are
18  probably best left to briefing.  I would like to offer to do
19  that, given the time constraints here and -- but what I --
20  but I -- what I would say for purposes of argument just right
21  now would be that I believe the government's going to rely on
22  a case, Lyons.  And Lyons -- and that's based on the brief
23  that they have already submitted.  They cited that case
24  pretty heavily.
25       We'd argue Lyons isn't determinative here.  Lyons

1  does not account -- and the distinction here is Lyons doesn't

2  account for what appears to be, based on Wine- --

3  Officer Wineinger's testimony --

4          THE COURT:  Sergeant.

5          MR. WILSON:  Sergeant.  Thank you.  I knew I would

6  get it wrong.

7          -- Sergeant Wineinger's testimony that,

8  essentially, these dogs are trained to put their faces up in

9  the window.  They are never stopped from doing so, and that

10  this is a -- this is a practice.

11          It's not -- so if there is any instinct involved,

12  the officers are relying on that instinct to get dogs' heads

13  and faces into windows.  I think you can glean that from the

14  testimony here today.

15          That practice -- and, again, I will -- I would love

16  to argue this to you in a brief because I feel like my brief

17  that I filed in October is -- doesn't even scratch the

18  surface now that we know more, but that practice, Your

19  Honor...

20          THE COURT:  I am going to -- if I could interrupt

21  you.

22          MR. WILSON:  Yes.

23          THE COURT:  Does the government have any objection

24  to additional briefing in this case?

25          MR. KANGIOR:  No, Your Honor.

8:23-cr-00215-RFR-MDN    Doc # 305    Filed: 02/13/25    Page 134 of 147 - Page ID # 134
851

Arguments

```
 1          THE COURT:  Okay.  I am going to allow that, so if
 2    that helps you.
 3          MR. WILSON:  Thank you.  Yeah.
 4          And that's I think where my -- the direction my
 5    brief is going to go in mostly is just pointing out, Your
 6    Honor, that Lyons isn't determinative here because the facts
 7    are different, to some extent, from what you see in Lyons.
 8          And the other thing that's important here I would
 9    argue is Lyons is old law compared with some of the cases
10    that have been out since well before this.  You know, the
11    government, I think, argued in its brief that Lyons hasn't
12    been explicitly or expressly overruled.
13          Well, it doesn't take the Supreme Court saying this
14    case is overruled in order to render the case law in a given
15    case bad law.  Ultimately, there is a case called Florida vs.
16    Jardines that says very explicitly that a trespass by a drug
17    dog, that's -- once it's done that, it's -- that's a Fourth
18    Amendment violation.
19          And if the dog is being used as an instrumentality
20    of the police, which is what the case law says the dog is,
21    well, the court -- the law enforcement and the government
22    can't fall back on an argument that, well, that was simply
23    the ins- -- the dog's instincts.  If you know it's going to
24    do that, you can't -- that's not an excuse.
25          THE COURT:  Sure.  And in Jardines that was a case
```

1    where it was an interior hall -- interior hallway to an

2    apartment --

3            MR. WILSON:  Uh-huh.

4            THE COURT:  -- structure outside the door.

5            MR. WILSON:  Uh-huh.

6            THE COURT:  I mean, that's a seminal case from the

7    Supreme Court.

8            MR. WILSON:  Uh-huh.  Uh-huh.

9            THE COURT:  But you find it to be analogous to a

10   situation where a drug dog in the field on a traffic stop in

11   an open window -- you think the same principles apply?

12           MR. WILSON:  The Eighth Circuit said so in Pulido.

13   And so what I would argue, Your Honor -- and that's why I

14   think we need to brief this because it is pretty -- it's --

15   it's a -- there is some legal analysis that needs to be done

16   here.  I will also be pointing the court to other courts

17   maybe that aren't binding on this court, but have found

18   similarly.

19           THE COURT:  Okay.  Well, Mr. Kangior, I don't -- I

20   am not going to order additional briefing on anything other

21   than the probable cause issue for the search of the vehicle.

22   So that would include the legality of the -- of the use of

23   the K-9 by Sergeant Wineinger.

24           The government certainly and Defendant certainly

25   can also brief the issue of whether there was probable cause

1    to effectuate the search whether or not the K-9 was utilized

2    and there was an alert and indication, so -- but that issue

3    of probable cause to search the vehicle I think would be

4    helpful to have additional briefing, so I am going to allow

5    that.

