IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | Case No 8:23CR215 |
| v. | **BRIEF IN SUPPORT OF MOTION TO SUPPRESS** |
| JADEN REIMAN,<br>Defendant. | |

COMES NOW the Defendant, Jaden Reiman, by and through counsel, Michael Wilson, and hereby submits the following, post-hearing Brief in Support of his Motion to Suppress. Reiman moves the Court to suppress evidence and statements from the trier of fact at trial.

### Defendant's Statement of Facts

Reiman refers this Court to his statement of facts in his pre-hearing Brief in Support of his Motion to Suppress (Doc. 232), but notes that he will discuss additional relevant facts, in detail and with citations to the record created at the hearing on his Motion to Suppress, throughout the Argument, *infra*.

Argument

**All evidence discovered during the search of Reiman's vehicle must be suppressed because the search was performed after multiple violations of Reiman's Fourth Amendment rights that occurred when drug dog Riggs, pursuant to his training and direction from Sergeant Wineinger, repeatedly intruded into the constitutionally protected space inside Reiman's vehicle.**

In any case involving a warrantless search, the government carries the burden of justifying law enforcement's actions. *Coolidge v. New Hampshire*, 91 S.Ct. 2022 (1971). The officers did not have a warrant authorizing their search of Reiman's vehicle. Accordingly, the Government bears the burden of proving that the officers developed probable cause to search the vehicle and that they did so without violating Reiman's Fourth Amendment rights. *Id.*

The officers did not have probable cause to search Reiman's vehicle until after drug dog Riggs, whose actions are governed by the Fourth Amendment, delivered his trained indication that narcotics were likely present in the vehicle. (77:1-13); s*ee U.S. v. Pulido-Ayala*, 892 F.3d 315, 318 (2018) (Because "[a] drug dog is an instrumentality of the police," its actions "normally are governed by the Fourth Amendment.") However, Riggs and his trainer, Sergeant Wineinger, violated Reiman's Fourth Amendment rights by conducting a search that became unreasonable. Riggs physically intruded into Reiman's property by sticking his snout and face beyond the plane of an open window, thereby committing a trespass

into Reiman's property. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting U.S. v. Jones, 565 U.S. 400, 404 (2012) ("When 'the Government obtains information by physically intruding ' on . . . effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'").

As Sergeant Wineinger initially explained on direct examination, and as confirmed by his body camera footage in Government Exhibit 4, Wineinger "indicate[d] or encourage[d] Riggs to stick his head inside of" Reiman's vehicle. (72:10-14; E4, at 17:42 (Wineinger directed Riggs to the window and Riggs stuck his snout through); E4, at 18:00 (Again, Wineinger directed Riggs to the window and Riggs stuck his snout through); E4, at 18:07 (Again, Wineinger directed Riggs to the window and Riggs stuck his snout through)). Riggs followed his training and the directions of Wineinger and, each time Riggs stuck his snout through the window at Wineinger's direction, police committed a trespass inside of Reiman's vehicle. *See Jardines*, 569 U.S. at 5.

Riggs did not deliver his trained indication to the presence of narcotics until *after* the repeated intrusions to gather the information he relied upon, nor did Wineinger testify to sufficiently strong reactions by Riggs prior to his intrusions into Reiman's vehicle to support probable cause. (E4, at 17:20-18:21; 77:1-13). Therefore police did not have probable cause to search the vehicle before the trespasses occurred. *See Pulido-Ayala*, 892 F.3d at 319-20. Police derived their probable cause to search Reiman's vehicle from repeated unreasonable searches, rendering all evidence obtained from the second search inadmissible.

3

**A.     Sergeant Wineinger repeatedly directed Riggs to the open window to sniff and the evidence shows that Riggs' unlawful intrusions were (1) a result of his training, (2) anticipated by Wineinger, and (3) encouraged by Wineinger.**

The Eighth Circuit has held that, although "'[t]he use of the drug-sniffing dog *on the exterior of a vehicle* during a valid traffic stop' is not a search and 'does not infringe upon any Fourth Amendment rights[,]' . . . [t]he inside of a car . . . is typically a different story." *U.S. v. Pulido-Ayala*, 892 F.3d at 318 (quoting *U.S. v. William*, 429 F.3d at 772) (emphasis added). Because "[a] drug dog is an instrumentality of the police," its actions "normally are governed by the Fourth Amendment." *Id.*

