## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JADEN D. REIMAN,<br><br>Defendant. | 8:23CR215<br><br>FINDINGS AND<br>RECOMMENDATION |

This matter is before the Court on the Motion to Suppress (Filing No. 231) filed by Defendant, Jaden Reiman. Defendant seeks to suppress evidence and statements arising out of a traffic stop and search of his vehicle following a drug canine sniff. Defendant filed a brief (Filing No. 232) in support of the motion. The Government filed a brief (Filing No. 261) in opposition.

The Court held a pre-hearing status conference with counsel on November 18, 2024, (Filing No. 255), and held an evidentiary hearing on the motion on January 14, 2025. Defendant was present at the evidentiary hearing with his attorney, Michael Wilson. The Government was represented by Assistant United States Attorney, Thomas Kangior. Daniel Eads, an investigator with the Douglas County Sheriff's Office ("Inv. Eads"), Sergeant Jarrod Wineinger, a deputy sheriff with the Douglas County Sheriff's Department ("Sgt. Wineinger"), and Brian Gerrity, an officer with the City of Omaha Police Department ("Ofc. Gerrity"), testified at the hearing. The Court received into evidence, without objection, the Government's Exhibits 1-4 (body worn camera footage from the traffic stop) and 5 (*Miranda* waiver), and Defendant's Exhibits 101-105 (screenshots from the body worn cameras), without objection.[1]

A transcript (TR.) of the hearing was prepared and filed on February 13, 2025. (Filing No. 305). At the conclusion of the evidentiary hearing, defense counsel requested an additional 30-days after the transcript of the hearing was filed to file supplemental briefing. (TR. 140). The undersigned magistrate judge granted the request. Defendant filed his supplemental brief on March 17, 2025. (Filing No. 313). The Government filed its supplemental brief on April 4, 2025. (Filing

---

[1] After the hearing, on January 17, 2025, Defendant filed an unopposed motion asking that the Court leave the record open to submit additional evidence relevant to the motion, (Filing No. 277), which the Court granted, extending the deadline to submit evidence to January 23, 2025, (Filing No. 279). On January 23, 2025, Defendant filed a notice that he had no additional evidence to submit. (Filing No. 283).

No. 328).  The matter is now fully submitted.  For the following reasons, the undersigned magistrate judge will recommend that the motion be denied.

## BACKGROUND

The charges in this case arise out of a joint local and federal law enforcement task force investigation into a Mexican drug-trafficking organization shipping "large quantities of methamphetamine to the Omaha area" and engaging local couriers to distribute it.  (TR. 14-15).  Ofc. Gerrity, a twenty-one year veteran of the Omaha Police Department, was one of the task force officers involved in the investigation.  (TR. 108-109).  In the afternoon on August 23, 2023, Ofc. Gerrity and another officer were conducting surveillance of Jonathan Ovalle Solis ("Solis"), a Mexican drug courier, at Solis's residence in Council Bluffs, Iowa.  Solis was under investigation because he had sold two pounds of methamphetamine to an undercover officer in two separate buys; as a result of those undercover buys, the task force had obtained a tracker warrant and placed a tracking device on Solis's vehicle, a brown Chevy Malibu.  (TR. 15-16, 108-110).

During Ofc. Gerrity's surveillance on August 23, 2023, he observed Solis leave his residence alone in his Chevy Malibu.  Ofc. Garrity followed him to a Walgreens parking lot at 24th Street and L Street in Omaha, Nebraska.  (TR. 110-111).  Almost immediately after Solis parked his Chevy Malibu, Ofc. Gerrity observed a white Buick Enclave pull into the Walgreens parking lot.  A white male, later identified as Defendant, exited the passenger side of the Buick Enclave holding a black drawstring bag, and got into Solis's Chevy Malibu for "less than a minute or two" before returning to the passenger side of the Buick Enclave.  Ofc. Garrity recorded this incident on his camcorder.  (TR. 17-20, 111-112).  The Chevy Malibu and Buick Enclave then left the parking lot at the same time.  (TR. 19).  Ofc. Gerrity testified he saw the arrivals and departures of both the Chevy Malibu and the Buick Enclave from the Walgreens parking lot, and at no point did he see any party from either vehicle go into the store.  (TR. 112-113, 116, 123-124).  Ofc. Garrity radioed his observations to the other surveilling officers.  (TR. 115).

Ofc. Garrity testified he could not see any "hand-to-hands" inside the Chevy Malibu, but based on his several years of experience and observation of many of these types of meetings, he was "certain" he had just observed a drug deal.  Ofc. Garrity testified, "Someone comes, meets a courier. They come in there in the car, either through the window or in a passenger's seat.  It only lasts less than a minute, and then they leave and go in separate directions."  (TR. 113-115).  Ofc.

Garrity testified it is common during such drug deals that the participants do not enter the store, which is "exactly" what occurred in this case. (TR. 115).

Approximately twenty agents were involved in the surveillance at this Walgreens parking lot and kept in contact with one another over radio. (TR. 20-21). Inv. Eads, an investigator with the Douglas County Sheriff's Office, was one of these surveilling officers. Inv. Eads had also observed Defendant's interaction with Solis in the Walgreens parking lot, and based upon his experience he likewise testified he believed a narcotics transaction had occurred. Task force officers therefore began following the Buick Enclave when it left the Walgreens parking lot. (TR. 19-20). Sgt. Wineinger, a K-9 deputy working with the task force, was contacted for assistance after the surveilling officers observed the suspected drug transaction in the Walgreens parking lot. (TR. 65).

Inv. Eads, driving an undercover and unmarked Toyota Tundra, followed the Buick and watched it merge on to I-80 westbound. Traffic on the interstate was moving at approximately 55 to 60 mph because it was rush hour. Inv. Eads testified that at approximately 108th street on I-80, he "observed the [Buick] following too close to a semi," meaning "when the semi was braking, [the Buick] had to brake so that they could avoid a collision." Inv. Eads testified the "rule of thumb is approximately two to three seconds so that you are far enough back that the semi driver can see you in the mirrors." Based on his visual observations, Inv. Eads believed the Buick was "within two seconds" of the semi. (TR. 21-23, 40-41).

