IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No 8:23CR215 |
| Plaintiff, | **DEFENDANT'S OBJECTIONS TO FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS** |
| v. | |
| JADEN REIMAN, | |
| Defendant. | |

COMES NOW the Defendant, Jaden Reiman, by and through counsel, Michael Wilson, and hereby requests this Court to consider the following objections to the Findings and Recommendation, (Filing No. 348), regarding his Motion to Suppress.  (Filing No. 231).

## I.    FACTUAL BACKGROUND/OBJECTIONS

The Background section of the Findings and Recommendation provides a chronology of events relevant to Reiman's motion to suppress.  (S*ee* Filing No. 348 at 2-10).

Reiman objects to the following factual findings in the Findings and Recommendations.

> **A. The officers' body camera footage established that drug dog Riggs sniffed the Buick for a fraction of a second while Sgt. Wineinger's attention was focused elsewhere but did not "alert" within the meaning of "alert" as described in Sgt. Wineinger's testimony.**

Based on testimony from Sgt. Wineinger, the Findings and Recommendation concluded that drug dog Riggs, before his first intrusion into the Buick, performed an "alert without a final indication" in the very brief moment at the beginning of his sniff procedure, when Sgt. Wineinger initially approached the Buick with Riggs. (Filing No. 348, at 19-20). Reiman objects to this factual finding.

**B. Neither the video evidence on the body cameras of both Sgt. Wineinger and Inv. Eads nor the testimony of Sgt. Wineinger support a finding that Riggs "alerted" at the very beginning of his sniff procedure.**

While the body camera footage of Sgt. Wineinger does not capture video of Riggs' behavior in the fraction of a second that Riggs was near the Buick driver's window prior to beginning the sniff procedure, it can be viewed in conjunction with the video taken by Inv. Eads' body camera at the same moment in time to provide context showing no change in behavior by Riggs. Moreover, audio taken by Sgt. Wineinger's body camera does not support a finding that Riggs demonstrated the "nasal breathing" described by Sgt. Wineinger on redirect examination more generally as an "alert." (TR. 104) Reiman objects to the factual finding that Riggs displayed an "alert" in the fraction of a second that he initially approached the open window of the Buick.

Sgt. Wineinger's body camera video shows him retrieve Riggs from the police vehicle and approach the front driver's side of the Buick with Riggs' leash in his left hand, his body located between Riggs and the Buick. (Ex. 4 at 17:11-29). This

initial approach with Riggs is visible in Inv. Eads' body camera video.  (Ex. 1 at

21:30-34).  Upon his arrival at the Buick, Sgt. Wineinger points to the bottom of the

open window and says "yep," followed immediately by "What?" as he turns his

attention (and his body) toward Inv. Eads, who can be seen standing approximately

two car lengths away, directing traffic  (Ex. 4, at 17:30).  Sgt. Wineinger next

immediately said "Oh, OK"; he never stopped moving during this exchange for more

than a fraction of a second.  (Ex. 4 at 17:31).

Within one second of when Sgt. Wineinger pointed at the bottom of the open

window, he had already moved away from the driver's open window and approached

the rear of the Buick with Riggs close by.  (Ex. 4 at 17:30-31).  The lack of time for

Riggs to do anything at the driver's door of the Buick is reinforced by Inv. Eads'

video, which demonstrated where Sgt. Wineinger and Riggs were located at the

moment Inv. Eads distracted Sgt. Wineinger with his first statement that he would

monitor the vehicle traffic.  (Ex. 1 at 21:32).  Based upon how quickly the verbal

exchange and Sgt. Wineinger's movement away from the driver's door occur, Riggs

could not have been near the front driver's door of the Buick for more than a

fraction of a second.

Importantly, the audio captured by Sgt. Wineinger's body camera picks up

the sounds of Riggs being "nasal," (TR. 73), at various points after his initial

trespass into the Buick, particularly when Riggs' snout is in or near the open

window leading up to his final indication.  (Ex. 4 at 17:44; 18:01-20).  However,

there is no sound coming from Riggs at the moment relied upon in the Findings and

Recommendation.  (Ex. 4 at 17:29-30).  Both the video and audio captured by the body cameras of both Sgt. Wineinger and Inv. Eads failed to contradict Sgt. Wineinger's testimony that Riggs alerted in any meaningful way in the one second that Riggs was near the driver's open window upon his initial approach to the Buick.

This fact finds further support in Sgt. Wineinger's initial testimony about this moment.  When first asked to describe what happened during the sniff procedure, Sgt. Wineinger did not testify as to a meaningful alert occurring upon his initial approach to the Buick with Riggs.  (TR. 73).  During that testimony, it was only upon the pair's return to the driver's side window and Sgt. Wineinger's direction to go "high" to the open window that Riggs "went up high, went nasal up in the window, came down, worked on the door seam.  Giving a little – he gave me a little radar."  (TR. 73).  After that, Wineinger described Riggs coming back to the window again, going "back into that window," taking "his final deep breath," then delivering his final indication.  (TR. 73-74).