6           Briefing on the issue of the traffic stop or the

7    reasonable suspicion to extend the stop beyond the mission of

8    the traffic violation itself, the questioning, I don't think

9    I need additional briefing on that.

10          If the parties want to do additional briefing on

11   good-faith or the exclusionary rule and how it might apply to

12   the use of the K-9, then certainly you can brief on that, but

13   I think additional briefing on that probable cause issue and

14   the use of the K-9 would be helpful to the court.

15          So with that said, Mr. Kangior, is there anything

16   else that you wanted to argue for the record?

17          MR. KANGIOR:  Yeah.  I would just ask that when you

18   are doing your analysis that you focus on what was known to

19   the officers prior to Riggs sticking his snout inside the

20   window.  He was already giving off alerting behavior,

21   combined with everything that the officers knew at the time,

22   that this defendant had met with a known drug dealer and

23   engaged in what they reasonably concluded was a drug

24   transaction, combined with that alerting behavior, the

25   statements made during the stop, the long pause that they

137

1    took prior to stopping giving them suspicions that they were

2    destroying evidence, that they had probable cause to search

3    before Riggs even got near that window.

4            THE COURT:  Right.  And all that is relevant to the

5    probable cause issue for the search.  So, I mean, if you --

6    you can add that in your argument in your brief.  The court's

7    aware of that from the testimony.

8            MR. KANGIOR:  And that's all I would -- and I will

9    address any other issues raised by Defendant in a response

10   brief.

11           THE COURT:  Uh-huh.  Okay.  So...

12           MR. WILSON:  I am sorry to interrupt, Your Honor.

13           THE COURT:  Yes?

14           MR. WILSON:  I just want to make sure for purposes

15   of the briefing that I am focused here because I don't want

16   to give you a bunch of stuff you don't need.

17           THE COURT:  Right.

18           MR. WILSON:  So I have got -- I have two basic --

19   well, the three basic topics here.

20           THE COURT:  The que- -- the statements.

21           MR. WILSON:  Statements.

22           THE COURT:  The statements and the reason for the

23   traffic stop and the ex- -- the extension of the detention

24   to --

25           MR. WILSON:  Uh-huh.

1           THE COURT:  -- effectuate the dog sniff.  I think

2      we have got that covered --

3           MR. WILSON:  Okay.

4           THE COURT:  -- and I won't need additional briefing

5      on that.

6           MR. WILSON:  Yeah.

7           THE COURT:  It's really the use of the K-9.

8           MR. WILSON:  Uh-huh.

9           THE COURT:  And then whether -- and then the

10     overall probable cause issue with regard to the search of the

11     vehicle.  And that may cause the parties to argue whether

12     there was probable cause with or without the dog alert and

13     indication.

14          MR. WILSON:  Uh-huh.

15          THE COURT:  And the government's argument with

16     regard to the good-faith exception to the exclusionary rule

17     as it relates to the use of the drug dog.

18          MR. WILSON:  That was the one I was trying to

19     remember, Your Honor.

20          THE COURT:  I think that -- the parties may want to

21     do additional briefing on that as well.

22          MR. WILSON:  Yes.  Absolutely.

23          Your Honor, the only other question I have then

24     about the briefing would be I think I believe it would be

25     helpful to the court and the parties to have a transcript of

1   the -- of the hearing.  I was going to order that

2   immediately.

3           THE COURT:  Well, you don't need to order it --

4           MR. WILSON:  Okay.

5           THE COURT:  -- because I am going to -- I am not

6   going to make a ruling today, obviously.  So I am going to

7   order a transcript.

8           MR. WILSON:  Okay.

9           THE COURT:  It will be prepared and filed and

10  available to the parties within 30 days of today's date.

11          MR. WILSON:  Thank you.

12          THE COURT:  Once that's done, then I am going to

13  have the parties do the briefing.  But with your client's

14  agreement, that time for additional briefing will be excluded

15  for purposes of calculation under the speedy trial act.  Does

16  he agree to that?