The government will likely rely on *U.S. v. Lyons*, 486 F.3d 367 (8th Cir. 2007), heavily in arguing against Reiman's Motion to Suppress. In *Lyons*, a drug dog broke the plane of a vehicle window just prior to the dog delivering his trained indication that he "had found the strongest source of the odor of narcotics." *Lyons*, 486 F.3d at 370. The window had been left down by the defendant, so the Eighth Circuit did not fault the officer for creating the opportunity for the intrusion. *Id.* at 373. It further agreed that the officer did not direct the dog to break the plane, and "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *Id.* The Eighth Circuit ultimately deemed the dog's single intrusion an "accident" and found that, where the course of action pursued by police at the time "would have led to discovery of the same evidence forthwith by

unquestionably legal means, there is no reason to penalize the police for this accident by excluding evidence." *Id.* at 373-74 (internal quotation marks omitted).

In contrast, Riggs repeated intrusions were no accident. Exhibit 4 and Wineinger's testimony show that drug dog Riggs intruded repeatedly, and that the intrusions were anticipated, and encouraged, by Sergeant Wineinger. Wineinger admitted that he "indicate[d] or encourage[d] Riggs to stick his head inside of" Reiman's vehicle, and the video shows Wineinger pointing into the window repeatedly. (72:10-14; E4, at 17:42; E4, at 18:00; E4, at 18:07) In fact, Wineinger testified that he anticipated Riggs would do this when he testified that, if "sticking the head inside of the vehicle to get into an odor cone, if that's what – if I need him to direct into that odor cone, yes.' That – that's part of the training is to get where the most likely source of odor could be coming from." (72:12-16)

In light of this testimony, and another admission by Wineinger that the "initial time I presented that window high that [Riggs sticking his nose in the window] could have been considered direction of me," Wineinger's claims that he did not direct Riggs to brake the plane of the window, (*see, e.g.*, 75:6-8; 79:19-22), strain credulity. He testified that Riggs' intrusions were not due to Wineinger directing Riggs to the window, but the result of Riggs "trying to get into the strongest source of the odor," while also testifying that he knew Riggs would do this because "that's part of training is to get where the most likely source of odor could be coming from." (72:12-16; 76:19-25)

5

Wineinger confirmed that he did not have probable cause to search Reiman's vehicle until Riggs gave his trained "indication," and that indication did not occur until after Riggs repeatedly intruded with Wineinger's anticipation and encouragement. (77:12-13) The above facts distinguish Reiman's case from *Lyons*, *supra*. There, the Eighth Circuit noted that the drug dog intruded only one time, it did so without the direction of an officer, *i.e.*, only on instinct, and the dog did so after strong alerting behaviors, just prior to giving its final indication of the presence of drugs. *Lyons*, 486 F.3d at 373-74. Here, Riggs intruded multiple times prior to alerting, Riggs did so with Wineinger's repeated encouragement through his indications at the plane of the open window, and Wineinger knew and anticipated that this would lead Riggs to stick his head into the window.

As Wineinger testified when asked whether Riggs was named after the unpredictable, reckless detective in the movie, Lethal Weapon, Riggs is "not unpredictable." (82:5-20; 88:12-24) Thus, unlike *Lyons*, where the officers did nothing to direct the drug dog's single intrusion, Wineinger's testimony and Exhibit 4 indicate he repeatedly encouraged the intrusions and that he knew Riggs, a predictable dog, would do so. It is not clear from the testimony and Exhibit 4 that Riggs would have given his indication absent the repeated intrusions, during which Riggs gathered protected information from inside the vehicle. *See Jardines*, 569 U.S. at 5.

**B. While the Eighth Circuit's opinion in *Lyons* is not determinative as to the issue of whether Riggs' repeated intrusions**

6

> **violated Reiman's Fourth Amendment rights, the Eighth Circuit's decision in *Pulido-Ayala* provides precedential support for sustaining the Motion to Suppress.**

Regardless of the factors distinguishing Reiman's case from *Lyons*, the *Lyons* propositions the Government will likely rely most heavily upon are bad law under subsequent U.S. Supreme Court precedent. *See Jones*, 565 U.S. at 405 (finding an entry into private property for purposes of obtaining information is a "search" under the Fourth Amendment and that, regardless of whether a defendant had a reasonable expectation of privacy in a particular place, that defendant has the right to be free from physical intrusions into constitutionally protected areas); *see Jardines*, 569 U.S. at 4 (finding a Fourth Amendment violation where officers physically entered and occupied the curtilage of a defendant's house and directed a drug dog to sniff inside the curtilage without permission from a homeowner). Thus, even if this Court considers *Lyons* factually close to Reiman's case, *Lyons* is not determinative as to the issue of whether Riggs' repeated intrusions violated Reiman's Fourth Amendment rights. *See, e.g., United State v. Buescher*, 691 F.Supp.3d 924, 929-39 (N.D. Iowa 2023) (while not binding on this Court, holding *Lyons* "not determinative" in analyzing whether a drug dog intrusion through the window of a vehicle infringed upon the defendant's Fourth Amendment rights).