Inv. Eads attempted to initiate a traffic stop of the Buick for the traffic infraction of following too close by activating his emergency lights. After the Buick did not immediately pull over, Inv. Eads began honking his horn. Sgt. Wineinger, driving an unmarked Ford F-150 equipped with visor and grille lights and a siren package, pulled up next to Inv. Eads "about a minute or two" after Inv. Eads initially activated his emergency lights and sirens. After it became apparent the Buick was not pulling over, Sgt. Wineinger activated his emergency lights, sirens, and his air horn several times to get the driver's attention. Sgt. Wineinger testified he saw the female driver of the Buick look in her rearview mirror at him and he motioned for her to pull over, but she kept driving. Both Inv. Eads and Sgt. Wineinger estimated the Buick continued to drive about one-and-a-half to two miles before pulling over. (TR. 22-23, 25, 67-68). Inv. Eads testified that in his training and experience, individuals typically do not travel that far before pulling over, and that this caused him concerns the occupants "could be obtaining a weapon" or "could be hiding evidence, destroying

3

evidence," particularly in light of the suspected drug transaction officers had observed in the Walgreens parking lot. (TR. 24).

After the Buick pulled over, Inv. Eads approached the passenger side to make contact with the passenger, Defendant, while Sgt. Wineinger approached the driver side to make contact with the driver, identified as Defendant's wife ("Ms. Reiman"). Their four-year-old child was in the backseat. (TR. 26, 30). Both officers were equipped with body worn cameras that recorded the stop, which was initiated at approximately 4:00 p.m. (TR. 68-69, Exs. 1-2 [Inv. Eads], Ex. 4 [Sgt. Wineinger]). Sgt. Wineinger asked Ms. Reiman why she did not pull over, and she replied she had "never seen lights like that before." (Ex. 4 at 2:20-2:30). Inv. Eads advised Ms. Reiman and Defendant that Inv. Eads had stopped the vehicle because they were following "way too close to a semi." (Ex. 1 at 6:51-7:05).

Sgt. Wineinger asked Ms. Reiman to produce her license, registration, and insurance, which she "eventually" produced, and required her to exit the Buick to return to his patrol car. Sgt. Wineinger testified Ms. Reiman complied after "some convincing." Sgt. Wineinger testified he asked her sit in his patrol car because it is safer, it is difficult to "hear roadside on the interstate," and because he was concerned about her access to potential weapons in the vehicle or to evidence that could be destroyed. (TR. 69-70; Ex. 4 at 3:12-8:05). Inv. Eads likewise directed Defendant to step out of the vehicle, but Defendant refused. (TR. 26, Ex. 1 at 6:51-12:00). Inv. Eads also testified that for traffic stops on the interstate they generally "bring everyone back to our car." (TR. 47). Inv. Eads testified that as Ms. Reiman got out of the Buick, Defendant said to her, "Don't say fuckin' anything." (TR. 26-27, 46; see also Ex. 3 at 4:55-5:10). Inv. Eads testified that statement was cause for concern because "Normal people don't do that" unless they have something to hide. (TR. 28).

Inv. Eads spoke to Ms. Reiman in Sgt. Wineinger's Ford F150 about the traffic infraction of following too close as he processed her paperwork. Ms. Reiman stated, "she was trying for the aerodynamics of the -- of the truck for better gas mileage following behind the vehicle." (TR. 28; (Ex. 1 at 13:05-14:15). Inv. Eads asked Ms. Reiman about where they were coming from, and she replied they were from Omaha and were "helping a sister." Ms. Reiman replied she was married to the passenger, but when Inv. Eads asked for his name, she declined to answer, saying she does not want to "give any information unless he does." (Ex. 1 at 14:20-14:50).

4

After the "business of the stop" was completed, Inv. Eads returned Ms. Reiman's documents and asked her if there was anything illegal in the vehicle, such guns, knives, marijuana, methamphetamine, heroin, stolen property. Ms. Reiman denied having anything illegal. Inv. Eads then asked Ms. Reiman for consent to search the vehicle, which she denied. (Ex. 1 at 18:30-19:32). Inv. Eads told her to "sit tight" for a minute, and then talked to Sgt. Wineinger by the Buick to let him know she did not consent to search and to deploy his drug K-9, Riggs. Inv. Eads required Defendant to exit the vehicle and informed him he was being detained, and also let Ms. Reiman know they were going to run a police dog around the vehicle. (TR. 31, 48, 70; Ex. 1 at 19:32-21:30).

Sgt. Wineinger testified regarding his training and experience as a K-9 officer. Sgt. Wineinger has been a K-9 officer since 2008, and has recertified annually since completing his initial K-9 course training. (TR. 58-59). Sgt. Wineinger has also been certified as a K-9 trainer in both patrol and narcotics and as a K-9 evaluator, which means he has the authority to certify K-9 handler teams. He has also been certified as a K-9 judge in patrol and narcotics, and he is one of three such judges in the state. (TR. 59-60).

Sgt. Wineinger has been assigned Riggs since 2021. (TR. 89). Riggs had been recertified the month prior to the traffic stop. (TR. 60-61). Riggs is trained to detect the odors of marijuana, methamphetamine, cocaine, and heroin. (TR. 61). Sgt. Wineinger assisted with Riggs's initial training, although he was with another handler for two years prior to Sgt. Wineinger. (TR. 83-84). Riggs receives a toy as a reward in training both for correctly positively indicating, and for successfully refraining from indicating. (TR. 84-85). In a real world situation, Sgt. Wineinger verbally praises Riggs for a positive indication as a "confirmation that he did his required training." (TR. 85).