Only after this testimony did the Government ask the question, "And when Riggs first approached the window, was he giving you any alerts?"  (TR. 74).  Sgt. Wineinger responded that, "when we got from the front of the door to the back of the door, he started going nasal on that."  (TR. 74)  This is the precise moment that Inv. Eads distracted Wineinger, who "lost [his] focus on Riggs and looked" away.  (TR. 74).  Most importantly, Wineinger did not testify to seeing anything definitive.  Rather, he testified that he "started to see an alert, *but [Riggs] continued past that.*

4

So we worked around for that first lap.  And *after that first lap*, I started to see alerting behavior that I could – that I was focused on."  (TR. 74) (emphasis added).  It was at the beginning of the second lap that Riggs' first intrusion occurred, as shown in the body camera footage and as testified to by Sgt. Wineinger.  (TR. 73; Ex. 4 at 17:44).

Following a recess that occurred prior to cross-examination, (TR. 81), the Government revisited on redirect examination the issue of whether Riggs alerted upon his initial approach to the Buick's driver door.  The Government specifically asked Wineinger, "Prior to Riggs first coming upon this open window during this deployment, was he indicating any alerting behavior?"  (TR. 103).  Sgt. Wineinger claimed that when they "first started," Riggs "started going nasal on [the rear passenger driver's side door seam] . . . for an instant."  (TR. 103)  But Sgt. Wineinger repeated his testimony that Inv. Eads distracted him from Riggs at that instant, and that Riggs "*didn't stop and stick with it*, so we continued on around the vehicle with the sniff."  (TR. 103) (emphasis added).

While Sgt. Wineinger eventually answered "Correct" to the Government's redirect examination question of whether Riggs alerted to him "that he was on to the odor of narcotics before even getting to that open driver's window," (TR. 104), all Sgt. Wineinger's prior testimony fell in line with what is seen in his and Eads' body camera footage:  that he did not see Riggs did engage in any behavior upon their first approach to the Buick that could be considered significant or an "alert."

Rather, the video and audio demonstrate no behaviors of the type described by Sgt. Wineinger, and Sgt. Wineinger was distracted at the time by Inv. Eads.

Reiman objects to the factual conclusion in the Findings and Recommendation that drug dog Riggs, before his first intrusion into the Buick, performed an "alert without a final indication" in the very brief moment at the very beginning of his sniff procedure, when Sgt. Wineinger initially approached the Buick with Riggs.  (Filing No. 348, at 19-20).

## II.   LEGAL OBJECTIONS

**A. Reiman objects to the legal conclusion in the Findings and Recommendation that Riggs' behavior when he "started going nasal on the seam between the driver's side and passenger side door as he first approached," sufficiently increased the likelihood of criminal activity beyond the threshold of probable cause to search the vehicle.**

The Findings and Recommendation concludes that "law enforcement had probable cause to search [Reiman's] Buick before Riggs first entered the open window."  (Filing No. 348, at 18).  It bases this legal conclusion on Sgt. Wineinger's testimony that Riggs, in the approximately one second when Riggs first approached the Buick, "'started going nasal on the seam between the driver's side and passenger side door as he first approached.'"  (Filing No. 348, at 19) (quoting (TR. 74).  According to the Findings and Recommendation, this very brief "alerting behavior" by Riggs, when added to (1) the police observations of a suspected drug

6

deal in a Walgreens parking lot, (2) the police observations of the Buick failing to immediately pull over such that they "could be hiding evidence destroying evidence," and (3) the police observations of Reiman telling his wife, "Don't say fucking anything," as she exited the vehicle, sufficiently increased the likelihood of criminal activity such that it established probable cause to search. (Filing No. 348, at 19-20). Reiman objects to this legal conclusion.

The Findings and Recommendation agree with Reiman that "K-9 Riggs' repeated intrusion of his snout into the Buick's open window, regardless of whether it was an instinctive action done without direction from Sgt. Wineinger, amounted to a warrantless physical trespass into the interior of [Reiman's] car for the purpose of gathering information, and is violative of the Fourth Amendment." (Filing No. 348, at 17-18). However, the Magistrate Judge never reached the issue of whether these Fourth Amendment violations warrant exclusion of evidence and/or statement because it found that Riggs' very brief, perhaps one second, "nasal" sniffing of a door seam between the driver's side front and rear doors took law enforcement from mere suspicion to probable cause to search. (Filing No. 348, at 18-19) Reiman objects to this legal conclusion as the applicable case law does not support a finding that this behavior alone, even if considered an "alerting behavior," sufficiently pushed the likelihood of criminal activity over the threshold of "probable cause."