17          MR. WILSON:  Yes, Your Honor.  Yes.

18          THE COURT:  Is that true, sir?

19          MR. WILSON:  I can ask him real quick if the...

20          THE COURT:  Is that true, sir?  You understand that

21  while this motion is pending not only from the date of filing

22  till today's date, to the time that we need to get the

23  transcript, but then briefing of the parties, that that time

24  and an additional 30 days for me to get my ruling out will be

25  excluded for purposes of calculation of the Speedy Trial Act?

```
 1    Do you understand that?

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT:  Do you object or -- to that in any way?

 4              THE DEFENDANT:  No, sir.

 5              THE COURT:  So you are agreeable to that?

 6              MR. WILSON:  So you are agreeable to that?

 7         (Indiscernible discussion in low tones.)

 8              MR. WILSON:  Okay.  Let him know.

 9              THE DEFENDANT:  I am agreeable to that, sir.

10              THE COURT:  Okay.  And no one has made a threat

11    or -- any threats or promises to get you to do so?

12              THE DEFENDANT:  No, Your Honor.

13              THE COURT:  Okay.  Well, I accept the defendant's

14    acknowledgment and waiver of Speedy Trial Act.

15              So how much time, Mr. Wilson, are you going to need

16    after the transcript is available to you to have a brief

17    filed?

18              MR. WILSON:  From receipt of the transcript, Your

19    Honor, 30 days, if the court -- if that's acceptable to the

20    court.

21              THE COURT:  So that would be February 14th.

22    It's -- it -- time is being excluded, so from the court's

23    perspective that's fine.

24              MR. WILSON:  Uh-huh.

25              THE COURT:  I do want you to have the necessary
```

1   time to properly brief the case or the -- or the motion.  Is

2   that ac- -- is that agreeable to the government?

3           MR. KANGIOR:  Yes.

4           THE COURT:  And then how much time, Mr. Kangior,

5   will the government need then afterwards to get your brief on

6   file?

7           MR. KANGIOR:  I would ask for two weeks.

8           THE COURT:  Okay.  So Defendant's additional

9   briefing on the issues that we discussed will be due on

10  February 14th -- no.  One moment.  We are likely not to have

11  a transcript before then, and instead of just adding days to

12  the transcript, I think it's better to assume that's going to

13  be filed about the time that 30 days is expired.

14          So we'll set the date for Defendant's briefing for

15  March 14th, 2025, and the government's motion -- or the

16  government's briefing will be due on March 28th, 2025.

17          And then I will enter a findings and recommendation

18  on this motion to Chief Judge Rossiter within 30 days

19  thereafter, and all of that time will be excluded for

20  purposes of calculation of the Speedy Trial Act.

21          Did I do the math right, Mr. Kangior?

22          MR. KANGIOR:  Sounds right to me.

23          THE COURT:  Sounds right to you too, Mr. Wilson?

24          MR. WILSON:  Yes.  Thank you, Your Honor.

25          THE COURT:  Okay.  It's now 12:30.  I have a

 1   warrant at 12:45 that I need to address, so why don't I come

 2   back out at 12:50 --

 3         MR. WILSON:  Okay.

 4         THE COURT:  -- and then we can make a record as

 5   to --

 6         MR. WILSON:  That last exhibit...

 7         THE COURT:  -- whether there is something that you

 8   may need to be submitting at a later date or whether it's

 9   covered by an exhibit already received by the court.

10         MR. WILSON:  Okay.  Thank you, Your Honor.  I

11   appreciate that.

12         THE COURT:  If -- so we'll come back at 12:50 then.

13         MR. WILSON:  Okay.

14         THE COURT:  Okay.  Anything else on behalf of the

15   government?

16         MR. KANGIOR:  No, Your Honor.

17         THE COURT:  On behalf of the defendant?

18         MR. WILSON:  No, Your Honor.  Thank you.

19         THE COURT:  Okay.  We are in recess.

20      (Recess from 12:30 p.m. to 12:53 p.m.)

21         THE COURT:  ...record in the United States of

22   America vs. Jaden D. Reiman.  The case number is 8:23CR215.

23         Counsel are present in the courtroom as well as the

24   defendant.  We have concluded our suppression hearing today.

25   The court made orders with regard to preparation of a

```
1    transcript and also briefing deadlines.

2                Defendant's counsel requested additional time to

3    keep the record open in the event that any additional

4    exhibits need to be received by the court.

5                Mr. Wilson, you were going to look to see if the

6    Government's Exhibits 1 or -- 1 and 2 contained all the

7    body-worn camera footage that you needed.

8                Where are we at with that?

9                MR. WILSON:  Appreciate you, Your Honor, for -- and

10   the court for giving -- being patient with us.  I looked to

11   where I scanned -- you know, I went through them.  This is

12   where I am at.

13               Mr. Reiman and I recall at some point we thought we

14   saw some video of interviews conducted within the -- of him,

15   of Mr. Reiman, conducted within a police vehicle at the

16   scene.  And Mr. Reiman is asking me, and I -- and I think

17   this is -- this -- Mr. Kangior graciously is not -- I don't

18   think would object if I -- if we could come back.

19               I would essentially ask to reopen the evidence in

20   less than a day if I find this, Your Honor, because it's

21   important for the court to have everything as it relates to

22   his statements that were given.

23               THE COURT:  So are you thinking that you would just

24   ask the court to receive an additional exhibit or would

25   there --
```