The Eighth Circuit has itself questioned the holding in *Lyons*, at least insofar as officers or the government might attempt to apply its "instinctive actions" language to a drug dog intruding into a defendant's vehicle. In *Pulido-Ayala*, the

7

Eighth Circuit made clear that although *Lyons* cited another case (with a defendant by the last name of Lyons), *U.S. v. Michael Lyons*, 957 F.2d 615 (8th Cir. 1992) (finding a dog's "instinctive actions" in tearing open a package in an airline freight room did not constitute a "search"), for the proposition that "'instinctive actions of a trained canine do not violate the Fourth Amendment,' that decision also concluded that the challenged search inevitably would have occurred based on independent probable cause, even if the drug dog had not instinctively entered the defendant's vehicle." *Pulido-Ayala*, 892 F.3d at 318-19. Instead of assigning any relevance to the "instinctive actions" of the dog as seen in *Lyons*, the Eighth Circuit relied on inevitable discovery where the dog's strong reactions prior to the single intrusion provided enough evidence to believe that the dog would have indicated absent the intrusion. *Id.* at 319.

Both Wineinger's testimony and Exhibit 4 demonstrate the government's failure to prove the inevitability of an indication from Riggs absent the repeated intrusions. Exhibit 4 shows little alerting behavior by Riggs until after Wineinger directed Riggs to the open window and Riggs stuck his snout and face in. Wineinger discussed a head snap behavior that occurred at one point later in the dog sniff, but admitted that information gained from Riggs putting his snout into the vehicle and engaging in "nasal sniffing" of the inside of the vehicle was the likely reason. (92:2-19) ("I believe there was at least one, if not two *that occurred after he had been up in the window with nasal sniffing*, came down, started to move past the window, head snapped back to it.") (emphasis added).

8

When asked by the prosecutor whether Riggs stuck his nose inside the window upon Wineinger's direction, he admitted "I believe the initial time I presented that window high that could have been considered direction of me . . . ." (76:4-9) Wineinger claimed that subsequent intrusions by Riggs were not on his direction, but his body camera footage suggests otherwise where Wineinger plainly places his hand squarely in front of, and very close to, the plane of the open window. (E4, at 17:42; E4, at 18:00; E4, at 18:07). When asked how the indication alerting to the strongest source of narcotics occurred, Wineinger explained that Riggs "went up into that window one last final time, took a deep inhale, came down on the seam between the B-pillar and the – and that door and then sat and focused for indication." (77:1-11) According to Wineinger, this indication is what gave him "probable cause to search." (77:12-13)

Based on this testimony, and applying the lessons of *Jones*, *Jardines*, and *Pulido-Ayala* to these facts, police did not have probable cause to search Reiman's vehicle based upon any behaviors by Riggs prior to his indication, which came after Riggs' repeated intrusions into Reiman's vehicle. Police trained Riggs to follow the scent into a protected area by sticking his snout and face into the vehicle. (72:10-16). Thus, this Court should find a lack of credibility in Wineinger's testimony that, when Riggs repeatedly broke the plane of the window, police suddenly had no responsibility and only Riggs was responsible for Riggs sticking his head into the window. (76:16-25) Each intrusion constituted a separate and distinct Fourth

Amendment violation, thereby invalidating probable cause to search and requiring exclusion of all evidence subsequently found in the vehicle by the search.

> **C. Even if this Court finds that *Lyons* has not been expressly overruled, *Lyons* does not rescue the Government from application of the exclusionary rule because Wineinger admitted that he and/or other police trained Riggs to stick his snout or face through an open window whenever the inside of the vehicle "is the most likely source of [where the] odor could be coming from." (72:12-16)**

Where "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule[,]" *Davis v. United States*, 564 U.S. 229, 232 (2011), the Government may argue that the officers reasonably relied on the holding in *Lyons* that, "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *Lyons*, 486 F.3d at 373. This argument is unavailing.