Sgt. Wineinger testified regarding how he deploys a K-9 during a traffic stop. Depending on the environment, Sgt. Wineinger typically tries to deploy the K-9 in a direction to see oncoming traffic to avoid "get[ting] hit by a car," and then works counterclockwise around the vehicle. (TR. 62). Sgt. Wineinger testified he will "initially let [Riggs] start sniffing on his own," and that Riggs will "move at head level [around] a vehicle." Sgt. Wineinger testified if Riggs "catches any odors on that initial [pass]," Sgt. Wineinger will "let the line play out [and] let [Riggs] follow it." If Riggs does not pick up an odor on the first pass, Sgt. Wineinger "will start to direct [Riggs]" to places where Sgt. Wineinger believed Riggs did not "g[e]t his nose into a particular seam or area,"

and "will typically direct [Riggs] high and low" on the next passes. (TR. 62). Sgt. Wineinger utilizes a long leash, and tries not to let his tension on the leash "interfere" or "influence" Riggs, and "allows [Riggs] to work an odor source on his own." (TR. 63).

Sgt. Wineinger testified drug canines have a "range of alert behaviors," and testified regarding Riggs's alerting behaviors when he is "in one of the four target odors he's been trained on." One of Riggs's alerting behaviors is when he goes "nasal," which is "when he goes from open-mouth sniffing to completely closed mouth[.]" (TR. 63, 103). Sgt. Wineinger testified Riggs also has a "head snap" alerting behavior, which is "[w]hen he wants to break away from my movement and go back to a location without any prompting from me[.]" (TR. 63). Sgt. Wineinger testified Riggs also has a "radar sweep behavior," which is when Riggs will do a "closed-mouth alert" in an area and "get nasally," then move past the area "a little bit, stop, [and] move past that area again . . . almost like he's trying to close in a box on where he's getting the strongest odor." (TR. 64).

Sgt. Wineinger testified that Riggs's trained final indication behavior after an alert is to "stop and focus on the strongest source of the odor that he can detect." If the source odor is at or near Riggs's head level, Riggs will "sit and focus on it." If the source odor is lower that head level, Riggs will lay down and focus on it. If the source odor is higher, Riggs "may go up and put his paws on something and stand and focus on it." When Riggs stops all movement, that indicates to Sgt. Wineinger that Riggs is demonstrating where he believes the strongest source of the odor of narcotics is comings from. (TR. 64). In training, Sgt. Wineinger has on occasion seen Riggs alert but not come to a final indication. (TR. 64-65).

Sgt. Wineinger testified regarding whether it is part of his "practice to ever indicate or encourage Riggs to stick his head inside of a vehicle:"

> A. The sticking the head inside of the vehicle to get into an odor cone, if that's what -- if I need him to direct into that odor cone, yes. That – that's part of training is to get where the most likely source of odor could be coming from. An open window is most likely going to be a strong source of odor for anything in the vehicle, but we do not train to have them follow up and jump into a vehicle, whether we give them a command to do it or whether they want to do it on their own. That's something we try and teach them to don't just jump into vehicles. If you -- if you get your odor source there and you fe- -- if you feel that's the source, you know, go to indication at that point.

(TR. 72). Sgt. Wineinger testified he trains K-9s not to jump into vehicles, but does not train them to refrain from putting their snouts in vehicles. (TR. 87-88).

6

In the two years Sgt. Wineinger has been working with Riggs, they have conducted "fifteen-plus" roadside narcotics sniffs. In that time, Sgt. Wineinger has seen Riggs "put his face or snout or head" through an open window of a vehicle. Sgt. Wineinger does not correct the behavior if "he's just putting his nose into the window," but does correct Riggs if he looks as if he is going to try to climb or jump into the vehicle. (TR. 89). This is because from Sgt. Wineinger's perspective, it is "fine" for Riggs to put his snout through the open window of a vehicle. (TR. 89-90). Sgt. Wineinger testified he would direct Riggs towards an open window because the "scent cone" would be stronger. (TR. 91).

During the traffic stop in this case, the adult occupants of the Buick were removed from the vehicle prior to Riggs's deployment. (TR. 26, 78). Defendant had left the passenger door open when he exited the vehicle, which Sgt. Wineinger closed prior to deploying Riggs, "[j]ust because of the inherent risk of if the dog were to follow his natural instincts and jump into a vehicle." Sgt. Wineinger "routinely" conducts his searches to prevent Riggs from entering vehicles due to safety concerns for the K-9. (TR. 71-72, 79). However, the driver's side window of the Buick remained rolled down. (TR. 75).

Sgt. Wineinger leashed Riggs and brought him to the Buick's front driver's side fender/door area. Sgt. Wineinger gave Riggs his "sniff command" and they began their counterclockwise pass around the car at approximately 4:17 p.m. (TR. 71; Ex. 4 at 17:18-30). Sgt. Wineinger initially gave Riggs three to four feet of leash. The first pass was head level. Sgt. Wineinger testified that when Riggs first went "from the front of the [driver's side] door to the back of the door, he started going nasal on that," but at that moment Inv. Eads "yelled out something," and Sgt. Wineinger lost his focus on Riggs. (TR. 73-74, 103).

After the first complete pass, Sgt. Wineinger wanted to direct Riggs to go "high" to "get him up into window seams" because window seams are "less protected than door seams" and provide more opportunities to detect odors. Sgt. Wineinger testified he directs Riggs "high and low" by raising his hand above Rigg's head to go high and below his head to go low; Sgt. Wineinger does "not touch the vehicle or any surface" and only directs Riggs's attention. (TR. 74-75). Sgt. Wineinger "directed [Riggs] high from the driver's side window to the . . . passenger's side doors." When they returned to the driver's side window, Sgt. Wineinger testified Riggs "went up high, went nasal up in the window, came down, worked on the door seam." (TR. 73, 93). During this first high pass, Riggs's nose went inside the open driver's side window and his paws touched the

side of the driver's door.  (Ex. 4 at 17:43-17:45).  Sgt. Wineinger testified he wanted Riggs to sniff the open window, and put his hand next to the open window to direct Riggs to sniff high, but testified he did not direct Riggs to sniff the inside the open window.  Sgt. Wineinger testified Riggs went into the open window "on his own" because he was "trying to get into the strongest source of odor," and that "Whether [Riggs] wants to stick his head in or not -- stick it in there is dependent on him and to whether he has a – any narcotics odor he's detecting." (TR. 75-76, 100, 102, 105).