The Magistrate Judge correctly noted that, "[t]o determine 'whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search[,] [t]he appropriate inquiry is 'whether all the facts surrounding a dog's alert,

viewed through the lens of common sense, would make a reasonably prudent person think that such a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.'" (Filing No. 348, at 18) (quoting *United States v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014) (quoting *Florida v. Harris*, 568 U.S. 237, 243 (2013))). The Findings and Recommendation concludes that the totality of the circumstances in Reiman's dog-sniff case support a finding that Riggs' "sniff [wa]s up to snuff" before the sniff ever truly began.

As discussed in detail in Section I of these Objections, *supra*, the Findings and Recommendation cites to Sgt. Wineinger's testimony that K-9 Riggs "'started going nasal' on the seam between the driver's side and passenger side door as he first approached." (Filing No. 348, at 19) (quoting TR. 74). It notes that going "nasal" amounts to "'go[ing] from open-mouth sniffing to completely closed mouth'" to "'focus more air or all the air coming through his nasal cavity.'" (Filing No. 348, at 19-20) (quoting TR. 63, 103-104). While it is true that Sgt. Wineinger testified that he "typically see[s]" this nasal sniffing when Riggs "starts to get into one of his target odors[,]" (TR. 103-104), the applicable case law does not suggest that Riggs' mere closed-mouth sniffing through his nasal cavity for about one second sufficiently elevated the officers' suspicions to probable cause to search.

As the Findings and Recommendation correctly acknowledged, "all the facts surrounding a dog's alert" must be "viewed through the lens of common sense . . . ." *Holleman*, 743 F.3d at 1156. The most Sgt. Wineinger could say about Riggs' open-mouthed versus closed-mouthed sniffing in the one second that Riggs was near the

8

driver's door prior to the trespasses was that he "started going nasal," not that

Riggs fully did so.  (TR. 74).  Sgt. Wineinger had to admit that this closed-mouth

sniffing lasted no more than an "instant," and that he was distracted from Riggs in

that instant by Inv. Eads.  (TR. 73-74, 103).  Moreover, Sgt. Wineinger made it clear

that Riggs "*didn't stop and stick with it*, so we continued on around the vehicle with

the sniff."  (TR. 103) (emphasis added).  Common sense dictates that, even if Sgt.

Wineinger observed the beginnings of an alerting behavior despite immediately

taking his attention away from it and moving around the car with Riggs, this

behavior did not sufficiently elevate the level of suspicion past the threshold of

probable cause.

Other case law does not suggest that approximately one second (or less) of a

drug dog "starting to" closed-mouth sniff a door seam in the initial seconds of a drug

sniff elevates a suspicious situation to one establishing probable cause to search a

vehicle.  Although "[s]ome courts have held a trained drug dog's 'alert,' as opposed

to the more conclusive 'indication,' is enough to establish probable cause,"

*Holleman*, 743 F.3d at 1156 (citing *United States v. Parada*, 577 F.3d 1275 (10th Cir.

2009), these cases require far more than a one-second, closed-mouth sniff of a door

seam.  Rather, officers must be "able to articulate specific, reasonable examples of

the dog's behavior that signaled the presence of illegal narcotics . . . ."  *Id.* (quoting

*United States v. Clayton*, 374 Fed.Appx. 497, 502 (5th Cir.2010)).

For instance, in *Holleman*, a police officer deployed his drug dog to sniff the

defendant's truck while it was parked in a hotel parking lot after a state trooper,

during a stop just minutes earlier, observed the defendant engaged in suspicious

behaviors, such as only opening his window one inch and sliding his documents

through the one-inch opening. *Id.* at 1154. He also provided hesitant answers

about his destination, gave "curious" statements about the purpose of his travel,

gave a different occupation compared with his purpose of travel, and displayed

nervous energy and heavy breathing. *Id.* at 1157-58. The defendant also declined

to give permission to search, but when the trooper attempted to deploy his drug dog

to sniff the vehicle, his drug dog was distracted by the smell of a dead animal

nearby. The trooper called ahead to a DEA officer, who followed the defendant's

truck until he parked in a hotel parking lot and radioed for a drug dog to come sniff

the truck.