1          MR. WILSON:  Yes.

2          THE COURT:  -- be any necessary testimony?

3          MR. WILSON:  There wouldn't be testimony from us,

4    Your Honor, as long as the government agrees it's body-worn

5    camera footage from one of its officers and it agrees to

6    admit it.  I -- again, it's frustrating to me because, you

7    know, when you think you -- you are pretty sure you have seen

8    something in all of the voluminous discovery I have received.

9          I want to make sure the court has everything.  And

10   Mr. Kangior, like I said, has been gracious in saying that...

11         THE COURT:  Would by end of the week be sufficient

12   for you?

13         MR. WILSON:  More than sufficient, Your Honor.  I

14   am going to be doing this right away.

15         THE COURT:  Okay.

16         MR. WILSON:  I don't want to stall -- delay the

17   court in any way.

18         THE COURT:  Sure.  And that's acceptable by the

19   government?

20         MR. KANGIOR:  Yes.

21         MR. WILSON:  Thank you.

22         THE COURT:  Okay.  Well, then by -- we'll keep the

23   record open until, let's say, until January 17th, 2025.  If

24   there is any additional exhibit that Defendant wishes the

25   court to receive, we'll have to be provided with that.

1          It will have to be properly marked, and you'll have

2     to indicate whether the government has any objection to the

3     court's receipt of that exhibit or exhibits.  If you comply

4     with those requirements and the government does not object,

5     then the court will receive any additional exhibit or

6     exhibits --

7          MR. WILSON:  I am sorry.  You said requirement...

8          THE COURT:  -- that deal with that issue.

9          MR. WILSON:  I am sorry to interrupt you.  You

10    mentioned the requirements.  I want to make sure I get the

11    requirements straight.

12         THE COURT:  Just that you identify whether there is

13    any additional --

14         MR. WILSON:  Okay.

15         THE COURT:  -- exhibit that you wish for the court

16    to receive.

17         MR. WILSON:  Okay.

18         THE COURT:  That you have met and conferred with

19    Mr. Kangior, that you have obtained whether he objects or

20    doesn't object to the exhibit.

21         MR. WILSON:  Uh-huh.  Uh-huh.

22         THE COURT:  If you do wish to offer an additional

23    exhibit or exhibits and Mr. Kangior does not object, then do

24    so by January 17th, 2025, and the court will receive the

25    exhibit.

1           MR. WILSON:  Thank you.

2           THE COURT:  It will have to be properly marked.  So

3    the next Exhibit Number is 106.

4           If there is an objection, then you'll have to

5    notify the court for the court to decide on how we need to

6    proceed, but --

7           MR. WILSON:  Uh-huh.

8           THE COURT:  -- given the context of these

9    proceedings, I am assuming the government would not object,

10   but in the event that the government does, we'll have to --

11   you'll have to inform the court of that so that I can take

12   whatever action is appropriate.

13          MR. WILSON:  Thank you, Your Honor.  It would

14   simply be additional body-worn camera footage.  That's the

15   only thing it can be.

16          THE COURT:  Okay.  Anything else today then?

17          MR. WILSON:  No, Your Honor.

18          THE COURT:  Okay.  Anything else on behalf of the

19   defendant?

20          MR. KANGIOR:  No, Your Honor.

21          THE COURT:  Or, excuse me, on behalf of the

22   government?

23          MR. KANGIOR:  No, Your Honor.

24          THE COURT:  Okay.  Thank you for everyone's hard

25   work today.  Everybody did an excellent job representing

1   their respective clients.

2           Defendant is in custody under an order of

3   detention, is remanded to the custody of the U.S. Marshal

4   pending further order of the court.

5           We are in recess.  The parties are excused.

6               (Hearing adjourned at 12:57 p.m.)

7                    §        §        §

8   I certify that the foregoing is a correct transcript from the
    electronic sound recording of the proceedings in the
9   above-entitled matter.

10

11   _____        _____
                Signature of Transcriber                Date
12   Julie A. Pell, RPR, CRR, CRC, RVR-M-S

13

14

15

16

17

18

19

20

21

22

23

24

25