While not binding on this Court, the Northern District of Iowa's recent opinions in *United States v. Buescher*, 691 F.Supp.3d 924 (N.D. Iowa 2023) and *United States v. Handley*, 2024 WL 1536750 (N.D. Iowa 2024) offer persuasive authority on this question. In *Buescher*, a district judge reversed the magistrate judge's order overruling the defendant's motion to suppress in a case with strikingly similar facts to those seen in Reiman's case.

The court ultimately applied the exclusionary rule in *Buescher* where the dog handling officer testified that the drug dog, Gus, was trained to put his nose in the

10

vehicle and that his attempt to jump into the vehicle through an open window was also a product of the dog's training. *Id.* at 936. Moreover, the officer had seen Gus behave in this manner in the past and that the officer considered this an "alerting" behavior. *Id.* While the Government argued that "no legitimate interests would be advanced by excluding the evidence" because the officer acted "in lawful accordance with his (and K-9 Gus') training," the court found as follows:

> . . .K-9 Gus—as an instrumentality of the Government—intruded on a constitutionally protected space. Not only had K-9 Gus done this previously, but Officer Kerr suggested K-9 Gus is actually trained to do so. As such, applying the exclusionary rule will afford meaningful deterrence in the form of updated training and practices concerning the need to avoid physical intrusions into the interior of a vehicle during a canine sniff.

*Id.* at 940.

Later, in *Handley*, the same district court judge in the Northern District of Iowa found another search unreasonable due to a drug dog, Lara, intruding her snout into a vehicle's open window during a sniff. *Handley*, 2024 WL 1536750. However, unlike in *Buescher*, the court refrained from imposing the exclusionary rule. It found that reasonable officers could rely on the above holding from Lyons so long as their actions, including their training of Lara, "did not violate defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence." *Id.* The court explained that, "[i]n *Buescher*, this Court applied the exclusionary rule to

11

suppress evidence because the drug-sniffing dog in that case was trained to enter the open windows of vehicles." *Id.* (citing *Buescher*, *supra*).

*Buescher* and *Handley* demonstrate the push-and-pull of the analysis presented by the principle that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at 232. The determining factor is whether an officer's training, practices, and experience with a given drug dog demonstrate deliberate, reckless, or negligent action (or inaction) on the part of the officer when that drug dog is conducting free air sniffs around vehicles. The Government should not escape application of the exclusionary rule under Davis when an officer knows or reasonably should know, due to his training and experience with a given drug dog, that the dog will intrude on a constitutionally protected space.

Here, Wineinger testified that he "indicate[d] or encourage[d] Riggs to stick his head inside of" Reiman's vehicle, with Exhibit 4 demonstrating that Wineinger pointed into the window repeatedly. (72:10-14; E4, at 17:42; E4, at 18:00; E4, at 18:07) Importantly, Wineinger also admitted that he knew that Riggs' training meant he would intrude into a constitutionally protected space when he testified that, if "sticking the head inside of the vehicle to get into an odor cone, if that's what – if I need him to direct into that odor cone, yes.' That – that's part of the training is to get where the most likely source of odor could be coming from." (72:12-16) Finally, after testifying that he had been working with Riggs for about two years at the time of the sniff of Reiman's vehicle and that they had conducted "[f]ifteen-plus"

12

drug sniffs during that time, Wineinger admitted that he had seen Riggs put his "face or snout or any other part of his body through an open window on a vehicle." (88:25-89:18) Wineinger testified that, from his perspective, these intrusions of Riggs' body into the open window of a vehicle to sniff and collect information from inside the vehicle is fine. (89:23-90:8)

Given this testimony, the Government cannot demonstrate that the officers acted in objectively reasonable reliance on the language in *Lyons* concerning the instinctive actions of a drug dog because there was nothing about Riggs' intrusions that was surprising to Wineinger given Wineinger's testimony regarding Riggs' training, the directions Wineinger gave Riggs when Riggs sniffed both outside and inside Reiman's vehicle, and the extensive experience Wineinger had with Riggs. Riggs, by Wineinger's repeated testimony, was a predictable drug dog, so Riggs' intrusions into Reiman's vehicle cannot be explained away as unexpected, "instinctive actions" like those of the dog in *Lyons*. Because Wineinger admitted that Riggs was trained to enter into the open windows of vehicles in pursuit of a "scent cone," (72:12-16), application of the exclusionary rule "will afford meaningful deterrence in the form of updated training and practices concerning the need to avoid physical intrusions into the interior of a vehicle during a canine sniff." *Buescher*, 691 F.Supp.3d at 940.