Sgt. Wineinger testified Riggs moved past the window and then gave "a little radar" or head snap by returning to the window on his own without "any direction" from Sgt. Wineinger.  When Riggs went back to the open window, he stuck his nose through the window a second time.  (TR. 93; Ex. 4 at 18:00-05).  Riggs moved away from the window but then came back and put his nose through the window a third time.  (Ex. 4 at 18:05-12).  Sgt. Wineinger testified Riggs then took "kind of his final deep breath, and then he went to sit . . . and focus for his indication" on the beam between the B-pillar and the driver's door.  (TR. 73-74, 77; Ex. 4 at 18:12-23).  Sgt. Wineinger believed there "was at least one, if not two," occasions where Riggs stuck his snout through the open window prior to his "head snap" on the way back to where he gave his final indication.  (TR. 92).

After Riggs's final indication, Sgt. Wineinger reported the positive result.  He and Inv. Eads searched the Buick, recovering a baggie with methamphetamine residue, a black tote bag, and a water bottle that officers later discovered contained methamphetamine.  (TR. 77-78, 98).

Defendant indicated he wanted to speak to law enforcement, and he was transported to the Douglas County Sheriff's Office ("DCSO") for an interview.  (TR. 30).  The interview room was not equipped with a recording device because it was broken.[2]  (TR. 32).  Inv. Eads and Deputy Jesse Ronk interviewed Defendant.  Sgt. Wineinger did not talk to Defendant at any point after deploying Riggs, and was not involved in his interview.  (TR. 80).  Inv. Eads testified Defendant was uncuffed for the interview and was seated in the corner of the room.  Deputy Ronk was seated against the wall, and Inv. Eads was seated at the desk.  (TR. 33).  Inv. Eads testified he began the interview by reading Defendant a *Miranda* rights advisory, which Defendant acknowledged and signed.  Inv. Eads testified that, although Defendant "was upset at the time of the interview," he "wanted to cooperate."  (TR. 33-34; Ex. 5).  Inv. Eads testified that neither he nor anyone else made

---

[2] Since this interview apparently was not recorded, Inv. Eads' recitation of *Miranda* and Defendant's interview were not made part of the evidentiary record in connection with this motion to suppress.

Defendant promises, neither he nor Ronk threatened Defendant, and no one told Defendant his wife and child were being arrested. (TR. 34). Inv. Eads testified that prior to being transported to the DCSO for the interview, Defendant had watched officers release his wife and child from the scene of the traffic stop in their Buick. Inv. Eads testified the interview lasted approximately one hour, and Defendant answered their questions coherently and did not appear to be under the influence of anything. (TR. 35).

Defendant is charged in the Superseding Indictment with one count of possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and is charged with several co-defendants with conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. (Filing No. 61). Defendant has now filed the instant motion to suppress all physical evidence and statements obtained from the traffic stop. (Filing No. 231).

Defendant first argues the traffic stop was not supported by probable cause or reasonable suspicion that a traffic violation occurred. (Filing No. 232 at p. 3). Defendant further argues officers unduly and illegally prolonged the traffic stop without reasonable suspicion. (Filing No. 232 at pp. 4-5). Defendant next argues the K-9 deployment and sniff violated his Fourth Amendment rights, both because the sniff was procured during his "illegally prolonged seizure" and because the K-9 searched the interior of his vehicle when his nose passed into the open window of his vehicle. Defendant therefore asserts the subsequent warrantless search of the vehicle based upon the K-9's indication was unlawful. (Filing No. 232 at pp. 5-7). Finally, Defendant argues his Fifth Amendment rights were violated when "officers implemented a strategy of threatening [him] with the placement of his young child in State custody and the arrest of his wife on felony charges if he did not waive his constitutional rights and confess," and that physical evidence and statements flowing from such threats must be suppressed. (Filing No. 232 at pp. 7-9).

The Government responds officers lawfully initiated a traffic stop for what they reasonably believed was a traffic infraction of following too closely. The Government also contends officers developed reasonable suspicion of criminal activity prior the traffic stop after observing an occupant of the Buick engaging in activity consistent with a narcotics transaction. (Filing No. 261 at pp. 3-4). The Government asserts officers therefore had reasonable suspicion of criminal activity both to prolong the stop and to deploy the drug K-9. (Filing No. 261 at pp. 4-6). The Government concedes K-9 Riggs put his nose and snout through the open window of Defendant's vehicle during

the deployment; however, the Government maintains this was not a Fourth Amendment violation because it was Riggs's "instinctive action" and was done without direction from Sgt. Wineinger, citing *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007).  (Filing No. 261 at pp. 6-9).  The Government further argues that, even if the Court were to conclude Riggs's intrusion into the open window did constitute a Fourth Amendment trespass, exclusion of evidence is not warranted because probable cause existed to search the vehicle prior to that trespass and because *Lyons* has not explicitly been overruled so that officers' reliance on its holding was reasonable.  (Filing No. 261 at pp. 9-11).  Finally, the Government argues Defendant made voluntary statements after being advised of his *Miranda* rights.  (Filing No. 261 at pp. 12-13).

## ANALYSIS

### I.     Traffic Stop of the Buick and Defendant's Detention

Defendant challenges both the initial stop of his Buick and his continued detention for deployment of the drug K-9, arguing both were unsupported by reasonable suspicion in violation of the Fourth Amendment.  (Filing No. 232 at pp. 3-5).  The Government asserts, and the undersigned magistrate judge agrees, that the traffic stop was supported by two separate lawful bases.  (Filing No. 261 at pp. 3-6).  First, law enforcement had probable cause to stop the Buick for the traffic violation of following too close.  Second, law enforcement had reasonable suspicion that an occupant of the Buick had engaged in a drug transaction in the Walgreens parking lot.

It is well established that "a traffic violation—however minor—creates probable cause to stop the driver of a vehicle."  *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)).  Probable cause for a traffic stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law."  *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013) (alteration in original) (quoting *United States Coney*, 456 F.3d 850, 856 (8th Cir. 2006)).  The question is not whether a traffic violation actually occurred, but is instead whether a reasonable officer would have believed that a traffic violation had occurred.  See *Gordon*, 741 F.3d at 876 (stating probable cause for a traffic stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law.") (alteration in original).