After not alerting, indicating, or changing his behavior while sniffing the free

air around four other vehicles in the hotel parking lot, the drug dog "stop[ped] dead

in his tracks and be[gan] to really detail the area between the bed of the truck and

the cab of the truck." *Id.* at 1154. The K-9 officer described this reaction as an

"alert." *Id.* The K-9 officer next directed the drug dog to sniff the vehicle next to

the defendant's truck, but the drug dog "did not alert, indicate, or otherwise change

his behavior while sniffing that vehicle." *Id.* Upon the drug dog's return to the

defendant's vehicle and receipt of a direction to sniff again, the drug dog "'stopped

and detailed the same area as the first time.'" *Id.* Based on the drug dog's two

alerts (and presumably the defendant's suspicious behavior), officers obtained a

search warrant for the truck and found about 250 pounds of marijuana. *Id.*

10

The difference between the drug dog's "alerting behavior" in *Holleman* and Riggs' purported "alerting behavior" in Reiman's case are stark. To help establish probable cause for the search, the K-9 officer in Holleman articulated "specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics." *Holleman*, 743 F.3d at 1156 (quoting *Clayton*, 374 Fed.Appx at 502). These examples included the drug dog, on two separate occasions, "stop[ping] dead in his tracks" when he reached the passenger side of the defendant's truck. *Id.* at 1154. They also included the drug dog, again on two separate occasions, "really detail[ing] the area between the bed of the truck and the cab of the truck." *Id.* These specific examples of the drug dog's behavior in *Holleman* reasonably signaled the presence of illegal narcotics.

Quite the opposite, in Reiman's case, Sgt. Wineinger could not articulate specific, reasonable examples of Riggs' behavior that signaled the presence of illegal narcotics prior to Riggs' intrusions into Reiman's Buick. First, articulating anything about Riggs' specific behavior was difficult for Sgt. Wineinger because, for the approximately one second that Riggs may have engaged in closed-mouth sniffing, Sgt. Wineinger was distracted by Inv. Eads and looking away from Riggs. (TR. 73-74, 103; E4 at 17:30). The most Sgt. Wineinger could say was that he "started to see an alert, *but [Riggs] continued past that*. So we worked around for that first lap. And *after that first lap*, I started to see alerting behavior that I could – that I was focused on." (TR. 74) (emphasis added).

11

Common sense suggests that this singular example of testimony from Sgt. Wineinger categorized as "alerting behavior" in response to leading questions from the Government late in his redirect examination, (TR. 104), does not rise to the level of the articulable, reasonable alerting behavior seen in *Holleman*. A one-second (or less), closed-mouth sniff of a door seam is far removed from multiple instances of a drug dog stopping in its tracks, then engaging in "really detail[ed]" sniffing of a particular section of a target vehicle. *Holleman*, 743 F.3d at 1154. Under this analysis, it is unreasonable to base the elevation of the totality of the circumstances in Reiman's case from suspicious to probable cause for a search, as the Findings and Recommendation conclude.

Reiman objects to this legal conclusion. He asks this Court to sustain the objection and continue the legal analysis to its logical conclusion: that the Fourth Amendment violations identified in the Findings and Recommendation were not rendered harmless by any prior alerts by Riggs that somehow established probable cause to search Reiman's vehicle, and that all evidence and statements identified in Reiman's motions must be excluded.

> **B. Reiman objects to the legal conclusion in the Findings and Recommendation that "law enforcement had probable cause to search [Reiman's] Buick before Riggs first entered the open window."**

The Findings and Recommendation concludes that "law enforcement had probable cause to search [Reiman's] Buick before Riggs first entered the open

window." (Filing No. 348, at 18).  For the reasons discussed above,  Reiman objects to this legal conclusion, which flowed directly from the conclusion in the Findings and Recommendation that Sgt. Wineinger's testimony elevated the suspicion of criminal activity to a level satisfying probable cause to search Reiman's vehicle, prior to any of the trespasses committed by drug dog Riggs and Sgt. Wineinger.

Reiman objects to this legal conclusion.  He asks this Court to sustain the objection and continue the legal analysis to its logical conclusion:  that the Fourth Amendment violations identified in the Findings and Recommendation were not rendered harmless by any behavior by drug dog Riggs that somehow established probable cause to search Reiman's vehicle, and that all evidence and statements identified in Reiman's motions must be excluded.

## III.    CONCLUSION

Law enforcement searched and obtained physical evidence from the constitutionally protected space in Reiman's vehicle during an illegal search that followed multiple trespasses into the vehicle by K-9 Riggs, as directed and anticipated by Sgt. Wineinger.  An unlawful arrest flowed from the fruits of these Fourth Amendment violations, during which officers obtained statements from Reiman.  For the foregoing reasons, Reiman respectfully asks the Court to sustain his objections to the Findings and Recommendation (Filing No. 348), grant his motion to suppress, and exclude all evidence and statements taken from Reiman as a result of the illegal search, the illegal arrest resulting therefrom, and the questioning by law enforcement following the illegal search and arrest.

Respectfully submitted,
Jaden Reiman, Defendant

/s/ Michael J. Wilson
Michael J. Wilson, 24224
BERRY LAW FIRM
1414 Harney Street, Suite 400
Omaha, NE  68102
(402) 466-8444
michael.wilson@berrylaw.com
Attorney for Defendant


CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF systems which sent notification of such filing to all registered participants.


/s/ Michael J. Wilson
Michael J. Wilson, 24224