13

**D.   The officers did not have probable cause to search Reiman's vehicle prior to the trained indication from Riggs, which occurred after the unreasonable police intrusions into Reiman's vehicle.**

The Government may claim that, regardless of whether police repeatedly intruded into the constitutionally protected space beyond the plane of Reiman's vehicle window, the officers had probable cause to search Reiman's vehicle prior to any such intrusions. This argument fails for several reasons.

First, Reiman points out Wineinger's direct examination testimony that drug dog Riggs' trained indication is what gave officers probable cause to search Reiman's vehicle. (77:1-13) However, this did not occur until the end of the drug sniff, *after* Riggs' repeated violations of Reiman's Fourth Amendment rights, when Riggs "sat and focused for indication." (77:1-13) Reiman also notes that, if the other officers believed they had sufficient cause for a search without conducting the drug dog sniff, that conclusion is not apparent from their actions at the scene as they employed Wineinger and Riggs to conduct the vehicle sniff. (E4, at 17:20-18:21)

However, Reiman recognizes that the Government may claim officers conducted the dog sniff out of an abundance of caution when, objectively speaking, they did not need to conduct a dog sniff because the totality of the circumstances supported probable cause to search Reiman's vehicle prior to any Fourth Amendment violations by Riggs and Wineinger.

14

In making this argument, the Government might point to the officers' observations of Reiman in a Walgreens parking lot soon before the traffic stop, including Reiman's entry into, and exit from, the vehicle of a person from whom police previously made two controlled purchases of one pound of methamphetamine. (15:19-16:5; 17:3-18:13) Officers observed Reiman, who left his Buick Enclave holding a black drawstring bag, enter the person's vehicle and remain in the vehicle for "[l]ess than a minute or two[,]" then exit the vehicle and return to the passenger's side of his Enclave with the black bag. (17:21-19:20) Due to these observations, and based on his training and experience, Investigator Eads believed a narcotics transaction had occurred between Reiman the other person. (19:25-20:4)

Eads followed Reiman's Enclave in his unmarked police Toyota Tundra as the Enclave left the Walgreens parking lot and drove westbound on Interstate 80. (20:25-21:23) When Eads illuminated his vehicles emergency lights to pull over the Enclave for a "following too close" violation, it did not initially stop, so Eads tried honking his car's horn as his vehicle did not have sirens. (22:5-23:10) Wineinger's unmarked vehicle had both emergency lights and sirens, so Wineinger pulled alongside Eads and turned on both his emergency lights and sirens. (22:25-23:4) The vehicles were traveling approximately "[f]ifty-five, sixty" miles per hour, and Eads thought the Enclave traveled "approximately a mile and a half, two miles," before pulling over near the Harrison/Giles exit from Interstate 80. (23:11-19) Eads testified that, based on his training and experience, the delay raised his suspicions

about weapons or that "[t]hey could be hiding evidence, destroying evidence." (24:9-12)

Finally, after pulling over the vehicle and instructing the driver of the Enclave, Reiman's wife, to exit the vehicle and walk to a police vehicle, officers heard Reiman yell at her, "Don't say fuckin' anything." (27:11-22) Eads testified that this concerned him because "[n]ormal people don't do that[,]" and responded, "[c]orrect[,]" when asked by the prosecutor, "[u]nless they have got something to hide?" (27:24-28:4)

Even considered in their totality, the above circumstances did not provide the officers probable cause to search Reiman's vehicle, hence their need to conduct a drug dog sniff using Wineinger and Riggs.

The Eighth Circuit has repeatedly considered circumstances where officers observed a suspected drug deal, including situations where defendants in vehicles have recently been observed interacting with known or suspected drug dealers, but no Eighth Circuit or U.S. Supreme Court case law reviewed by Counsel for Reiman has held that such circumstances result in probable cause to search a defendant's vehicle. Rather, at best, circumstances similar to those reported by Eads result in reasonable suspicion supporting either (1) an extension of a traffic stop initiated for a traffic violation, or (2) a *Terry* stop of a vehicle. *See, e.g., U.S. v. Allen*, 43 F.4th 901, 908 (2022) (finding reasonable suspicion to extend traffic stop where: (1) officer observed defendant standing outside a truck occupied by a suspected drug dealer at 12:48 a.m. in front of a house suspected to be a location of drug dealing; (2) the