Nebraska law prohibits "follow[ing] another vehicle more closely than is reasonable and prudent."  Neb. Rev. Stat. § 60-6,140(1).  While the statute contains no specific criteria for

assessing whether a driver's following distance is reasonable, "when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent." *United States v. Banks*, 43 F.4th 912, 917 (8th Cir. 2022) (citing *United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006)).

In this case, Inv. Eads testified he initiated a traffic stop of Defendant's Buick for following a semitruck too close.  Inv. Eads testified he was following Defendant's Buick on the interstate traveling at approximately 55 to 60 mph, and that based upon his visual observations, Defendant's Buick was "within two seconds" of the semitruck.  Inv. Eads testified the general rule of thumb for a safe distance is "two to three seconds."  Inv. Eads testified he initiated the traffic stop after he observed the Buick following a semitruck so close that the Buick had to brake to "avoid a collision." The body camera footage from the traffic stop reflects that Inv. Eads informed the driver of the Buick that she was pulled over for the violation of following a semitruck too close.  The driver did not object to the reason for the stop, but instead seemingly acknowledged and explained why she may have been too close to the semitruck.  Although there is no video recording of this traffic violation, after review of the evidence and testimony, the undersigned magistrate judge finds Inv. Eads's testimony is credible regarding his observations of this traffic violation.  See *United States v. Mendoza*, 677 F.3d 822, 827-28 (8th Cir. 2012) (discussing that the credible testimony of an officer regarding observations of a traffic violation is sufficient to satisfy the government's burden to show probable cause or reasonable suspicion for the stop).  Accordingly, the undersigned magistrate judge finds Inv. Eads had a "reasonable basis" for believing the driver of the Buick committed the traffic violation of following too close, providing probable cause to initiate a traffic stop.  See *Gordon*, 741 F.3d at 876; *Banks*, 43 F.4th at 917.

In addition to the traffic violation, officers separately had reasonable suspicion to stop the Buick for a suspected drug transaction based on their investigation and surveillance prior to the stop.  "A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  "This includes the right to 'briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity.'" *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 226 (1985)).  Courts "consider the totality of the circumstances when determining whether an officer has a particularized

and objective basis to suspect wrongdoing." *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *Winters*, 491 F.3d at 921 (quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th Cir. 1997)).

In this case, Defendant's Buick first came to the attention of task force officers during a larger investigation into a Mexican drug-trafficking organization operating in Omaha. Prior to the stop, task force officers had been surveilling the residence of a known drug courier after he sold two pounds of methamphetamine to an undercover officer during two undercover buys. During that surveillance, task force officers followed the drug courier from his residence to a Walgreens parking lot in Omaha. Almost immediately after the drug courier parked his vehicle, surveilling officers observed Defendant's Buick arrive at the Walgreens parking lot, and then watched Defendant exit the Buick holding a drawstring bag and get into the drug courier's vehicle for "less than a minute or two" before returning to the passenger side of the Buick. Surveilling officers then saw both vehicles leave the parking lot and go their separate ways. Ofc. Garrity testified he observed the arrivals and departures of both vehicles from the parking lot, and at no point did a party from either vehicle entered the Walgreens. Experienced law enforcement officers testified that the above conduct is typical of a narcotics transaction, and that based on their observations, they were "certain" a drug deal had just occurred. See *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) ("In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."). The totality of these circumstances, particularly given the training and experience of the officers involved, provided an objective and particularized basis to believe the occupants of the Buick were engaged in drug activity and provided another lawful basis for the stop.

Defendant next suggests his detention "went beyond the scope of a legitimate traffic stop" and that officers "unduly prolonged the stop." Defendant asserts that absent his "illegally prolonged detention . . . no canine sniff would have occurred." (Filing No. 232 at pp. 5-6). Whether the duration of a traffic stop is reasonable under the Fourth Amendment "is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting *Rodriguez v.*

*United States*, 575 U.S. 354, 357 (2015)).  "What matters is whether officers prolonged the stop 'beyond the time needed to complete the purpose of the stop.'" *United States v. Rutledge*, 61 F.4th 597, 602 (8th Cir. 2023).  Here, law enforcement's stop of Defendant's Buick was supported not only by the traffic violation, but also by reasonable suspicion to investigate the apparent drug transaction. The question therefore becomes whether law enforcement detained Defendant longer than necessary to carry out both of these "missions."  The undersigned magistrate judge concludes they did not.

Review of the testimony and body camera footage reflect law enforcement officers' actions and questions during the encounter were directed toward investigating the two missions.  Inv. Eads told Ms. Reiman about the traffic violation, asked her for her for her license and the Buick's documents, asked her about where they had been going, and requested the occupants exit the Buick during the duration of the stop (with only Ms. Reiman complying).  See *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008) ("After stopping a vehicle, an officer has the authority to ask the driver what his or her destination and purpose is, check the driver's license and registration, or request that the driver step out of the vehicle.").  Officers initiated the stop at approximately 4:00 p.m., and by 4:15 p.m. Inv. Eads had requested, but been denied, consent to search the vehicle.  Sgt. Wineinger was already on the scene with his K-9 Riggs, who was initially deployed at approximately 4:17 p.m., and completed his deployment around the vehicle just after 4:18 p.m. (Ex. 4 at 17:21-18:20).  The approximate eighteen minutes from the beginning of the stop to the completion of the deployment of the drug canine was well within the reasonable range for this investigation into the two "missions" of the stop.  See *United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023) (finding 27 minutes from the stop until the dog's alert did not violate the Fourth Amendment because law enforcement "acted diligently to pursue the mission of the stop: to assist with the investigation of [the defendant's] drug-related activity."); *Magallon*, 984 F.3d at 1279 ("[A]ddressing the suspicion of drug activity require[s] time.").  Therefore, the undersigned magistrate judge finds law enforcement did not violate Defendant's Fourth Amendment rights by his detention in this case, and the dog sniff was not a product of a any unlawful detention.  See *United States v. Rose*, 124 F.4th 1101, 1106 (8th Cir. 2025) ("[A]s long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful.").