16

defendant, upon seeing an officer, appeared to hide something in an area of the car where offenders often hide contraband; and (3) the defendant attempted to distance himself from the inside of the car and said the officer should know him from a recent police raid at the residence); *U.S. v. Bustos-Torres*, 396 F.3d 935, 942 (2005) (finding reasonable suspicion supporting a *Terry stop* of the defendant's vehicle where: (1) the defendants and a suspected drug dealer met in the parking lot of a lounge in a location known to officers as a "hotbed for drugs"; (2) prior to the defendants' arrival, an officer witnessed a vehicle pull into the parking lot, the suspected drug dealer emerged from the lounge and took part in an apparent drug deal with the vehicle occupants involving the exchange of money for a baggie, and the vehicle drove away, all within a few minutes; and (3) the officer witnessed the same sequence of events when the defendants' vehicle arrived, "with the critical difference that [the drug dealer] entered the car and [the officer] could not see what took place between [the drug dealer] and the defendants.").

The above cases include circumstances like those testified to by Eads in Reiman's hearing in that they involve the defendants engaging in behavior that the officers reasonably suspected to be drug transactions with known or suspected drug dealers. However, such behaviors provide officers, at best, a reasonable suspicion to either (1) extend a traffic stop for a traffic violation, or (2) conduct a *Terry* stop of the defendant's vehicle to investigate further. *See Allen*, 43 F.4th at 908; *Bustos-Torres*, 396 F.3d at 942.

Nothing about the officers' observations of Reiman's behavior in the parking lot of the Walgreens was so clearly criminal that officers could stop his vehicle and search it without additional investigation and evidence strongly supporting the presence of narcotics in Reiman's vehicle. For instance, as in *Bustos-Terry*, the officers never saw Reiman holding large amounts of illegal narcotics or sums of money or anything else that might be said to justify an immediate search of his vehicle upon the initiation of the traffic stop. Rather, the officers merely observed two men in a car for one to two minutes under circumstances that raised their suspicions that a narcotics transaction took place.

The Government may claim that the length of time it took Reiman's vehicle to pull over, as well as his direction to his wife to say nothing, somehow gave rise to probable cause to search his vehicle when considered in combination with the officers' observations at the Walgreens, but this argument remains unpersuasive. Concerning the length of time it took to pull over Reiman, the Eads testified that he was in an unmarked car, during rush hour, and that the best he could do to supplement his vehicle's lights was to honk his car horn. (22:5-23:10) Wineinger pulled alongside Eads and turned on both his emergency lights and sirens, but he too was in an unmarked car. (22:25-23:4) From an objective standpoint, it is reasonable to believe that Reiman and his wife did not see the lights or hear Eads' horn immediately, and that it took some time for them to recognize the lights and sirens before next satisfying themselves that the vehicles were, in fact, occupied by police officers who were attempting to pull over their vehicle.

Regarding Reiman's statement "[d]on't say fuckin' anything[,]" (27:11-22), directed at his wife as she followed officer's instructions to leave their vehicle, Reiman did not admit to the presence of anything illegal in the Enclave. Nor did Reiman's statement include specific references to narcotics activity or anything else, aside from Reiman's apparent request that his wife not speak to police about "anything." While this could be seen as an articulable fact further supporting a reasonable suspicion that justified extending the officers' traffic stop of the Enclave, it is similar to the circumstances of *Allen*, where the defendant engaged in behaviors that could be seen as an attempt to conceal information from officers. *Allen*, 43 F.4th at 908. However, as seen in *Allen*, while potential concealing behaviors like these contribute to reasonable suspicion, they are not direct admissions of the presence of narcotics or other contraband, thus they do not rise to level of probable cause to search, even in combination with other circumstances suggesting potential drug activity.

## Conclusion

Due to the separate and distinct violations of Reiman's constitutional rights during the drug dog sniff conducted by Wineinger and Riggs that occurred when Riggs made repeated intrusions into the constitutionally protected area inside Reiman's vehicle, exclusion of all evidence obtained during the subsequent search by police is warranted.

19

Respectfully submitted,
Jaden Reiman, Defendant

/s/ Michael J. Wilson
Michael J. Wilson, 24224
BERRY LAW FIRM
1414 Harney Street, Suite 400
Omaha, NE 68102
(402) 466-8444
michael.wilson@berrylaw.com
Attorney for Defendant

CERTIFICATE OF SERVICE

    I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF systems which sent notification of such filing to all registered participants.

/s/ Michael J. Wilson
Michael J. Wilson, 24224