## II.        The Dog Sniff and Probable Cause to Warrantlessly Search the Buick

The heart of Defendant's motion to suppress, and the issue on which the parties provided supplemental briefing, concerns whether Defendant's Fourth Amendment rights were violated when K-9 Riggs repeatedly put his nose through the open window of the vehicle during his deployment, and if so, whether the evidence obtained from the search after Riggs's positive indication following those intrusions should be suppressed.  See Filing No. 313; Filing No. 328.

"The use of a well-trained narcotics dog around the exterior of a vehicle that has been lawfully stopped 'does not expose noncontraband items that otherwise would remain hidden from public view,' . . . and 'generally does not implicate legitimate privacy interests.'" *United States v. Pulido-Ayala*, 892 F.3d 315, 318 (8th Cir. 2018) (quoting *United States v. Place*, 462 U.S. 696, 707 (1983) and *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)).  As such, "[t]he use of the drug-sniffing dog on the exterior of a vehicle during a valid traffic stop" is not a search and "does not infringe upon any Fourth Amendment rights." *Id.* (quoting *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005)).  "The inside of a car, however, is typically a different story.  Police ordinarily cannot search the interior of an automobile unless they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* (citing *California v. Carney*, 471 U.S. 386, 392 (1985); *United States v. Ross*, 456 U.S. 798, 823 (1982)).  Because "[a] drug dog is an instrumentality of the police," its actions as "an instrument or agent" of the government are governed by the Fourth Amendment.  See *id.* (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989)).

The Government relies on *United States v. Kelvin Lyons*, 486 F.3d 367 (8th Cir. 2007) to support its position that Riggs's intrusion into the Buick did not violate the Fourth Amendment. (Filing No. 261; Filing No. 328).  In *Kelvin Lyons*, a drug canine deployed during a traffic stop stuck his head through an open passenger-side window of the vehicle and then sat down beside that door in his final indication. *Kelvin Lyons*, 486 F.3d at 370.  The Eighth Circuit discussed that the canine officer had not created the opportunity for the canine to breach the interior of the vehicle because the defendant had rolled the window down on his own during the stop, and left the window down when he exited the vehicle. *Id.* at 373.  The officer did not have an "affirmative duty" to instruct the defendant to roll up the window and he did not direct the drug canine to stick his head through the window during the deployment.  In concluding the district court properly denied the defendant's motion to suppress evidence obtained as a result of the dog sniff, the Eighth Circuit

14

stated, "Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *Id.* (citing *United States v. Michael Lyons*, 957 F.2d 615 (8th Cir. 1992) (concluding a drug canine's "instinctive action" in tearing open a package after positively alerting to the odor of narcotics within the package did not constitute a search because the dog did so without prompting from his handler).

The Government asserts *Kelvin Lyons* has never explicitly been overruled and contends the facts of this case are similar, warranting the same outcome. Specifically, Ms. Reiman rolled down the Buick window unprompted and left it open after she exited the vehicle, so law enforcement did not create the opportunity for Riggs to breach the interior of the vehicle. And, while Riggs did put his snout through the Buick's open window into the interior of the Buick more than once prior to coming to a final indication, the Government asserts the evidence shows this was an instinctive action to locate the strongest source of the odor done without direction by Sgt. Wineinger. Because Riggs acted instinctively without police misconduct, the Government contends his actions did not violate the Fourth Amendment under *Kelvin Lyons*. (Filing No. 328 at pp. 9-10).

Defendant counters that, to the extent *Kelvin Lyons* is still good law, the facts of this case are distinguishable. Defendant argues Sgt. Wineinger repeatedly directed Riggs to the open window to sniff, and that the evidence establishes K-9 Riggs's unlawful intrusions into the window were not only the result of his training, but were also anticipated and encouraged by Sgt. Wineinger. (Filing No. 313 at pp. 4-6). Defendant further asserts *Kelvin Lyons* is no longer good law, directing the Court's attention to two United States Supreme Court decisions issued after *Kelvin Lyons*, and one Eighth Circuit Court of Appeals decision: *United States v. Jones*, 565 U.S. 400 (2012); *Florida v. Jardines*, 569 U.S. 1, 133 (2013); and *Pulido-Ayala*, 892 F.3d 315. (Filing No. 313 at p. 9). The Government does recognize there is reason to doubt whether the precedential value of *Kelvin Lyons* endures after *Pulido-Ayala*, 892 F.3d 315. (Filing No. 328 at pp. 10-11).

The Eighth Circuit has indicated *Kelvin Lyons* may no longer hold precedential value. In *Pulido-Ayala*, a drug canine deployed during a traffic stop jumped into the defendant's vehicle and positively alerted. The district court, citing the two *Lyons* cases, denied the defendant's motion to suppress evidence obtained from the drug canine's alert after concluding there was no search because the drug dog's intrusion into the interior of the vehicle was done "instinctively" without direction by his handler. See *Pulido-Ayala*, 892 F.3d at 319; see also *Kelvin Lyons*, 486 F.3d at 373 ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth

Amendment."). On appeal, the defendant in *Pulido-Ayala* argued that when police utilize a drug canine, and the dog enters a citizen's vehicle, the police have conducted a "search" within the Fourth Amendment, regardless of the officer's subjective intent. The Eighth Circuit recognized its prior decisions suggest that if there is no "police misconduct," then the "instinctive action" of a trained police canine to enter a car does not violate the Fourth Amendment. *Id.* However, the Eighth Circuit also recognized "[t]here is reason to doubt" whether the district court's reading of the *Lyons* cases—that "the officers' intent is dispositive"—endures because "the Supreme Court has emphasized that with two 'limited exception[s]' for special-needs and administrative searches, the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment." *Pulido-Ayala*, 892 F.3d at 319 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736-37 (2011)). The Eighth Circuit further pointed out that in *Michael Lyons*, the inevitable discovery doctrine separately justified admitting evidence of the package's contents because probable cause to search existed upon the drug canine's positive alert prior to his tearing open of the package. *Pulido-Ayala*, 892 F.3d at 319 (discussing *Michael Lyons*, 957 F.2d at 617). Likewise, in *Kelvin Lyons*, the court "concluded that the challenged search inevitably would have occurred based on independent probable cause, even if the drug dog had not instinctively entered the defendant's vehicle." *Id.* (discussing *Kelvin Lyons*, 486 F.3d at 373-74). Ultimately, the Eighth Circuit in *Pulido-Ayala* concluded it "need not explore the problem further" because it also concluded officers had probable cause to search the vehicle before the drug canine jumped inside of it. *Id.*

As recently as April 15, 2025, the Eighth Circuit has seemingly reaffirmed its statement in *Kelvin Lyons* that, "Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *United States v. Munoz*, No. 24-1573, 2025 WL 1109418, at *2 (8th Cir. Apr. 15, 2025) ("Because the dog acted instinctively, his contact with the car did not violate the Fourth Amendment.") (quoting *Kelvin Lyons*, 486 F.3d at 373). At the same time, the Eighth Circuit again recognized it has since "cast doubt on the dog-instinct versus officer-conduct distinction because 'the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment.'" *Id.* (quoting *Pulido-Ayala*, 892 F.3d at 319). But, as in *Pulido-Ayala*, the Eighth Circuit in *Munoz* stated it did not need to conclusively decide the issue because it determined "when, as here, 'the dog's alert alone, without' the instinctive act 'would

have given [officers] probable cause to search . . . the inevitable discovery doctrine justifies[s] admitting evidence." *Id.* (quoting *Pulido-Ayala*, 892 F.3d at 319).

The two Supreme Court cases cited by Defendant and decided after the *Lyons* cases—*Jones* and *Jardines*—also leave the status of *Lyons* in question. In *Jones*, the Supreme Court found that law enforcement's attachment of a GPS tracker to the underside of the defendant's vehicle amounted to a common-law trespass onto the defendant's property such that an unreasonable warrantless search had occurred; this was because "The Government physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404. In *Jardines*, the Supreme Court found the warrantless deployment of a drug canine on a homeowner's porch was an unreasonable search because "[t]he officers were gathering information . . . in the curtilage of the house, which we have held enjoys protection as part of the home itself," and that information was gathered "by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at 5-6. Defendant maintains that under *Jones* and *Jardines*, Riggs's entry into the Buick's open window into the interior of the vehicle was a trespass with intent to obtain information, and was therefore a warrantless and unreasonable search in violation of the Fourth Amendment. (Filing No. 313 at pp. 7-9).

Following *Jones*, *Jardines*, and *Pulido-Ayala*, a handful of cases in the Northern District of Iowa have concluded the "dog-instinct versus officer-conduct distinction" set forth in the *Lyons* cases is not determinative when a drug canine breaches the interior of a vehicle during deployment. Instead, these district courts have concluded that because a drug canine is an instrumentality of the police, the government conducts a warrantless, unreasonable search when the drug canine is allowed to penetrate an open vehicle window for the purpose of obtaining information, regardless of whether the dog acted instinctively without direction from law enforcement. See *United States v. Buescher*, 691 F. Supp. 3d 924 (N.D. Iowa 2023); *United States v. Handley*, No. 23-CR-57-CJW-MAR, 2024 WL 1536750, at *7 (N.D. Iowa Apr. 9, 2024); *United States v. Newberry*, No. CR24-1026-LTS-MAR, 2024 WL 4892519, at *2 (N.D. Iowa Nov. 26, 2024). The undersigned magistrate judge generally finds the reasoning and explanation in these decisions is persuasive in light of *Jones*, *Jardines*, and *Pulido-Ayala*. While the use of a drug sniffing on the exterior of a vehicle during a valid traffic stop is not a search, a dog physically sniffing the interior of the vehicle appears to be a physical trespass to gather information, which is violative of the Fourth Amendment under *Jones* and *Jardines*. As such, K-9 Riggs's repeated intrusion of his snout into the Buick's

open window, regardless of whether it was an instinctive action done without direction from Sgt. Wineinger, amounted to a warrantless physical trespass into the interior of the defendant's car for the purpose of gathering information, and is violative of the Fourth Amendment.

Nevertheless, the undersigned magistrate judge finds that law enforcement had probable cause to search Defendant's Buick before Riggs first entered the open window. "[I]t is uncontroversial that if police had probable cause to search the car before the dog entered the interior, then any search effected by the entry was permissible. No warrant is required to search a car with probable cause." *Pulido-Ayala*, 892 F.3d at 319 (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925)). "A police officer has probable cause to conduct a search when 'the facts available to him would warrant a person of reasonable caution in the belief' that contraband or evidence of a crime is present." *United States v. Rose*, 124 F.4th 1101, 1106 (8th Cir. 2025) (quoting *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015); *Florida v. Harris*, 568 U.S. 237, 243 (2013)). "In determining whether an officer had probable cause to search, courts apply a common sense approach and consider all relevant circumstances." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) (citing *United States v. Gleich*, 397 F.3d 608, 613 (8th Cir. 2005)). The "probable cause inquiry is always fact specific." *United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024) (quoting *United States v. Tuton*, 893 F.3d 562, 571 (8th Cir. 2018)).

"A dog is presumptively reliable at detecting illicit drugs—and its alert establishes probable cause for a search—if the dog has satisfactorily completed a bona fide certification or training program." *Id.* (citing *Harris*, 568 U.S. at 246-47). "Every dog is unique, and a dog that smells illicit drugs is not required to communicate with its handler in any specific way. *Id.* (citing *United States v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014)). To determine "whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search[,] [t]he appropriate inquiry is 'whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.'" *Holleman*, 743 F.3d 1152 (8th Cir. 2014) (quoting Harris, 568 U.S. at 248 (2013)). "The court evaluates a dog-sniff case, like any other probable-cause case, 'under the totality of the circumstances.'" *Collier*, 116 F.4th at 761 fn. 3 (quoting *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007)).

In this case, Defendant does not challenge the reliability of Riggs himself, (TR. 129-130), and the record establishes that Riggs is trained and certified to detect the odors of marijuana,

18

methamphetamine, cocaine, and heroin. Sgt. Wineinger testified that Riggs was satisfactorily trained in narcotics detection, they recertified every year, and Riggs had recently recertified in narcotics detection the month before the stop. Sgt. Wineinger also testified regarding his own training and significant experience as a K-9 officer. Sgt. Wineinger is certified as a K-9 trainer in both patrol and narcotics and as a K-9 evaluator, which means he has the authority to certify K-9 handler teams, and he is also one of three certified K-9 judges in patrol and narcotics in the state.

As part of his significant K-9 training and experience, Sgt. Wineinger knows drug canines have a "range of alert behaviors," and testified regarding Riggs's alerting behaviors when he is "in one of the four target odors he's been trained on." One of K-9 Riggs's alerting behaviors is when he goes "nasal," which is "when he goes from open-mouth sniffing to completely closed mouth" to "focus more air or all the air coming through his nasal cavity." (TR. 63, 103-104). Sgt. Wineinger testified that, on K-9 Riggs's first pass around the vehicle, he "started going nasal" on the seam between the driver's side and passenger side door as he first approached. (TR. 74). Sgt. Wineinger testified this was Riggs displaying his alerting behavior, which he "typically see[s] . . . [w]hen he starts to get into one of his target odors[.]" (TR. 103-104). Sgt. Wineinger testified Riggs displayed this alerting behavior before going into the open driver's window. (TR. 104). It was only after this alerting behavior that Sgt. Wineinger directed Riggs to "go high" on the second pass, after which Riggs got onto his hind legs and put his snout through the open window for the first time.

Standing alone, Riggs's alert without a final indication is likely insufficient to establish probable cause. But, *all* the facts surrounding K-9 Riggs's alert are considered and "viewed through the lens of common sense," when determining whether those facts "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." See *Holleman*, 743 F.3d at 1158. As discussed above, prior to stopping the Buick, law enforcement had observed what they were "certain" was a drug deal between Defendant and a known methamphetamine seller in a Walgreen parking lot. Then, when Inv. Eads and Sgt. Wineinger attempted to initiate a traffic stop of the Buick, the Buick did not immediately pull over and kept driving for one-and-a-half to two miles, despite the two separate officers activating their lights, sirens, and air horn. Inv. Eads testified this delay in pulling over caused him concerns the occupants "could be hiding evidence, destroying evidence," particularly after observing the apparent drug transaction. Then, as Ms. Reiman was exiting the Buick Defendant told her, "Don't say fuckin'

19

anything," causing Inv. Eads further concern that there was criminal activity afoot that the occupants of the Buick were trying to hide. The totality of these circumstances, combined with Riggs's alert "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." See *Pulido-Ayala*, 892 F.3d at 318-19 (concluding the "strong reaction of the trained drug dog while outside the car" together with the defendant's previous suspicion reaction at a drug check point, "police had probable cause to believe that the vehicle contained contraband in the moment before [the drug canine] actually crossed the threshold into the interior of the [vehicle]."); *Tuton*, 893 F.3d at 571 ("In *Holleman*, we rejected the contention that a final indication is required to establish probable cause."). Accordingly, because law enforcement had probable cause to search the Buick before K-9 Riggs ever entered its interior, evidence obtained from the subsequent warrantless search does not need to be suppressed. See *Pulido-Ayala*, 892 F.3d at 319.

### III. Defendant's Statements

Defendant also "moves to suppress all evidence (physical and statements) which were coerced by explicit and implicit threats to arrest Defendant's wife and place his young daughter in State custody, none of which was cured by *Miranda* advisements." (Filing No. 231). Defendant asserts "officers implemented a strategy of threatening [Defendant] with the placement of his young child in State custody and the arrest of his wife on felony charges if he did not waive his constitutional rights and confess." (Filing No. 232 at p. 8). Defendant argues that despite being provided a *Miranda* rights advisory, his statements were involuntary due to the "coercive" nature of the interrogation. (TR. 4-6). Defendant therefore requests "[s]uppression of [his] custodial statements subsequent to these threats." (Filing No. 232 at p. 9).

*Miranda* warnings are required when an individual has been subjected to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). Although the requirement that a *Miranda* warning be given does not dispense with the voluntariness inquiry, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001) (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)). The central question in evaluating voluntariness "is whether the defendant's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting

*Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); see also *United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022).  To answer that question, the court examines "both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023) (quoting *Sandell*, 27 F.4th at 630). "[T]he degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition" are all relevant factors. *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)).  "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Magallon*, 984 F.3d at 1284 (quoting *LeBrun*, 363 F.3d at 724).

The briefing and arguments offered by the parties indicate that Defendant seeks to suppress statements he made during a custodial interview after being advised of *Miranda*.  However, the actual recitation of *Miranda* and Defendant's statements and interview were not offered as evidence in this matter.  The Government did provide a signed *Miranda* waiver (Ex. 5), but the Court does not have the benefit of reviewing the circumstances under which they were given.  Instead, Inv. Eads testified regarding the circumstances of the interview.  According to his testimony, two officers interviewed Defendant at a DCSO interview room.  Defendant was not handcuffed, and Inv. Eads read his *Miranda* rights, which Defendant acknowledged and waived.  Inv. Eads testified that, although Defendant "was upset at the time of the interview," he "wanted to cooperate."  Inv. Eads testified that neither he nor anyone else make Defendant promises, neither he nor the other officer threatened Defendant, and no one told Defendant his wife and child were being arrested. Inv. Eads testified that prior to being transported to the DCSO for the interview, Defendant had watched officers release his wife and child from the scene of the traffic stop in their Buick.  Inv. Eads testified the interview lasted approximately one hour, and Defendant answered their questions coherently and did not appear to be under the influence of anything.  (TR. 35).  The undersigned magistrate judge has also reviewed the body camera footage contained in Exhibits 1-4 offered as evidence in this matter, and notes that it does not contain evidence of threats, strong arm tactics, or other coercive tactics that would render Defendant's subsequent in custody statements following a *Miranda* advisement involuntary.  Based on the record before it, there is no evidence to conclude

Defendant's "will and capacity for self-determination" were overborne requiring suppression of custodial statements. See *LeBrun*, 363 F.3d at 726. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that Defendant's Motion to Suppress (Filing No. 231) be denied.

Dated this 5th day of May, 2025.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.